IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Case No. 1:20-cv-02148-CRC

**JANE DOE, M.D.,**

    Plaintiff,

      v.

**STEVEN L. LIEBERMAN,**
    in his official capacity as Acting Principal Under Secretary for Health,
    Department of Veterans Affairs, Veterans Health Administration,

**DISCIPLINARY APPEALS BOARD**,
    Department of Veterans Affairs, Veterans Health Administration, and

**EASTERN COLORADO HEALTHCARE SYSTEM,**
    Department of Veterans Affairs, Veterans Health Administration,

    Defendants.

_____

## AMENDED COMPLAINT
_____

## INTRODUCTION

    This case arises out of final administrative/agency action taken by Defendant Lieberman ("Undersecretary") approving and executing the decision of Defendant Disciplinary Appeals Board ("DAB") upholding the actions of Defendant Eastern Colorado Healthcare System ("ECHS") of the Department of Veterans Affairs ("VA"). The actions, decision and approval/execution sustained a charge of unprofessional conduct against Plaintiff Dr. Doe as alleged in five specifications. Further, they imposed the penalty of revoking the clinical privileges she held with ECHS and removing her from federal service as a full-time permanent VA employee.

    The VA process in general, including the adverse actions taken by ECHS against Dr.

Doe's privileges and employment, and the appellate proceedings and decision of the DAB as approved and executed by the Under Secretary in particular, have been egregiously corrupted by legal errors. Those errors include, *but are not limited to*, violating her due process rights by: refusing to allow Dr. Doe to present documentary evidence in her own defense; failing to provide her with details and circumstances in the form of names, dates, places, and other data constituting the basis for at least one of the specifications; refusing to allow her to present expert testimony by a previously-approved expert witness; not allowing her to impeach opposing witnesses through use of contradictory sworn deposition testimony; considering adverse information unrelated to any of the specifications in order to uphold them; imposing a summary suspension on her without explanation and extending it for almost six months in violation of VA policy; and the like.

If allowed to stand, the effect of the actions, decision and ultimate approval/execution will be to deprive Dr. Doe of the ability to practice medicine and permanently end her career as a physician. That will be the case because, under 42 U.S.C. §§ 11133 and 11134 of the Health Care Quality Improvement Act ("HCQIA"), they must be reported to the National Practitioner Data Bank ("NPDB") and to the Colorado Medical Board. If the former occurs, Dr. Doe – who, as a cardiac anesthesiologist and critical care physician must have clinical privileges to practice medicine and her medical specialties – will as a practical matter be unable to obtain privileges anywhere. In short, her career will be over.

## PARTIES

**P**LAINTIFF

1. Jane Doe, M.D., is a young physician who did her residency in anesthesiology at Jackson Memorial Hospital in Florida (2006-10), a fellowship at Harvard Medical School in anesthesiology and critical care (2010-11) and a further fellowship at the Texas Heart Institute in

cardiovascular anesthesiology (2013-14).  She is triple board-certified in anesthesiology (2011), critical care (2012) and advanced perioperative transesophageal echocardiography (2014).  She was employed at the VA pursuant to 38 U.S.C. § 7401 as a cardiac anesthesiologist and critical care physician from September 2014 until mid-February 2018 when she was summarily suspended.  That suspension continued until August 2018 when Dr. Doe was informed of proposals, and subsequently of actions, to revoke her clinical privileges and remove her from federal service on a charge of unprofessional conduct based on five specifications.  She then appealed that decision to the VA's DAB.

<u>**DEFENDANTS**</u>

2.   The ECHS summarily suspended Dr. Doe's clinical privileges on February 14, 2018. It followed that by imposing five additional automatic monthly suspensions.  Then, on August 20, 2018, it took the actions of revoking those privileges and removing her from federal service on a charge of unprofessional conduct based on the five specifications.

3.   The DAB was appointed in September 2018 by the VA's Under Secretary for Health to hear Dr. Doe's appeal of the ECHS actions.  It held a multi-day hearing in early December 2019 and issued its decision on January 15, 2020, upholding the five specifications, sustaining the charge of unprofessional conduct and recommending approval of the ECHS actions.

4.   Steven L. Lieberman, M.D., MBA, FACHE, is the Acting Principal Under Secretary for Health, Department of Veterans Affairs, Veterans Health Administration.   On March 9, 2020, he took final administrative/agency action approving and executing the DAB's decision .

### NATURE OF THE ACTION

5.   Plaintiff Dr. Doe brings this suit for judicial review under 38 U.S.C. § 7462(f) seeking declaratory relief to invalidate, and injunctive relief to prevent and restrain, implementation of

Defendants' above-referenced actions, decision and approval/execution, including reporting to the NPDB and Colorado Medical Board under 42 U.S.C. §§ 11133 and 11134.

## APPLICABLE LAW, JURISDICTION AND VENUE

6.   This Court has original jurisdiction over the subject matter of this action pursuant to 38 U.S.C. § 7462(f) (judicial review), 28 U.S.C. § 1331 (federal question), § 2201(a) (declaratory relief) and § 2202 (relief further to declaratory judgment).

7.   Venue for this action properly lies in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) (where substantial part of events or omissions giving rise to claim occurred).

## OPERATIVE FACTS

### CHRONOLOGY OF KEY EVENTS

8.   From fall 2014 through spring 2017, Dr. Doe received consistently favorable performance evaluations at ECHS, including such comments as:   "Doing well"; "Doing very well"; "Excellent"; and "a paragon of skill, knowledge and compassion for all."

9.   Historically, University of Colorado Medical School residents have rotated through the VA's ECHS, including its anesthesia service.   During the summer of 2017, however, there had been an exodus of ECHS staff due to the profound dysfunction of the anesthesia service, the Medical Director of Intensive Care had resigned from that leadership position, the Pain Clinic had been shut down and cancellation of elective surgery for veterans was anticipated due to understaffing of anesthesiologists.   Accordingly, in July 2017 Dr. Vesna Todorovic, Chief of the University's Anesthesiology Department, visited the VA to determine whether to suspend rotation of the Department's residents through ECHS until the anesthesia service became more stable.

10.   Also in late July 2017, Dr. Doe met with Dr. Harold Dillon (then-ECHS Deputy Chief of Staff) to raise concerns regarding the ongoing dysfunction of the Anesthesiology

Department, specifically the anesthesiologists' refusal to work post-call days which exacerbated the short staffing and contributed to cancellation of hundreds of veterans' scheduled surgeries.

11.   In early August 2017, Dr. Doe was assigned to supervise two new residents performing complex and high-risk procedures in their first month of anesthesiology training.   The assignment deviated from the universal standard of practice of academic hospitals across the country and internal department policy to assign only one new resident at a time to a physician in order to ensure adequate supervision.   Despite Dr. Doe's explicit request to revise this unsafe assignment of cases, the situation was not corrected.

12.   Also, on August 15, 2017, Dr. Doe was electronically evaluated by University residents.   The evaluation demonstrated that they valued her unique perspective, she took her commitment to teaching seriously and she made an effort to contribute to the residents' education. It included numerous positive, enthusiastic comments about her interactions with residents.

13.   Later in August 2017, Dr. Doe submitted a letter to ECHS leadership -- including the Chief of Staff (and, later, the official proposing Dr. Doe's privileges revocation and termination), Director (and, later, the official deciding Dr. Doe's privileges revocation and termination), Interim Chief of Anesthesiology, OIG, Department of Risk Management and Patient Safety -- regarding the risk to veterans' safety posed by an impaired Certified Registered Nurse Anesthetist ("CRNA").   The issued had been brought up to hospital leadership on numerous prior occasions by operating room staff but had been dismissed.

14.   In early September 2017, prompted by Dr. Doe's letter, ECHS leadership began a fact-finding process in the Anesthesiology Department to investigate the claims of drug diversion by the CRNA.

15.   In mid-September 2017 Human Resources official Eric Winter recommended that

ECHS authorize an administrative investigation based on the preliminary reports of the ongoing disarray in the Anesthesiology Department. But, ECHS leadership refused to follow the recommendation and ignored HR's critical findings.

16. Later in September 19, 2017, Dr. Ellen Mangione, Chief of Staff (and proposing official), sent an e-mail to Dr. Vesna Todorovic, Chairman of the Anesthesiology Department, inquiring, "*Does the problematic anesthesiologist we discussed earlier today have an appointment at the U? Is she allowed to supervise residents? Would rather keep the name out of the e-mail...*" Although Dr. Doe's name was intentionally excluded from the e-mail, Dr. Doe was the only female in the Anesthesiology Department at the time.

17. In October 2017, Dr. Todorovic e-mailed the then-ECHS Chief of Staff a summary of anonymous and undated complaints about Dr. Doe that had been solicited from four residents by individuals in positions of authority over them. Dr. Doe was not informed of this at the time and was allowed to continue to supervise residents. These anonymous, solicited complaints later became the basis for one of the five specifications (Spec. #8) against her.

18. After two years of receiving consistently favorable performance evaluations, in late October 2017 an adverse proficiency report was issued regarding Dr. Doe by an interim supervisor but was not furnished to her until mid-March 2018 by e-mail after she had been summarily suspended. Incongruously and inconsistently, the adverse proficiency report encompassed the two-year time period of the consistently favorable performance evaluations.

19. In mid-November 2017 U.S. Congressman Mike Coffman requested an investigation of ECHS management to address the same concerns Dr. Doe had raised with

Dr. Dillon during their meeting in July 2017. Internal data revealed that the health of approximately 234 veterans was adversely affected by the problems which Dr. Doe disclosed to her leadership that caused widespread surgery cancellations.

20. By late November 2017 an evidence file had already been prepared against Dr. Doe by Drs. Dillon and Mangione. According to the VA handbook, the file was required to "*include redacted patient medical records which document and substantiate the substandard care.*"

21. In the latter regard, between November 2017 and February 2018 an outside VA review was conducted on a selection of Dr. Doe's cases. The conclusion reached by the reviewer was that the standard of care was met in virtually all cases.

22. In early December 2017, Dr. Dillon solicited two old complaints dated April 2017 from nurses to continue building an evidence file against Dr. Doe despite that those complaints had been deemed meritless at the time by Dr. Doe's direct supervisor.

23. In mid-December 2017 the University sent a letter to ECHS alleging concerns regarding Dr. Doe's oversight of anesthesiology residents and removing her from supervising them. Neither the University nor ECHS had ever previously raised with Dr. Doe any concerns pertaining to her supervision of residents. She was not informed of such concerns, much less her removal, until the letter was provided to her by ECHS in early January 2018. Even then, Dr. Doe's University and ECHS supervisors did not discuss with her either the situation itself or a plan of action to correct the resident supervision issue, although she was told they would do so and it was required by the University's bylaws. Dr. Doe herself made several attempts in January and February 2018 to set up a meeting with University officials to

discuss the specific supervision concerns raised in the letter and find a resolution, but she was never granted a meeting.

24.   In early January 2018, Dr. Doe's supervisor, Dr. Ian Black, Chief of the Anesthesiology Department, began ignoring a request from her doctor that she not be exposed to radiation due to high-risk pregnancy.   She continued to be assigned to cases requiring continuous exposure to radiation, even though the Anesthesiology Department had eight male physicians who could have performed those duties.

25.   In January 2018, Dr. Doe filed an EEOC complaint that included the failure to accommodate her disability as a discrete act of discrimination.

26.   Also in January 2018, the VA's Office of Medical Inspector ("OMI") investigated the dysfunction of the Anesthesiology Department at ECHS.   OMI presented its findings to VA leadership, which substantiated the misuse of post-call days by anesthesiologists as a contributing factor to the cancellation of hundreds of scheduled veterans' surgeries.

27.   By early February 2018, ECHS leadership had received the outside review of Dr. Doe's selected cases concluding the standard of care was met.   Therefore, the prerequisite outlined by "Provider Competency and Clinical Care Concerns" for taking adverse privileging action was not met.

28.   A few days prior to the summary suspension of Dr. Doe's clinical privileges, Dr. Black began soliciting written complaints about her in an open forum.   He disparaged her publicly on numerous occasions and offered overtime pay to employees under his supervision who stayed after hours to provide written complaints.

29.   On February 7, 2018, a complaint was submitted about a January 29, 2018

incident forming the basis for Specification 4.

30.   On February 9, 2018, Dr. Ian Black e-mailed several ECHS personnel to lament that Dr. Doe met 100% of her performance metrics for Fiscal Year 2017.

31.   On February 12, 2018, complaints were submitted about the February 9, 2018 incident forming the basis for Specification 1 and the February 7, 2018 incident forming the basis for Specification 2.

32.   Then, on February 14, 2018, ECHS summarily suspended Dr. Doe's clinical privileges and removed her from patient care without providing her any meaningful information to allow her to respond to the criticism raised about her work. None of her patients ever experienced an adverse outcome as a result of the care she provided, nor was there any evidence to support any concern regarding patient safety. The Professional Standards Council did not approve the summary suspension of Dr. Doe's clinical privileges as required by VA Bylaws.

33.   On February 23, 2018, a complaint was submitted about a November 3, 2017 incident forming the basis for Specification 5 to build a case against Dr. Doe retroactively. Although the alleged incident occurred months earlier, it was never discussed with Dr. Doe.

34.   Dr. Black, as Chief of Anesthesiology, then conducted a month-long investigation of Dr. Doe and completed a report by mid-March 2018.  Nevertheless, ECHS continued to deprive Dr. Doe of the specific information she needed to meaningfully respond to the accusations made against her.  Thereafter, her "summary" suspension was extended via "automatic" suspensions on a monthly basis into August of 2018.

35.   In late March 2018 Dr. Black adversely altered Dr. Doe's performance pay

report for FY 2017, which had been authorized by her supervisor at the time, Dr. Sean Shockey.   Dr. Black did so despite that he was never her supervisor during FY 2017.

36.   In late July 2018, the VA's OMI released the report of its investigation to Congress, which substantiated the concerns raised by Dr Doe.

37.   The OMI report concluded: "*We substantiate that Senior Leadership failed to address Anesthesia's employee concerns in a timely manner. The discontinuation of an ongoing Fact Finding and an Administrative Investigation Board (AIB) for ambiguous reasons, caused some staff members to lose confidence in Leadership. Denver also failed to demonstrate a clear process or procedure for initiating and conducting formal Fact Findings*".

38.   In early August 2018 Dr. Doe was informed of proposals to revoke her clinical privileges and remove her from federal service on a charge of unprofessional conduct based on the allegations contained in a number of specifications.   In pertinent part, the Professional Standards Council approved the revocation of Dr. Doe's clinical privileges in reliance on an incorrect representation that she had been the subject of a prior disciplinary action (a Focused Professional Practice Evaluation for cause) and uncorroborated hearsay from the University of Colorado.   Later in August 2018 Dr. Doe was notified of the actions revoking her clinical privileges and removing her from federal service on a charge of unprofessional conduct based on the allegations contained in five specifications.

39.   In late August 2018, Dr. Doe appealed those actions to the VA's DAB.

40.   Also in August 2018, Dr. Doe proactively self-referred to the Colorado Physicians Health Program ("CPHP"), which is an independent entity designated by the Colorado

Medical Board to conduct professional assessments of physicians' fitness to practice medicine. CPHP reviewed the documentation related to ECHS' action against Dr. Doe and a multi-disciplinary team conducted a complete evaluation of her case.  It concluded the evidence reviewed and its own evaluation contradicted the allegations, did not find any evidence of unprofessional conduct on Dr. Doe's part and deemed her fit to practice medicine.

41.  The DAB was appointed in September 2018 to hear Dr. Doe's appeal of the ECHS actions revoking her clinical privileges and removing her from federal service.  It held a multi-day hearing in early December 2019 and issued its findings on January 15, 2020, in a decision upholding the five specifications, sustaining the charge of unprofessional conduct and recommending the upholding of the ECHS actions.  On March 9, 2020, the VA took final administrative/agency action approving and executing the DAB's decision.

42.  Dr. Doe was not notified of the DAB's decision nor of the VA's final administrative /agency action until June 30, 2020.  She then requested, in the interest of justice, that the VA postpone the effective date of such action pending judicial review.  In particular, she requested that the VA not file an adverse action report ("AAR") with the NPDB nor copy such report to the Colorado Medical Board because doing so would irretrievably injure her professionally before a court could set the action aside.

43.  The VA has agreed, pending completion of judicial review, not to file an AAR with the NPDB and not to notify the Colorado Medical Board without providing advance notice to Dr. Doe.

### LEGAL ERRORS

44.  The ECHS process, DAB proceeding, and the VA's final administrative agency

action are replete with legal errors including:

I.      **Failure to Consider Documentary, Testimonial, Expert, and Impeachment Evidence**

45.   ***Error 1:   Exclusion of Appellant's Additional Evidence File Exhibits.***   The DAB panel improperly rejected and refused to permit use at the December 2019 hearing of Dr. Doe's proffered exhibits contesting the ECHS action.

a.   The Evidence File compiled by ECHS was considered by the panel as having been accepted and admitted into evidence.   It was comprised of Parts A and B consisting of a total of 28 Tabs, only three of which at most could be considered as supporting Dr. Doe.

b.   Accordingly, Dr. Doe submitted and sought to likewise have accepted and admitted into evidence "Appellant's Additional Evidence File Exhibits" designated as Part C, comprising 24 Tabs consisting of 280 pages to be used during the hearing.   Those Exhibits were essential as a matter of fundamental fairness to Dr. Doe in order to present a complete evidentiary record on her behalf. They were also relevant and necessary in terms of cross examination of and countering ECHS witnesses (including rebuttal character and reputation).

c.   The DAB panel rejected their submission, refusing to accept and admit them into evidence and permit their use by Dr. Doe during the hearing.   By doing so, the DAB denied Dr. Doe the right to defend herself and, so, of a fair hearing.

d.   The DAB also prohibited Dr. Doe's counsel from asking any questions, introducing into evidence any matters or submitting any oral arguments relating to items that were not in the ECHS evidence file.

46.   ***Error 2:   Exclusion of expert testimony by John Ziegler, M.D.***   The DAB panel improperly prevented Dr. Ziegler from testifying at the December hearing as an expert

witness for Dr. Doe after having previously approved him as such.

    a.   Appellant's Second Amended Witness List, dated Nov. 22, 2019, identified John Ziegler, M.D., FASA, as an expert for Dr. Doe both as an anesthesiologist and as a former VA service chief.   It contained the following statement of the nature of his testimony:

> Dr Ziegler, a former Chief of Anesthesiology, Salt Lake City VAMC, will testify *as an expert witness*. Both as an anesthesiologist and as a former Service Chief, he will testify that the misconduct alleged in Specification Nos. 1, 2, 4, 5 and 8 do not represent instances of substandard or improper patient care.
>
> Dr. Ziegler will also testify regarding his *experience* in academic practice, in negotiating a variety of contracts with the VA on behalf of a university, his awareness of the politics and culture differences involved in the relationship between an academic affiliate and the VA, as well as the ongoing problems with long VA wait times for surgery.
>
> He will also testify regarding his *experience* in mentoring junior colleagues and trainees and how issues with communication style, resident complaints or clinical competence could have and should have been handled. In particular, Dr Ziegler will testify that the VA had the ability to address any concerns regarding communication issues through avenues other than revocation of Dr. [Doe's] clinical privileges and termination of her employment.   [Emphasis added.]

    b.   On Nov. 26, 2019, the DAB panel approved that witness list with one change that did not affect its approval of Dr. Ziegler's proffered expert and experience testimony.

    c.   The panel's subsequent reversal prevented Dr. Doe from eliciting Dr. Ziegler's testimony as delineated above.   That testimony was essential as a matter of fundamental fairness to Dr. Doe.   Its exclusion denied her the ability to defend herself.

    47.  ***Error 3:  Exclusion of sworn deposition testimony for impeachment purposes.*** The DAB panel improperly refused to allow Dr. Doe to use on cross-examination prior sworn deposition testimony of Dr. Ian Black and other adverse witnesses to impeach their direct testimony against her at the hearing.

    a.   A number of the ECHS hearing witnesses against Dr. Doe had been deposed

under oath in a parallel Merit System Protection Board proceeding and given sworn testimony there that contradicted or otherwise undercut their testimony against her in the DAB hearing.

b.  It is a black-letter principle of evidence that a testifying witness may be impeached by means of a prior inconsistent statement.   In particular, it is universally accepted that prior testimony given by a witness in a deposition may be used against that witness when testifying in a proceeding.  *See, e.g.,* Fed.R.Evid. 613(b) (authorizing use of extrinsic evidence of prior inconsistent statement), 804(b)(1) (permitting such use where party against whom testimony is offered had opportunity and motive to develop the testimony by examination).

c.  Use of such sworn deposition testimony was relevant and necessary as a matter of fundamental fairness to Dr. Doe in terms of cross examination of and countering ECHS witnesses, including rebuttal character and reputation witnesses.   Its exclusion denied Dr. Doe the ability to defend herself.

## II.   Inability to Cross-Examine the Proposing and Deciding Officials

48.  ***Error 4:  The ECHS evidence file was replete with false allegations from the proposing and deciding officials regarding aggravating and mitigating factors and the revocation of Dr. Doe's clinical privileges.***   It included claims she was an "imminent threat to patient safety," despite evidence to the contrary; subjective application of far more severe penalties to far less egregious conduct than in other cases; and the Department's motivation for retaliating against Dr. Doe.   Including such material in the evidence file before the DAB without having the witnesses present and subject to cross-examination deprived Dr. Doe of the right to defend herself and, so, of a fair hearing.

## III.   Consideration of Non-Specific, Extraneous, and Previously-Undisclosed Allegations

49. ***Error 5: Failing to dismiss and subsequently upholding anonymous, non-specific resident critique-based Specification 8 based solely on improper hearsay evidence while failing to consider an important evidentiary aspect.*** In its entirety, Specification #8 alleged:

> Between on or about May 1, 2016 and on or about December 1, 2017, while serving as an attending anesthesiologist, you were unprofessional in your interactions with residents from the University of Colorado Anesthesiology Residency Program. Specifically, you were difficult to reach or not present during key parts of patient care, and you provided inadequate supervision and guidance to anesthesiology residents. You also displayed a lack of effective, respectful, and professional communication with residents before, during, and after cases.

a. In a November 1, 2019 Pre-Hearing Conference call, the DAB panel rejected Dr. Doe's motion to dismiss such vague Specification. It then went on to improperly consider, and uphold, Specification 8 based upon, in pertinent part, the written evidence mentioned in the specification which had been transmitted by the University's Dr. Todorovic, who did not testify at the hearing, to ECHS about Dr. Doe's supposed inadequate interactions with residents. That "evidence" included vague criticisms of Dr. Doe that had been solicited from four anonymous residents and which failed to include patient names, case numbers, dates, medical records, other witnesses present and outcomes. Thus, Dr. Doe had no ability to cross-examine Dr. Todorovic or the residents who had submitted the critiques, much less to confront them or their statements with patient records, nor any ability to call other witnesses involved in those cases who could refute the anonymous generic assertions.

b. Further, the DAB panel considered, and upheld Specification 8 based upon, in pertinent part, vague testimonial evidence consisting entirely of improper hearsay about Dr. Doe's supposed inadequate interactions with residents. That testimony came from Dr. Ian

Black, RN Molly Gordon, Dr. Daniel Beck and Dr. Anthony Oliva – all of whom were quoted numerous times by the DAB panel in that regard.   The panel cited no justification or criteria for considering and relying on such hearsay.   And, none of the testimony included residents or patients names, case numbers, dates, medical records, other witnesses present or outcomes.   It was simply rumor and innuendo.

  c.   Consideration of such non-specific evidence violated federal statutory requirements entitling Dr. Doe, as a Title 38 employee facing removal, to a statement of what, *specifically*, she supposedly violated and a file containing *all* the supporting evidence. It likewise violated a VA directive requiring that, as an employee, she be provided the *specific* details and circumstances – *i.e.*, names, dates, places, and other data – constituting the basis for the proposed adverse action in order for her to fully understand the charges and have a fair opportunity to respond to them.   The panel's rejection of the motion and consideration of such evidence prevented Dr. Doe from being able to defend herself.

  d.   The panel also failed to consider an important evidentiary aspect of this matter, namely the existence of numerous favorable computer evaluations of Dr. Doe by residents.

 50.   ***Error 6:   Considering and applying uncharged aggravating "Douglas factor" evidence not related to any particular specification.***   The DAB panel decision expressly addressed mitigating circumstances.   There, it generically referenced the testimony of Melanie Torres (without citing any specific page or line) to the effect that Dr. Doe's alleged communication issues began prior to the onset of her health concerns during late 2017 and early 2018.   The undisclosed new adverse information presented by Ms. Torres during her testimony was not related to any particular specification.   It is material because the panel

expressly relied on it in the sense of being an aggravating, rather than mitigating, factor.   As such, this additional material adverse information may have undermined the panel's objectivity and the fairness of the process.   Its inclusion constitutes harmful error, which is error by the VA in the application of its procedures that is likely to have caused it to reach a conclusion different from the one it would have reached had the error been cured or non-existent.

51.   ***Error 7:   Upholding Specifications 1, 2, 5 and 8 based on uncharged misconduct information unrelated to their allegations, without reference to an objective standard and without considering important aspects.***

a.   Specification 1 alleged (emphasis added) that

On February 9, 2018, during a parathyroidectomy procedure on patient C2171, [Dr. Doe] placed an arterial line without appropriate evaluation and assessment, without confirming through additional readings or physical exam the patient's vital signs, and *without appropriate communication with other staff.*

i.   Yet, the DAB's written decision indicated that it upheld Specification 1 in significant part for general communications reasons not related to patient C2171 at all:

*Timothy Christie testified of his experience over several years working with the Appellant*; he suggested there is no collaborative team effort to include her unwillingness to relay information regarding why or how things are done on a daily basis ....   *He further explained working with the Appellant was always very difficult* concerning intervention with the patients....   *Dr. Black provided testimony of complaints received of the Appellant's inability* "to communicate and to have a discussion and be collegial" from a "fairly wide breadth of people throughout the institution" .... [Emphasis added.]

ii.   This additional information, which is material to the decision upholding Specification 1 precisely because the DAB cited and relied on it, may have undermined the panel's objectivity and the fairness of the process.   Moreover, due process requires that an employee be given notice of the charges in sufficient detail to be able to make an informed reply.   Accordingly, punishment may only be based on the charge and specifications themselves.   It is

an abuse of discretion to exceed the notice of proposed removal.   The inclusion of this uncharged misconduct constitutes harmful error.

      iii.   Further, the DAB failed to identify or define an objective standard or cite any expert witness testimony regarding what constitutes appropriate or inappropriate communication with other staff in this context.

      b.   Specification 2 alleged (emphasis added) that

On February 7, 2018, during a procedure on patient S8826 involving excision of a pilonidal sinus and left scrotal mass, [Dr. Doe] removed an inflated endotracheal tube without allowing for evaluation of placement prior to doing so, and ... administered medications *without appropriate communication and coordination with the CRNA*.

      i.   Yet, the DAB's written decision indicated that it upheld Specification 2 for general reasons not related to patient S8826 at all:

CRNA Sarah Fredriksson described the Appellant [as] excitable and she felt the Appellant "took precipitous actions without due diligence or coordinating and communicating ... as joint anesthesia providers".…   CRNA Frederickson went on to describe the "interpersonal environment" created by the Appellant did not foster a team environment.… *CRNA Frederickson gave examples of the Appellant preoperatively seeing patients and not communicating such, causing same patient to be seen twice or only communicating information about the patient after they were both in room with the patient*.… [Emphasis added.]

      ii.   For the reasons set forth in ¶ 35.a(ii) above, the inclusion of this uncharged misconduct constitutes harmful error.

      iii.   Further, the DAB failed to identify or define an objective standard or cite any expert witness testimony regarding what constitutes appropriate or inappropriate communication and coordination with the CRNA in this context.

      c.   Specification 5 alleged that

On November 3, 2017, during a left cubital tunnel release on patient T3301, you were distracted by a conversation on your cell phone involving an unrelated matter.   Due to your distraction, you were unprepared to address the patient's

discomfort, and you were unaware of the surgeon's progress on the case.

i.   Regarding that specification the DAB panel decision stated "Dr. Bolson suggests 'communication has *always* been somewhat abrasive and at *sometimes* [*sic*] hostile and didn't seem like' her [*sic*] and the Appellant 'could find common ground *often* to discuss things and move forward. It seems *always* there was tension *when working with*' the Appellant ...." (Emphasis added.)   Based in pertinent part on that extraneous testimony, which is irrelevant to the allegations of the specification, the panel went to "conclude[] this specification is upheld."

ii.   For the reasons set forth in ¶ 35.a(ii) above, the inclusion of this uncharged misconduct constitutes harmful error.

iii.   Further, the DAB failed to cite an objective standard or expert witness testimony regarding what is inappropriate use of a cell phone during the course of a procedure.

iv.   Moreover, the panel entirely failed to consider important evidentiary aspects of this matter:   Dr. Doe was only involved for the last 20 minutes of the 80-minute procedure, completely undermining the complaining surgeon's recollection and testimony regarding the anesthesia provider.   And, it is standard practice to inquire about the stage of the procedure when relieving another anesthesia provider.

d.   <u>Specification 8</u> alleged

Between on or about May 1, 2016 and on or about December 1, 2017, while serving as an attending anesthesiologist, you were unprofessional in your interactions with residents from the University of Colorado Anesthesiology Residency Program. Specifically, you were difficult to reach or not present during key parts of patient care, and you provided inadequate supervision and guidance to anesthesiology residents. You also displayed a lack of effective, respectful, and professional communication with residents before, during, and after cases.

i.   Yet, the DAB's written decision indicated that it upheld Specification 8 after improperly considering and based in pertinent part upon evidence proffered by Dr. Beck that was

outside the allegations of the specification:

> Dr. Beck testified of surgeons scheduling procedures to avoid the Appellant and requesting backup availability when scheduled with the Appellant....  Dr. Beck also made mention the Appellant doesn't take accountability ....

ii.  For the reasons set forth in ¶ 35.a(ii) above, the inclusion of this uncharged misconduct constitutes harmful error.

e.  ***Error 8:  Inclusion of ECHS Evidence File information extraneous to the five specifications and charge.***  The DAB panel had before it in the ECHS Evidence File eight Tabs (nos. 14 and 17-23) containing information adverse to Dr. Doe but which did not relate to any of the five specifications at issue in the December hearing.  These extraneous materials about unrelated matters simply amounted to vague criticisms of Dr. Doe that may have undermined the panel's overall objectivity and the overall fairness of the process.  As set forth in ¶ 35.a(ii), inclusion of this uncharged misconduct constitutes harmful error.

## IV.    **The DAB's Own Findings Fail to Support its Determinations**

52.  ***Error 9:  The DAB erroneously upheld Specifications #1 and #2 that the panel itself determined were not completely proved in all respects.***

a.  <u>Specification 1</u> alleged that "On February 9, 2018, during a parathyroidectomy procedure on patient C2171, you [i] placed an arterial line without appropriate evaluation and assessment, [ii] without confirming through additional readings or physical exam the patient's vital signs, and [iii] without appropriate communication with other staff."

i.  As to the first two elements, the DAB decision expressly found in favor of Dr. Doe stating, "It was well within the Appellant's right to decide whether to place the arterial line."

ii.  Regarding the third element, the panel found that "The Appellant acted 'without appropriate communication with other staff.'  As proven aspects of the specification

support the overall charge, the Board concludes this specification is upheld."

     b.  <u>Specification 2</u> alleged that "On February 7, 2018, during a procedure on patient 88826 involving excision of a pilonidal sinus and left scrotal mass, you [i] removed an inflated endotracheal tube without allowing for evaluation of placement prior to doing so, and [ii] you administered medications without appropriate communication and coordination with the CRNA."

       i.  As to the first element, the panel decision found in favor of Dr. Doe, expressly stating that "the Appellant's efforts were validated as the most senior person on the team ...."

       ii.  Regarding the second element, the panel found that "The Appellant acted without appropriate communication and coordination with the CRNA.'  As proven aspects of the specification support the overall charge, the Board concludes this specification is upheld."

     c.  Upholding these specifications that were not completely proven in all respects is improper.  Not requiring each element to be proved is error.  It is impermissible to split a single charge into several separate charges and then sustain one of the newly-formulated charges, which represents only a portion of the original charge.  Where there exists a failure of proof on any one of the elements, the entire charge must fall.

     53.  ***Error 10: The DAB improperly upheld the Charge***.  The DAB then upheld the Charge of Unprofessional Conduct based upon specifications that were not themselves proved in all the respects that they alleged.

     a.  In upholding the charge, the panel simply opined

Testimony during the hearing clearly depicts the Appellant had unprofessional conduct especially in *communication or the lack thereof*. Each specification and findings under the charge display the Appellant's *failure to appropriately communicate* as expected by a competent physician. The Appellant admitted to *ineffective communication* and poor interactions with team members. The Appellant's *failure to effectively communicate* put the agency and the patients at unnecessary risk.  The Board concludes this charge is sustained. [Emphasis added.]

For the reasons set forth in ¶ 37.c above, the charge must fall.

b.   Further, the DAB failed to cite any objective standard or criteria establishing how or why Dr. Doe's purported communication issues constituted unprofessional conduct for a cardiac anesthesiologist and critical care physician.   Nor are "communication issues" even addressed in the VA Table of Penalties.

c.   And, in upholding the charge the panel entirely failed to consider important aspects of the matter.   Dr. Doe is not a native English-speaker; she has a pronounced accent that can make communication difficult at times. Nonetheless, there was never an allegation, much less evidence, that any patient ever had a bad outcome or suffered any harm.   Further, there was no indication that Dr Doe's alleged communication deficiency was intentional.

53.1.   ***Error 11: The DAB failed to consider an important aspect of Specification #4.***
Specification 4 alleged that "On January 29. 2018. during an endoscopic retrograde cholangiopancreatography (ERCP) procedure on patient W0436, you entered the room where fluoroscopy was in use without lead protection, and you demanded that the fluoroscopy be ceased during the procedure. The reason you entered the room involved another case."   In upholding this specification, the DAB completely failed to take into account important aspects of the matter.   Specifically, it failed to consider that (i) Dr. Doe was laboring under the disability of a high-risk pregnancy, (ii) her doctor had requested the reasonable accommodation of her not being exposed to radiation and (iii) the request had been ignored.

**V.    Improper Suspension and Extensions**

54.   ***Error 12: The February 14, 2018 summary clinical privileges suspension and automatic continuation until August 20, 2018 violated Dr. Doe's rights in numerous respects.***

a.   ECHS merely stated that the privileges suspension was predicated on alleged generic "concerns [that] have been raised to suggest that aspects of [Dr. Doe's] clinical practice do not meet the accepted standards of practice and potentially constitute an imminent threat to patient welfare."   In imposing the summary suspension ECHS noted it was relying on unspecified reports from unnamed peers, nurses, and residents, but did not produce any such reports of concerns.   That notice was a violation of VA Directives.

b.   On February 16, 2018, Dr. Doe formally requested through counsel a copy of the evidence file, but never received it.   That is a violation of VA.

c.   The vague and general charges were simply accusations that on some unidentified date, at some unidentified location, Dr. Doe engaged in allegedly improper behavior or deficient communication toward one or more unidentified individuals.   This is woefully insufficient to satisfy the minimum procedural due process protections afforded tenured federal employees. Offering Dr. Doe the right, as the notice of suspension did, to provide any information she desired in response to these unspecified concerns did not constitute affording her due process.

d.   The Due Process Clause of the Constitution's Fifth Amendment requires federal agencies to provide an employee notice of both the charges and the evidence and an opportunity to respond before being subjected to a material change in the terms and conditions of employment or potential adverse employment action.   That did not happen.   Relatedly, the factors and reasons on which ECHS intended to rely should have been included in the advance notice of adverse action so that Dr. Doe would have had a fair opportunity to respond to those factors before a decision was made.   That did not happen either.

e.   The summary suspension of Dr. Doe's privileges necessitated completion of a comprehensive review within 30 days, or documented reasons why that could not be

accomplished with an expectation of when that review would be completed.   Neither occurred.

   f.   After the initial 30-day summary suspension period, ECHS simply gave Dr. Doe notices of automatic suspensions every month for a total of 6 months.   Those, too, improper and violated VA directives.   An automatic suspension of clinical privileges is *only* allowed where a summary suspension is *not* involved.   And, an appropriate automatic suspension is ordinarily expected to be resolved within 20 days. If there are more than three automatic suspensions of privileges in 1 calendar year, or more than 20 days per calendar year, a thorough assessment of the need for the practitioner's services must be performed and documented and appropriate action taken.   In this case there were five improper automatic suspensions covering the period from March 16 to August 20, 2018, with no accompanying assessment and documentation.

   g.   The ECHS revocation and removal in August 2018 – six months after the summary suspension was imposed – is not what VA directives contemplate.

   h.   ECHS violated VA bylaws in multiple respects.   One, by failing to consider Dr. Doe's medical issues at the time of the incidents forming the basis for the specifications and by failing to review supporting medical documentation, resulting in multiple improper adverse consequences to her.   Two, by failing to have the summary suspension of her clinical privileges approved by the Professional Standards Board.

## VI.   <u>Imposition of Improper Penalties</u>

   55.   <u>*Error 13*</u>.   **Failure properly to consider and apply the "*Douglas* factors.**"   The ECHS actions revoking Dr. Doe's clinical privileges after a 6-month suspension and removing her from federal service was upheld by the DAB panel's decision and approved and executed by Defendant Lieberman's final administrative/agency action.   They all failed to properly consider and apply the factors set forth in *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981).   Further,

the DAB relied upon inadmissible hearsay in their penalty determination and analysis of Douglas Factors 1, 3, 6, 7.

- (1)  <u>The nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities</u>.  The penalty imposed for Dr. Doe's alleged offenses is far greater than their nature and seriousness and excessive in relation to her duties, position and responsibilities as a cardiac anesthesiologist and critical care physician.  The specifications, and record more broadly, are devoid of conduct that reasonably could be characterized as anything but minor.  Therefore, Dr. Doe's suspension and ultimate termination constituted an abuse of discretion by Defendants.

- (2)  <u>The employee's job level and type of employment</u>.  Defendants failed to afford credit for Dr. Doe's job levels and employment as a cardiac anesthesiologist and critical care physician and applied a subjective, arbitrary standard to find that this factor favored upholding the penalty imposed.

- (3)  <u>The employee's past disciplinary record</u>.  Defendants failed to assign proper credit for the fact that Dr. Doe had no prior disciplinary record and that the University previously indicated it was amenable to creating a remediation plan so it could reinstate her.

- (4)  <u>The employee's work record</u>. Defendants failed to afford credit to, or even consider, Dr. Doe's favorable performance evaluations encompassing the period from fall 2014 through spring 2017, including the results of the FPPE indicating that Dr. Doe met 100 percent of performance metrics for year 2017.

- (5)  <u>Management's confidence in the employee's ability to successfully perform and behave in the future</u>.  The DAB panel's express acknowledgments that Dr. Doe could be successful somewhere else after being hired with a clean slate by another institution completely

repudiates its contrary finding on this factor.

- (6) <u>The consistency of the penalty</u>.  The revocation of clinical privileges and removal from federal service imposed on Dr. Doe constitute penalties far harsher than those imposed on other employees for similar and more serious alleged offenses. The panel vaguely asserted in conclusory fashion that the removal penalty is consistent with the VA Table of Penalties, but as explained above "communication issues" on which the charge was upheld are not even remotely addressed there.

- (7) <u>The impact of the offense upon the reputation of the VA</u>.  In contrast to the OMI report to Congress about the misuse of post call days by Dr. Doe's colleagues contributing to cancellation of hundreds of veterans scheduled for surgery, the record is devoid of any evidence that Dr. Doe's conduct was sufficiently notable or detrimental to the VA's reputation to warrant termination.  The patient cases alleged in Specifications 1, 2, 4 and 5, and generically alluded to in Specification 8, resulted in no findings of patient harm or that the standard of care was breached.  The supposed vague, generic complaints by a few anonymous residents are immaterial; supervising residents is not a job requirement at ECHS.

- (8) <u>The degree to which the employee either knew or should have known that the conduct in question was improper or that the standard of care was not met</u>.  The standard of care was met in all instances.  And, regarding Dr. Doe's interpersonal communication practices, ECHS never gave her any warning or put her on notice that she needed to be more explicit or forthcoming in that regard before initiating the course of action to oust her.

- (9) <u>The potential for the employee's rehabilitation</u>.  The panel failed to consider an important evidentiary aspect of this matter, namely the favorable testimony of forensic psychiatrist Dr. Scott Humphreys, Associate Medical Director of the Colorado Physician Health

Plan ("CPHP"), to the effect that Dr. Doe was an excellent candidate for rehabilitation, including for improvement of her communication style and that CPHP has had considerable success in rehabilitating physicians who have had communications issues.   Nor did it afford any credit to Dr. Doe for her multiple proactive efforts regarding rehabilitation by improving her communication skills.

- (10)  <u>Any mitigating circumstances surrounding the offense</u>.  As referenced in ¶ 34 above, the DAB panel turned this factor into an aggravating circumstance not related to any particular specification.  It also dismissed Dr. Doe's health issues as non-mitigating and failed to address at all any other potentially mitigating circumstances.

- (11)  <u>The adequacy and effectiveness of alternative sanctions to deter such conduct in the future</u>.  Defendants failed to consider any alternative sanctions whatsoever for a first-time disciplinary action.

## <u>FIRST CLAIM FOR RELIEF</u>
### (38 U.S.C. § 7462 - Major adverse actions involving professional conduct or competence)

56.  Dr. Doe re-alleges and incorporates by reference as if fully set forth here ¶¶ 1-55 above.

57.  Dr. Doe has been employed by the VA pursuant to 38 U.S.C. § 7401(1) as a full-time permanent physician.

58.  As such, under 38 U.S.C. § 7461(c)(1) she is entitled to procedural protections when experiencing a "major adverse action" as defined by 38 U.S.C. § 7461(c)(2).

59.  Pursuant to Defendants' actions, Dr. Doe was first suspended and then discharged by Defendant ECHS from that employment.  Those constitute "major adverse actions" under 3 U.S.C. § 7462(c)(2)(A) and (E), respectively.

60.   The basis for that suspension and discharge was a charge of unprofessional conduct by Dr. Doe under 38 U.S.C. § 7461(c)(3).

61.   Because the suspension/discharge involved a question of professional conduct or competence resulting in a major adverse action being taken, Dr. Doe was entitled by 38 U.S.C. § 7461(b)(1) to appeal to a Disciplinary Appeals Board convened under 38 U.S.C. § 7462; she did.

62.   The decision of Defendant DAB here upheld the ECHS actions, and was then approved and executed by Defendant Lieberman as the final administrative/agency action of the VA.   As such, Dr. Doe is entitled by 38 U.S.C. § 7462(f)(1) to judicial review.

63.   For the reasons set forth above, Dr. Doe is entitled under 38 U.S.C. § 7462(f)(2) to have this Court set aside the VA's final administrative/agency action, the DAB's decision and the ECHS action as being:

   a. arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

   b. obtained without procedures required by law, rule, or regulation having been followed; and

   c. unsupported by substantial evidence.

### SECOND CLAIM FOR RELIEF
#### (Violation of Due Process)

64.   Dr. Doe re-alleges and incorporates by reference as if fully set forth here ¶¶ 1-63 above.

65.   The Fifth Amendment to the U.S. Constitution provides that "No person shall ... be deprived of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. V.

66.   Dr. Doe has been employed by the VA pursuant to 38 U.S.C. § 7401(1) as a full-time

permanent physician with clinical privileges at ECHS.   Accordingly, she has liberty and property interests in those clinical privileges and that employment under federal statutes and directives.

67.   Defendants deprived Dr. Doe of liberty property by revoking her clinical privileges at ECHS and removing her from permanent federal employment with the VA.

68.   Defendants' deprivation of Dr. Doe's liberty property rights was without due process because, among other things, Defendants variously:

a. Failed to give Dr. Doe notice of the basis for, and evidence giving rise to, the February 2018 summary suspension of her clinical privileges;

b. Automatically extended that suspension on a month-by-month basis into August 2018 in violation of VA directives;

c. Continued to violate VA directives by failing to consider Dr Doe's medical issues and evaluate medical documentation to determine their potential impact in the alleged misconduct.

d. Improperly took the actions of revoking Dr. Doe's clinical privileges and removing her from federal service on a charge of unprofessional conduct based on five specifications.

e. Failed to give Dr. Doe a fair opportunity to respond in her own defense to and be heard regarding the charge and specifications by refusing to permit her to

i. Proffer defense exhibits contesting the actions of ECHS,

ii. Elicit testimony relevant to Dr Doe's defenses to the specifications and charge and submit rebuttal evidence not included in the ECHS evidence file.

iii. Call Dr. John Ziegler as an expert witness to offer testimony directly refuting Defendants charges of misconduct, addressing the interactions of the VA with a

contracted academic affiliate, noting the ongoing problems of long VA wait times for surgery and indicting the penalties imposed as being unwarranted under the circumstances, and

   iv. Use prior sworn deposition testimony on cross-examination of several adverse witnesses, including Dr. Ian Black and other ECHS employees, to impeach their direct testimony against her at the hearing;

   v. Cross-examine the proposing and deciding officials and Dr. Todorovic.

  f. Considered non-specific, extraneous and previously-undisclosed allegations by

   i. Failing to dismiss and subsequently upholding anonymous, non-specific resident critique-based Specification 8, including by reliance solely on improper hearsay while failing to consider an important evidentiary aspect,

   ii. Considering and applying uncharged aggravating "*Douglas* factor" evidence not related to any particular specification,

   iii. Upholding Specification nos. 1, 2, 5, 8 based on information unrelated to the incidents forming the basis for the charges, without reference to an objective standard and without considering important aspects; and

   iv. Having before it in the record information adverse to Dr. Doe that was not related to any of the five specifications at issue on which the charge was based;

  g. Committed harmful error in making findings which fail to support their determinations by

   i. Upholding Specification nos. 1 and 2 after the DAB panel determined they were not completely proved in all respects, and

   ii. Upholding the Charge based on specifications which were not completely proved in all respects, without any objective standard or criteria and entirely failing to consider

important aspects;

h.   Improperly first imposing and then subsequently automatically extending a summary suspension in violation of VA directives; and

i.   Imposing improper penalties by failing to properly consider and apply the "*Douglas* factors."

69.   Dr. Doe has a liberty interest in her professional reputation.

70.   Defendants intend to file an AAR with the NPDB reflecting the outcome of their arbitrary, capricious, egregious, and oppressive summary suspension, automatic extension and ultimate revocation of her clinical privileges and termination of her employment. Defendants conduct, including filing such an AAR, will impose a stigma on Dr. Doe and will foreclose her freedom to take advantage of other opportunities by eliminating her ability to find another job as a physician and effectively barring her from the practice of medicine in violation of her substantive due process rights.

71.   These violations of Dr. Doe's due process rights have injured Dr. Doe and will continue to injure Dr. Doe in the absence of declaratory and injunctive relief.

## PRAYER FOR RELIEF

In view of all of the preceding, Dr. Doe respectfully requests that this Court order that

A.   The VA's final administrative/agency action approving and executing the DAB's decision upholding the ECHS' action be set aside as:

(1)   Arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

(2)   Obtained without procedures required by law, rule, or regulation having been followed; and

(3)   Unsupported by substantial evidence.

B.      Defendants' conduct above be declared a violation of her due process rights under the U.S. Constitution and federal statutes and directives.

C.      Defendants be permanently enjoined and restrained from:

(1)     Implementing the above-described final administrative/agency action executing the DAB decision upholding the ECHS decision revoking Dr. Doe's clinical privileges and removing her from service as a federal employee, and

(2)     Submitting an adverse action report to the National Practitioner Data Bank and/or a copy to the Colorado Medical Board.

D.      Defendants pay to Plaintiff her costs of suit, including a reasonable attorney's fee.

E.      Plaintiff have such other, further and different relief as this Court deems just and proper.

DATED:   November 9, 2020

JONES & KELLER, P.C.
*S/ T.P. McMahon*
Thomas P. McMahon
Admitted *pro hac vice*
1675 Broadway, 26th Floor
Denver, Colorado 80202

HOYER LAW GROUP, PLLC
/s/ David Lawrence Sher
David Lawrence Sher
Dave@hoyerlawgroup.com
1300 I Street N.W. Suite 400e
Washington, DC 20005
Tel. (202) 975-4995
Fax   (813) 375-3710

Attorneys for Plaintiff