IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Case No. 1:20-cv-02148-CRC

**JANE DOE, M.D.,**

Plaintiff,

v.

**STEVEN L. LIEBERMAN,**
in his official capacity as Acting Principal Under Secretary for Health,
Department of Veterans Affairs, Veterans Health Administration,

**DISCIPLINARY APPEALS BOARD**,
Department of Veterans Affairs, Veterans Health Administration, and

**EASTERN COLORADO HEALTHCARE SYSTEM,**
Department of Veterans Affairs, Veterans Health Administration,

Defendants.

_____

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
_____

JONES & KELLER, P.C.
Thomas P. McMahon
tmcmahon@joneskeller.com
Admitted *pro hac vice*
1675 Broadway, 26th Floor
Denver, Colorado 80202
Tel. (303) 573-1600
Fax (303) 573-8133

HOYER LAW GROUP, PLLC
David Lawrence Sher
Dave@hoyerlawgroup.com
1300 I Street N.W. Suite 400e
Washington, DC 20005
Tel. (202) 975-4995
Fax (813) 375-3710

Attorneys for Plaintiff

DATED:   December 21, 2020

## INTRODUCTION

This case arises out of final agency action taken by Defendant Lieberman ("Undersecretary") to execute the decision of Defendant Disciplinary Appeals Board ("DAB") upholding the actions of Defendant Eastern Colorado Healthcare System ("ECHS") of the Department of Veterans Affairs ("VA"). The actions, decision, and execution sustained a charge of unprofessional conduct against Plaintiff Dr. Doe as alleged in five specifications. Defendants imposed on Dr. Doe the penalty of revoking her clinical privileges with ECHS and removing her as a permanent VA employee.

The VA process was egregiously corrupted by legal errors. Defendants violated Dr. Doe's due process rights and violated the statute governing the VA's conduct by, among other things:

- Refusing to allow Dr. Doe to present documentary evidence in her own defense;

- Precluding her from presenting expert testimony by a previously approved expert witness;

- Excluding the use of contradictory sworn deposition testimony for impeachment;

- Precluding Dr. Doe from cross-examining officials who proposed and took the actions against her;

- Failing to provide Dr. Doe with sufficient notice of the details forming the basis for the specifications and the evidence used to uphold them;

- Considering adverse information unrelated to the specifications to uphold them;

- Upholding two specifications and the charge despite them not having been fully proved;

- Failing to consider important aspects of certain specifications; and

- Imposing a summary suspension on Dr. Doe without explanation and extending it for almost six months in violation of VA policy.

If allowed to stand, the effect will be to deprive Dr. Doe of the ability to practice medicine and permanently end her career as a physician. That will occur because, under 42 U.S.C. §§ 11133 and 11134 of the Health Care Quality Improvement Act ("HCQIA"), Defendants must report their decisions and actions to the National Practitioner Data Bank ("NPDB") and to the Colorado Medical Board. If the former occurs, Dr. Doe – who must have clinical privileges to practice medicine and

engage in her medical specialties as a cardiac anesthesiologist and critical care physician – will be unable to obtain privileges anywhere. In short, her career will be over.

## CHRONOLOGY OF RECORD FACTS

1.      Dr. Jane Doe, M.D., is a young physician who did her residency in anesthesiology at Jackson Memorial Hospital in Florida (2006–10), a fellowship at Harvard Medical School in anesthesiology and critical care (2010-11), and a further fellowship at the Texas Heart Institute in cardiovascular anesthesiology (2013-14). (AR692-93.)

2.      Beginning in September 2014, Dr. Doe -- who is triple board-certified in anesthesiology, critical care and cardiothoracic anesthesiology -- was employed by the VA as a cardiac anesthesiologist and critical care physician pursuant to 38 U.S.C. § 7401(1) as a full-time permanent physician with clinical privileges at ECHS. (AR692-93, 981; Defendants' Answer ("Ans.") ¶¶ 57, 66.)

### DYSFUNCTION IN ECHS ANESTHESIOLOGY DEPARTMENT

3.      Historically, medical residents at the University of Colorado Medical School ("University") have rotated through the VA's ECHS, including its anesthesia service. (*See, e.g.,* AR26, 40, 50 (electronic evaluations by University residents).) In 2017, however, there was an exodus of ECHS staff from the Anesthesia Department due to profound dysfunction. (*See* AR901-02, 906, 921.)

4.      In July 2017, Dr. Doe met with then-ECHS Deputy Chief of Staff, Dr. Harold Dillon, to discuss the dysfunction. (AR8.) Dr. Doe presented concerns regarding the refusal of her Anesthesia colleagues, including Dr. Daniel Beck, to work post-call days -- *i.e.*, the next day after having been on call – as required by VA policy (AR46-48), thereby exacerbating the Department's short staffing and limiting its capacity to perform veterans' surgeries. (AR2439 ("Recommendation to VHA").)

5.      In October 2017, new Anesthesiology Chief Dr. Ian Black expressed disagreement with VA's requirement that physicians work post-call days. (AR2448-49.) Dr. Beck even threatened to resign if he was required to work post-call days. (*Id.*)

6.      In November 2017, Colorado Congressman, Mike Coffman requested an investigation

of ECHS management to address the same concerns Dr. Doe raised with Dr. Dillon during their meeting in July 2017. (AR10 (citing KDVR article); Ans. ¶ 19.)

7.      In late July 2018, the VA's Office of Medical Inspector ("OMI") released a report to Congress substantiating the concerns previously raised by Dr. Doe. (AR2435-40, 944-48.) The report recommended that a review be conducted of the apparent failure by the ECHS Chief of Staff (Dr. Ellen Mangione) and Deputy Chief of Staff (Dr. Dillon) to address the misuse of post-call days in Anesthesia which contributed to staffing shortages and limited the performance of veterans' surgeries. (AR2440, 947 ("Leadership failed to address Anesthesia's employee concerns in a timely manner.").)

### ECHS INVESTIGATION, SUSPENSION, REVOCATION, AND TERMINATION OF DR. DOE

8.      Between January and August 2017, University residents electronically evaluated Dr. Doe ("Resident Evaluations"). (AR26-27, 50.) They rated her as exceeding expectations in 6 of 9 categories and as meeting expectations in the other 3. (AR50.) There were numerous positive, enthusiastic comments acknowledging the value of Dr. Doe's unique perspective, her commitment to teaching, her efforts to contribute the residents' education and her interactions with residents. (*Id.*)

9.      The Resident Evaluations were consistent with Dr. Doe's performance evaluations that encompassed the period from fall 2014 through spring 2017, which were routinely favorable, including evaluations that included such comments as: "Doing well"; "Doing very well"; "Excellent"; and "a paragon of skill, knowledge and compassion for all." (AR796-814.)

10.     Nevertheless, in September 2017 Dr. Mangione emailed Dr. Todorovic (University Chief of Anesthesiology) to inquire, "does the problematic anesthesiologist we discussed earlier today have an appointment at the U? Is she allowed to supervise residents? (Would rather keep the name of the e-mail ....)" (AR729.) Dr. Doe was the only female anesthesiologist in the Anesthesiology Department at the time. (AR2203-04; Ans. ¶16.)

11.     In mid-October, Dr. Todorovic emailed Dr. Mangione a summary of anonymous and undated complaints about Dr. Doe that had been solicited from four residents. (AR231-35; Ans. ¶ 17.)

Based on that email, by late October ECHS leadership was considering a summary suspension of Dr. Doe's clinical privileges. (AR826-30.) These complaints later became the basis for Specification 8 against her. (AR92; Ans. ¶ 17.) Yet, Dr. Doe was never informed about the alleged concerns, and she continued to supervise residents for three months thereafter until she received notice to the contrary in January 2018. (AR735; AR1998-99 (DAB tr. 171:5-172:13); Ans. ¶ 23.)

12.     After two years of consistently favorable performance evaluations (AR796-814), at the end of October 2017 an interim supervisor issued an adverse proficiency report regarding Dr. Doe, which was not furnished to her until March 2018 *after* she had been suspended. (AR34; Ans. ¶ 18.) Incongruously and inconsistently, the adverse report encompassed the period of favorable performance evaluations by Dr. Doe's prior permanent supervisor. (*Compare* AR805-14 *with* AR816-17.)

13.     By late November 2017, Drs. Dillon and Mangione had already prepared a draft evidence file against Dr. Doe necessary to take an adverse privileging action. (AR750-51.) Then, in December 2017 ECHS engaged the Chief of Anesthesiology at the Miami VA, Dr. Christina Matadial, to perform an outside review of certain of Dr. Doe's cases. (AR832.) After conducting the review, Dr. Matadial concluded that Dr. Doe met the appropriate standard of care. (AR832-57; *see* Ans. ¶¶ 21, 27.)

14.     In December 2017, the University sent a letter to the ECHS alleging concerns regarding Dr. Doe's oversight of residents and removing her from supervising them. (AR229-30; Ans. ¶ 23.) Neither the University nor ECHS previously raised with Dr. Doe any concerns pertaining to her supervision of residents. (AR735.) She was not informed of such concerns, much less her removal, until the letter was provided to her by the ECHS in early January 2018. (*Id.;* Ans. ¶ 23.) Even then, Dr. Doe's supervisors did not discuss with her a plan of action to correct the resident supervision issue. (Ans. ¶ 23; *see* AR147-48.) In fact, Dr. Doe made several attempts in January and February 2018 to meet with University officials to discuss the concerns raised in the letter and to find a resolution but was never granted a meeting. (AR735-7; Ans. ¶ 23.)

15.     In early January 2018, Dr. Doe submitted a request to ECHS for "reasonable

accommodation" due to issues with a difficult, high-risk pregnancy. (AR1072 (DAB tr. 99:16-23), 2402 (Black Dep. tr. 163:20-21), 2494 (¶¶ 9-10).) Her personal physician requested, among other things, that her exposure to radiation be limited while she was pregnant. (AR2533; *see* AR2077-78 (DAB tr. 250:22 – 251:1).) Dr. Doe's supervisor, Chief of Anesthesiology Dr. Ian Black, nevertheless continued to assign her to cases requiring exposure to radiation (AR2078-79 (DAB tr. 251:8 - 252:1).)

16.     Dr. Doe filed a formal EEOC complaint in February 2018. (*See* Ans. ¶ 25.) The complaint included the failure to accommodate her disability as a discrete act of discrimination. (AR2494 (¶¶ 9-11); *see generally* AR2492-2502.)

17.     Meanwhile, in January 2018 the OMI presented to VA leadership its findings regarding the investigation of the ECHS Anesthesiology Department substantiating anesthesiologists as a contributing factor in the cancellation of hundreds of scheduled veterans' surgeries. (Ans. ¶ 27.)

18.     By early February 2018, ECHS leadership had received the outside review of Dr. Doe's selected cases that concluded she met the standard of care in all cases. (Ans., ¶27; AR834-57.) Also in early February 2018, Dr. Black began soliciting complaints about Dr. Doe and offered overtime pay to employees under his supervision who stayed after hours to draft them. (AR1531-328, 1490-94.)

19.     On February 7, 2018, Hazem Hammad, M.D., submitted a complaint about Dr. Doe forming the basis for Specification 4. (AR282; Ans. ¶ 29.)

20.     Also in early February 2018, Dr. Black e-mailed several ECHS personnel describing it as "worst case" that Dr. Doe met 100% of her pay-for-performance metrics in FY2017. (AR818; Ans. ¶ 30.) He subsequently emailed Drs. Mangione and Dillon noting that granting Dr. Doe her performance bonus would "undermine[] the argument that she is a substandard performer." (AR819.)

21.     On February 12, 2018, Certified Registered Nurse Anesthetists ("CRNAs") Timothy Christie and Sarah Fredriksson filed complaints about incidents forming the bases for Specification 1 and Specification 2, respectively, against Dr. Doe. (AR241, 253-54; Ans. ¶ 31.)

22.     On February 14, 2018, ECHS Director, Sallie Houser Hanfelder, summarily suspended

Dr. Doe's clinical privileges and removed her from patient care. (AR2170-71; Ans. ¶¶ 2, 32.)

23.     On February 16, 2018, Dr. Doe's attorney demanded information relied upon to issue the summary suspension of her clinical privileges, but the information was never provided. (AR2196-2205 ("The Agency has withheld the entirety of the specific information that would provide [Dr. Doe] an opportunity for a meaningful reply."); Ans. ¶ 54.b.)

24.     After the suspension, Dr. Rajshri Bolson, submitted a complaint to Dr. Back about an alleged incident from months earlier on November 3, 2017 forming the basis for Specification 5. (AR299; *see* Ans. ¶33.) Dr. Doe was not notified of concerns about the alleged incident in the interim.

25.     ECHS leadership extended Dr. Doe's "summary" suspension via a series of monthly "automatic" suspensions until August 2018. (Ans. ¶¶ 2, 34; AR2207, 2549, 2251, 2255, 2260.) The extensions did not include any information about the basis for the suspensions (*see* AR2246-2264), nor is there any evidence that the ECHS provided Dr. Doe with other information about their basis.

26.     In November 2017, Dr. Doe's then-supervisor, Dr. Sean Shockey, authorized a FY2017 performance-for-pay award to her of $12,750 out of a possible $15,000. (AR820.)   In March 2018, Dr. Black reduced that award to zero. (*Id.*) He did so despite his own calculation that Dr. Doe earned at least 81.5% ($12,225) of the possible performance award (AR819), and despite that he was never Dr. Doe's supervisor during FY2017 (Ans. ¶ 35).

27.     In August, the ECHS officially revoked Dr. Doe's clinical privileges and removed her from federal service on a charge of unprofessional conduct ("Charge") based on the allegations in Specifications 1, 2, 4, 5, & 8. (AR87-89; Ans. ¶¶ 2, 38, 59-60, 67.)

28.     The Professional Standards Council approved the revocation of Dr. Doe's clinical privileges by relying on the false premise she was subject to prior disciplinary action for cause and uncorroborated hearsay from the University. (AR193; Ans. ¶ 38.)

29.     Dr. Doe appealed the ECHS's actions to the DAB. (AR7-45; Ans. ¶¶ 39, 61.) In September 2018, the Undersecretary appointed a DAB panel to hear her appeal of those actions. (AR5;

Ans. ¶¶ 3, 41.) The DAB held a multi-day hearing in December 2019 and issued a decision on January 15, 2020 upholding the five specifications, sustaining the charge of unprofessional conduct, and recommending approval of the ECHS action. (AR965-71; Ans. ¶¶ 3, 41, 52, 62.) On March 9, 2020, the Undersecretary took final administrative/agency action to approve and execute the DAB decision ("Final Agency Action"). (AR972; Ans. ¶¶ 3, 41, 62.)

30.     The ECHS process and actions, DAB proceeding and decision, and Final Agency Action are replete with legal errors and, for the reasons set forth below, must be set aside.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), "summary judgment is appropriate when the pleadings and the evidence demonstrate 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Sierra Club v. Mainella*, 459 F.Supp.2d 76, 89 (D.D.C. 2006). In judicial review cases under the Administrative Procedure Act, however, courts have held that "the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record." *Id.*

Dr. Doe does not seek review under the APA, but the "standard of review of decisions of the [VA] mirrors the standards for judicial review of other administrative actions, and analogous administrative law precedents [apply]." *Abaqueta v. United States*, 255 F.Supp.2d 1020, 1024 (D.Ariz. 2003). Summary judgment here "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the [] standard of review" under 38 U.S.C. § 7462(f)(2) and the Constitution. *Mainella*, 459 F.Supp.2d at 90.

## ARGUMENT

**I.     The Final Agency Action Should Be Set Aside for Defendants' Violations of Dr. Doe's Constitutional Right to Due Process.**

The 5th Amendment guarantees that individuals cannot be deprived of life, liberty, or property without due process of law. U.S. CONST. amend. V. Identification of the specific due process dictates

> requires consideration of three distinct factors. First, the private interest that will be affected …; second, the risk of erroneous deprivation of such interest through the procedure used, and the probable value … of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the … burdens that [other] procedural requirements would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Agency action will be reversed if it fails to afford due process protections to its employees. *Mason v. Dep't. of Navy*, 70 M.S.P.R. 584, 588 (M.S.P.B. 1996).

### A. Dr. Doe Has Private Interests Affected by Defendants' Actions.

#### (1) Dr. Doe Has A Property Right in Her Continued Employment and Clinical Privileges.

Dr. Doe's "federal constitutional due process claim depends on [her] having a property right in continued employment." *Stone v. F.D.I.C.*, 179 F.3d 1368, 1374 (Fed. Cir. 1999) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)). "Property interests are not created by the Constitution; 'they are created and their dimensions … defined by existing rules or understandings that stem from an independent source ....'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972)).

"While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Loudermill*, 470 U.S. at 541. Dr. Doe was a full-time permanent employee of the VA pursuant to 38 U.S.C. § 7401(1) until she was terminated. (AR965-66 at II.a.; AR981 (DAB tr. 8:1-6); Ans. ¶¶ 57, 66.) Thus, she was entitled to procedural protections when experiencing such a "major adverse action" (AR981 (DAB tr. 8:1-11)) as defined by 38 U.S.C. § 7461. Termination is a major adverse action. 38 U.S.C. § 7461(c)(2). Therefore, Dr. Doe had a 5th Amendment property interest in her continued federal employment.

#### (2) Dr. Doe Has a Liberty Interest in Her Professional Reputation.

Federal courts "have recognized that a public employee has a liberty interest in her professional reputation, particularly when forced to find other employment." *McGregor v. Greer*, 748 F. Supp. 881, 885 (D.D.C. 1990). "In order to set forth a constitutionally cognizable liberty interest claim, plaintiff must allege two distinct harms: (1) a change in status beyond reputation, and (2) a disabling stigma

resulting from the government's actions." *Id.* Here, Defendants intend to report Dr. Doe's adverse privileging action (Ans. ¶ 70) to the NPDB and the Colorado Medical Board.

In that regard, courts recognize that "[a]n adverse report on the NPDB … is intrinsically harmful to that [physician's] practice, professional reputation, and livelihood ...." *Walker v. Mem'l Health Sys. of East Texas,* 231 F.Supp.3d 210, 216 (E.D.Tex. 2017). That is because every medical entity that might consider "hiring or contracting with [a physician] is required to query the NPDB." *Id.* An "adverse report carries an indelible stigma that diminishes [a physician's] reputation and calls into question [her] ability to render competent medical services ...." *Id.* That "poses a substantial threat to [a physician's] ability to gain or maintain employment to support [her] practice." *Id.*

Thus, a report by Defendants to the NPDB and Colorado Medical Board would irretrievably harm Dr. Doe's livelihood and would impose on her a disabling stigma. Accordingly, she has a liberty interest in her professional reputation for which due process is required under the 5th Amendment.

**B.    The DAB Failed to Afford Dr. Doe Proper Notice and an Opportunity to Respond in Violation of Her Constitutional Right to Due Process.**

"The essential requirements of due process ... are notice and an opportunity to respond." *Stone*, 179 F.3d at 1375 (quoting *Loudermill*, 470 U.S. at 546)).

Regarding notice, "[p]rocedural due process guarantees are not met if the employee has notice only of certain charges or portions of the evidence and the deciding official considers new and material information." *Id.* at 1376. The factors on which an agency relies for an adverse employment action "should be included in the advance notice of adverse action so that the employee ha[s] a fair opportunity to respond to those factors before the agency's deciding official." *Lopes v. Dept. of Navy*, 2011 M.S.P.R. 63, ¶6 (M.S.P.B. 2011) (citing *Vena v. Dept. of Labor*, 111 M.S.P.R. 165, ¶9 (2009); *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 304 (1981)).

"[I]ntroduction of new and material information … undermines the … constitutional due process guarantee of notice (both of the charges *and of the employer's evidence*) and the opportunity to respond." *Stone*, 179 F.3d at 1376 (emphasis added). It is violative of due process "for the employee

to have 'notice only of certain charges or portions of the evidence' and new material information is considered." *Id.* "It is *constitutionally impermissible* to … receive additional material information that may undermine the objectivity required to protect the fairness of the process." *Id.* (emphasis added).

Further, parties have a "right to present rebuttal evidence on all matters decided at the hearing." *Pub. Serv. Comm'n of Kentucky v. F.E.R.C.*, 397 F.3d 1004, 1012 (D.C. Cir. 2005); *see also Carnation Co. v. Sec'y of Labor*, 641 F.2d 801, 803 (9th Cir. 1981) ("Procedural due process requires that a party against whom an agency has proceeded be allowed to rebut [relevant] evidence offered by the agency …."). "Indeed, the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n. 4 (1974).

There are two reasons why a respondent having a meaningful opportunity to present her side of a case is important in enabling an agency to reach an accurate result.

> First, dismissals for cause will often involve factual disputes and consideration of the employee's response may help clarify such disputes. [Second], even if the facts are clear, "the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect."

*Stone*, 179 F.3d at 1376 (citing *Loudermill*, 470 U.S. at 543). The Due Process Clause entitles Dr. Doe to a hearing that was fair. At a minimum, she was entitled to (i) know in advance the VA's claims and *all* of its evidence, (ii) confront the witnesses against her and (iii) present testimonial and documentary evidence in her defense. The DAB failed in one way or another on all three requirements.

### (1)     Defendants Improperly Excluded Appellant's Additional Evidence File.

At the Hearing, the DAB considered and admitted only the documentary evidence offered by ECHS, AR1-358, while refusing to admit and consider any of "Appellant's Additional Evidence File Exhibits," AR669-948, offered by Dr. Doe comprising 24 Tabs and 280 pages of documentary evidence refuting ECHS' position. (AR982 (DAB tr. 9:14-19), 983 (DAB tr. 10:3-20).) The DAB panel would not even allow Dr. Doe's counsel to ask questions about documents that were not in the ECHS

Evidence File. (AR1901 (DAB tr. 74:18-20)) ("you're not allowed to ask ... about anything that does not exist in the [ECHS] evidence file").) The extensive relevant defense evidence the DAB excluded and refused to consider that contradicted the VA's allegations included, among other things:

- Evaluation forms establishing Dr. Doe's excellent job performance in the years preceding and including the time within which the alleged misconduct and purportedly poor performance occurred. (AR695-715.)

- Evidence of ECHS personnel reporting broad general dysfunction and unprofessional conduct within the Anesthesia Department unrelated to Dr. Doe. (AR727.)

- Evidence of bias against Dr. Doe forming part of the basis for Specification 8. That included communications by Dr. Mangione (then-Chief of Staff) in which she questioned whether Dr. Doe was allowed to supervise residents and characterizing her as the "problematic anesthesiologist" (AR729), presumably referring to Dr. Doe's complaint about departmental dysfunction. She then expressed incredulity upon learning that Dr. Doe was in fact allowed to supervise residents and indicated she would seek an internal ECHS follow up (AR730).

- Evidence of a pretext for terminating Dr. Doe, including evidence that Dr. Mangione compiled an evidence file against her by late November 2017 – prior to most of the incidents giving rise to the Specifications and many months prior to ECHS notifying Dr. Doe of alleged misconduct or its investigation in that regard. (AR750-51.)

- Evidence that the bases for the Specifications asserted against Dr. Doe, her summary suspension, revocation of her clinical privileges and termination were unfounded and contrary to VA Clinical Privileges Guidelines. Those Guidelines require that the challenged practices pose "an imminent danger to the health of any individual" to justify summary suspension or revocation of clinical privileges. (AR755. Among the evidence the DAB refused to consider was the fact that ECHS never expressed concerns regarding Dr. Doe's clinical competence or professional conduct in 2017, when some of the incidents forming the basis for her adverse privileging action and removal allegedly

occurred. (AR796-814.) Nor did the DAB consider, because it had excluded, evidence establishing that Dr. Doe's cases examined by the outside review met the standard of care, (AR832-57, Ans. ¶¶ 21, 27) and, therefore, failed to establish a basis for undertaking the adverse privileging action. (AR754.)

- Evidence that, in December 2017, the then-ECHS Deputy Chief of Staff (Dr. Dillon) apparently solicited complaints about conduct by Dr. Doe occurring eight months previously which Dr. Doe's direct supervisor at the time had deemed meritless. The solicited complaints were wholly unrelated to the Specifications asserted against Dr. Doe, her summary suspension, revocation of her clinical privileges and eventual termination. (AR793-94.)

- Evidence of Dr. Doe's positive Focused Practice Performance Evaluation ("FPPE") for October 1, 2016 to May 8, 2017, including that she met 100% of performance metrics for FY2017. (AR805-14.) This evidence would have refuted evidence offered by ECHS and relied on by the DAB panel reflecting a negative evaluation by Dr. Shockey for FY2017.

- Evidence of animosity and bias against Dr. Doe by her immediate supervisor, Dr. Black, Chief of Anesthesiology, in which -- five days prior to the summary suspension of her clinical privileges -- he lamented that she met 100% of her performance metrics for FY2017 and that her true performance would undermine his desire to claim she was a "substandard performer[.]" (AR818-19.).

- Evidence of bias and dishonesty by Dr. Black in altering Dr. Doe's bonus performance pay-for-performance recommendation for FY2017, despite that he did not begin as ECHS Chief of Anesthesia until FY2018 and his own calculation yielded an award to Dr. Doe of 81.5%. (*Id.*)

- Evidence that, as early as October 26, 2017, Dr. Doe's clinical privileges were a target of a Focused Clinical Care Review ("FCCR") investigation, (AR826), despite that ECHS never informed her she was the focus of an investigation or of the concerns giving rise to it. Dr. Doe's evidence excluded by the DAB established ECHS had drafted a notification to her but never delivered it. (AR823-24.) The DAB prevented Dr. Doe from using documents in the additional exhibit file to establish that FCCRs are to be conducted pursuant to VA policy. (AR1901 (DAB tr. 74:1-20).)

- Evidence that the investigation of Dr. Doe's clinical privileges prior to her summary suspension yielded a finding that she met the standard of care in all records reviewed (AR834-57; Ans. ¶¶ 21, 27) and, thus, ECHS failed to gather detailed evidence of substandard care necessary to take that adverse privileging action. (AR3223 (VA Handbook 1100.19 regarding "Summary Suspension").)

- Evidence of a June 29, 2016 Memorandum establishing that the surgical service was responsible for entering orders in the computer, not anesthesiologists like Dr. Doe. (AR860-61.) That refuted testimony by ECHS witness Torres that Dr. Doe had communication issues in years prior to the incidents giving rise to her adverse privileging action and removal because pharmacy staff purportedly had difficulty understanding post-operative orders regarding her patients. (AR1660 (DAB tr. 592:1-24).) The DAB relied on Ms. Torres' testimony to uphold the Specifications. (AR970 ¶10.)

- Evidence of bias by ECHS witness Dr. Carlton Barnett based on an incident in which Dr. Doe reported that Dr. Barnett failed to adhere to a requisite standard of care and engaged in verbal threats and threatening body language toward Dr. Doe. (AR873-80.)

- Evidence of a fraudulent coding system created by Dr. Beck to indicate he was working in the operating room while he was not present at the facility (AR884-88) and evidence of his threat to resign if required to work post call days (AR889-90), all of which contributed to cancellation of hundreds of veteran surgeries as substantiated in the OMI report to Congress (AR891, 893).

- Evidence of bias against Dr. Doe by Dr. Beck over the post-call days issue (AR882-93) and evidence refuting hearsay testimony he offered that surgeons scheduled procedures to avoid working with Dr. Doe, that they requested backup availability when they were scheduled with Dr. Doe, and that Dr. Doe did not accept accountability (AR895-98). The DAB panel ultimately relied on and cited the Beck testimony in its decision after not allowing Dr. Doe to impeach or refute it. (AR968.)

- Evidence refuting the DAB's view that Dr. Doe was a source of discord in the Anesthesia Department. (*See, e.g.*, AR969 (¶¶ 5, 6 [Appellant's communication style created a toxic environment], 967 (¶ 9 [Appellant created a very toxic environment])). Within this excluded evidence

was information indicating that: (i) the Department and Surgical Intensive Care Unit ("SICU") had a culture of hostility and unprofessional conduct involving pervasive verbal and professional conflict between CRNAs, physicians and the Chief of Anesthesiology (AR727); (ii) experienced serious reports of a hostile work environment created by doctors and staff other than Dr. Doe (AR910-42); and (iii) had been found by OMI to have been mismanaged for years (AR944-48).

The DAB's refusal to consider Dr. Doe's Additional Evidence File Exhibits deprived her of the right to present evidence in her defense and foreclosed her opportunity to refute the evidence against her by offering a contrary interpretation. Even worse, the DAB failed to provide *any* justification for that exclusion at the time (DAB tr. 9:13-19) or in its written decision (AR965-71), much less a facially legitimate and bona fide factual basis for doing so. *See, e.g., Kerry v. Din*, 576 U.S. 86, 103 (2015) (Kennedy and Alito, JJ., concurring). Thus, under the *Mathews* factors, the DAB had no justification for refusing Dr. Doe's proffered evidence and failed to provide safeguards to ensure she enjoyed her right to present a defense. This additional evidence, together with the evidence she *did* offer, would have further established the DAB's lack of any basis whatsoever to uphold ECHS' decision and actions. The DAB violated her due process rights, and the Final Agency Action must be set aside.

> ### (2)    *Defendants violated Dr. Doe's right to respond by improperly excluding expert testimony by Dr. John Ziegler, M.D.*

As reflected in Dr. Doe's *approved* Second Amended Witness List, she sought to offer testimony from an expert witness, Dr. John Ziegler: (i) that the specifications alleged against her did not constitute substandard patient care; (ii) regarding VA – academic contracts, the politics and culture differences involved in the relationship between an academic affiliate such as the University and the VA, and the ongoing problems with long VA wait times for surgery; and (iii) that the ECHS could have, and should have, handled any alleged concerns about Dr. Doe's communication style, resident complaints or clinical competence through avenues other than revocation of her clinical privileges and termination. (AR641-43 at ¶ 6.) The DAB approved Dr. Ziegler's inclusion in that witness list to testify in those respects. (AR649 ¶ 1.) Under Fed.R.Evid. 702 Dr. Ziegler should have been allowed to testify

as an expert. *See, e.g., Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004) (administrative proceedings should be guided by "spirit" of interpretation of Rule 702 regarding expert testimony).

Yet, at the hearing, the DAB refused to allow him to testify as an expert on the topics for which he was approved. (AR1799-1800.) By excluding this evidence, the DAB foreclosed Dr. Doe's ability to defend herself by offering a multi-point presentation contrary to that offered by ECHS. What's worse, the DAB's claimed justification for refusing to allow Dr. Ziegler's testimony was that the Chairperson, Dr. Sakawi, claimed that he – and he alone – would serve as the expert witness in the case, (AR1799-1800 (DAB tr. 731:8-732:8)). But, because he (the Chairperson) did not testify, Dr. Doe had no notice of his "expert" views and no ability to cross examine him. Further, she had no ability to offer a contrary presentation on her own behalf with regard to the matters for which Dr. Ziegler had been endorsed and approved. Dr. Ziegler's testimony would have established that ECHS' actions were impossibly flawed. The objectivity and fairness of the DAB proceeding was thereby obviated, *see, e.g., Kerry,* 576 U.S. at 103-04, thus denying Dr. Doe her right to due process.

> ### (3)    *Defendants improperly precluded Dr. Doe from using sworn deposition testimony for impeachment, and precluded her from cross-examining the proposing and deciding officials*.

The DAB also improperly refused to allow Plaintiff to use prior sworn deposition testimony of ECHS witnesses on cross examination to impeach their direct testimony against her. (AR649 at ¶ 3.) Courts recognize that administrative proceedings should adhere to the spirit of the Federal Rules of Evidence. *See, e.g., Niam*, 354 F.at 660 (7th Cir. 2004). Under those Rules, use of a witness' prior testimony is an express exception to the rule excluding hearsay. *See* Fed.R.Evid. 804(b)(1). And, they expressly authorize a party to impeach a testifying witness by means of a prior inconsistent statement and to use extrinsic evidence of a witness's prior inconsistent statement. *See* Fed.R.Evid. 613(a) & (b).

The U.S. Supreme Court has noted that protection of an individual's right to present evidence in defense of a governmental action seriously injuring that individual is an immutable principle. *Greene v. McElroy*, 360 U.S. 474, 496-97 (1959). That protection is important in the case of documentary

evidence but is "even more important where the evidence consists of testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Id.* The Court has formalized these protections in the requirements of confrontation and cross-examination and has zealously preserved these protections all cases, including "where administrative and regulatory actions are under scrutiny." *Id.* Prohibiting Dr. Doe from cross examining witnesses with their own prior sworn deposition testimony that contradicted their hearing testimony vitiated her right to offer a contrary presentation.

For example, regarding Specification 2 the DAB relied on vague general testimony by CRNA Sarah Fredriksson. First, the panel noted that she characterized Dr. Doe "as excitable" and stated she thought Dr. Doe "took precipitous actions without due diligence or coordinating and communicating ... as joint anesthesia providers …." (AR967.) The DAB went on to note that Fredriksson described the interpersonal environment created by Dr. Doe as not fostering a team approach. (*Id.*) Then it concluded that she offered examples of Dr. Doe seeing patients preoperatively but not communicating that fact, causing the patient to be seen a second time or only communicating information about the patient after both Dr. Doe and CRNA Fredriksson were in the room with the patient. (*Id.*)

That hearing testimony, however, is contradicted by sworn deposition testimony Ms. Fredriksson gave in a parallel proceeding about the patient and procedure at issue in Specification 2:

        Page 16 (AR2655 (Dep. tr. 16:15-20).)
        15   Q. Okay. Did you have a good working
        16   relationship with her [Dr. Doe] prior to this time?
        17   A. It was -- from my perspective it was
        18   collaborative. I felt that she -- we worked together
        19   well. I guess -- so yes, it was a good working
        20   relationship.
-------------------------------------------------------------------------------------------
        Page 19 (AR2658 (Dep. tr. 19:11-25).)
        11   Q. So in this case in particular, then, am I
        12   correct in hearing you that there -- was there not a
        13   need -- a lot of need for discussion at this point at
        14   the induction?
        15   A. Not for extensive discussion. I mean, it
        16   was basic, you know, Yes, we're going -- usually at
        17   the time I'm in the room. I would see Dr. [Doe] in

18    the pre-op area, too. So that's basically where our
19    major discussion would take place as to what we're
20    going to do.
21    Q. Okay. And in this situation in the pre-op
22    area, did you have a discussion with Dr. [Doe] on
23    that day?
24    A. I'm sure I did.    I just don't recall at
25    what point in time because it's so routine.
------------------------------------------------------------------------------
Page 20 (AR2659 (Dep. tr. 20:1-3).)
1    Q. Sure.   It was so routine that you can't
2    really recall the details of it?
3    A. Right.
------------------------------------------------------------------------------
Page 30 (AR2669 (Dep. tr. 30:4-12).)
4    Q. There may not have even been any
5    Conversation?
6    A. No. There would have.   There was
7    conversation, because we would have been – there is a
8    lot of things that we would be talking about right at
9    that moment. You know, whether the patient
10   fasciculated and is ready, whether – that sort of
11   thing.   I don't recall exactly what the conversation
12   was.

The excluded specific Fredriksson deposition testimony would have impeached her vague,

general DAB hearing testimony, directly undercutting the panel's finding on Specification 2.

Further, regarding Specification 4, Dr. Black conceded at the DAB hearing that he had received

a "reasonable accommodation" request regarding Dr. Doe (AR1072 (DAB tr. 99:22-24)) relating to

her difficult pregnancy (AR1073 (DAB tr. 100:17-18). He went on to suggest that the accommodation

request included a weight restriction of 40 pounds and that the lead apron she was not wearing weighed

less than that. (AR1074 (DAB tr. 101:19-22).) But, exhibits to his prior deposition in the parallel

proceeding - including the request itself (AR2351 ("No heavy lifting, pushing")) and Dr. Black's own

EEOC questionnaire responses (AR2495 ("Complainant was unable to lift heavy objects…. [S]he

could not push patients by herself … also was unable to lift patients."), 2496 (the requested

accommodation was "No heavy lifting")) -- make clear that no such specific weight restriction

accommodation was requested. Rather, he testified in deposition that the 40-pound restriction was

something ECHS itself imposed. (AR2402 (Dep. tr. 163:14-17).)

Dr. Doe's inability to confront CRNA Fredriksson and Dr. Black with their prior deposition testimony and exhibits prejudicially undermined Dr. Doe's opportunity to fully confront them and cross-examine their DAB hearing testimony against her. This violated her due process rights.

What is more, the ECHS evidence file included demonstrably false allegations by the proposing and deciding officials regarding the basis for their decisions to revoke Dr. Doe's clinical privileges and terminate her employment. For example, they revoked Dr. Doe's privileges after citing her as an "imminent threat to patient safety" (AR2170), despite evidence to the contrary such as the outside reviewer's determination that she met the requisite standard of care. (AR834-57; Ans. ¶¶ 21, 27.)

Also, Dr. Doe was not allowed to cross examine these officials regarding their handling of far more egregious conduct by anesthesiologist Douglas Semian putting patients at risk (*see, e.g.*, AR923 (failure to provide required patient report), 924 (failure by to properly chart patient record), 937 (formal complaint regarding his failure to communicate as required)) by imposing a far less severe penalty (*see* AR925-28 (mere requirement that he communicates effectively and professionally).

Had Dr. Doe been able to confront certain ECHS decisionmakers and to cross examine other witnesses with their depositions, she would have discredited the evidence on which ECHS' actions were based. The DAB having before it false, adverse materials without the sponsoring witnesses being present to be cross-examined deprived Dr. Doe of the right to defend herself and, so, of a fair hearing.

> *(4)     Dr. Doe did not have proper notice of charges and evidence considered by Defendants in effectuating and upholding her termination.*

"In arriving at its decision, the agency shall not consider any reasons for action other than those specified in the notice of proposed action." *Douglas*, 5 M.S.P.B. at 331, n. 65. "Only the charge and specifications set out in the Notice may be used to justify punishment because due process requires that an employee be given notice of the charges against [her] in sufficient detail to allow the employee to make an informed reply." *O'Keefe v. U.S. Postal Serv.*, 318 F.3d 1310, 1315 (Fed. Cir. 2002). The court in *O'Keefe* held that, "[b]y accusing [the employee] of specific misdeeds that were not within the

scope of the Notice of Proposed Removal, the Board exceeded the scope of its review of the agency's decision." *Id.* "As such, the Board has abused its discretion in finding that [the employee's] conduct was so egregious as to require removal." *Id.*; *see also Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1281 (Fed. Cir. 2011) (court will not uphold agency's decision where deciding official considered alleged prior incidents of misconduct not included in the notice of proposed removal); *Turner v. United States. Postal Serv.*, 85 M.S.P.R 565, 569 (M.S.P.B. 2000) (agency commits harmful, prejudicial procedural error by considering reasons for its action that were not referenced in the proposal notice).

Here, Defendants failed to provide Dr. Doe with constitutionally adequate notice of the charges and evidence against her, and the DAB improperly considered new and material information to uphold the adverse privileging actions. First, the DAB panel upheld Specifications 1, 2, 5, and 8, based on information about uncharged misconduct.

For example, Specification 1 alleged misconduct relating only to patient C217. (AR966 (DAB written decision)). Yet, the DAB upheld Specification 1 based on new, material, and extraneous evidence from a CRNA and another anesthesiologist wholly unrelated to patient C217:

> [CRNA] Timothy Christie testified of his *experience over several years working with the Appellant*; he suggested there is no collaborative team effort to include her unwillingness to relay information regarding why or how things are done *on a daily basis .... He further explained working with the Appellant was always very difficult* concerning intervention with the patients.... *Dr. Black provided testimony of complaints received of the Appellant's inability* "to communicate and to have a discussion and be collegial" from a "*fairly wide breadth of people* throughout the institution" ....

(Id.) (emphasis added).

Similarly, Specification 2 alleged misconduct relating only to patient S8826. (*Id.*) Yet, the DAB panel upheld Specification 2 based on new, material, and extraneous evidence from one CRNA, Sarah Fredriksson, wholly unrelated to patient S8826:

> [Fredriksson] gave examples of Appellant preoperatively seeing *patients* and not communicating such, causing same patient to be seen twice or only communicating information about the patient after they were both in room with patient.

(*Id.* at 967 (emphasis added).)

Moreover, Specification 5 alleged misconduct relating only to patient T3301. (*Id.*) Yet the DAB panel upheld that Specification based on allegations of new, material and uncharged misconduct from Dr. Bolson in which she testified that

> [Dr. Doe's] communication has *always* been somewhat abrasive and at *sometimes* [*sic*] hostile and didn't seem like' her [*sic*] and the Appellant 'could find common ground *often* to discuss things and move forward. It seems *always* there was tension *when working with*' the Appellant ...."

(*Id.* (emphasis added).) Defendants even admit in their Answer that the DAB explicitly upheld Specification 5 based in pertinent part on this testimony *that was extraneous and irrelevant to the specification*. (*Compare* Am. Cmplt. ¶ 51.c.i. *with* Ans. ¶ 51.c.i.)

Specification 8 alleged, vaguely, that Dr. Doe's interactions with residents were improper. The DAB then upheld Specification 8 based on testimony from Dr. Back that was outside the allegations:

> Dr. Beck testified of surgeons scheduling procedures to avoid the Appellant and requesting backup availability when scheduled with the Appellant.... Dr. Beck also made mention the Appellant doesn't take accountability ....

(AR968.) The DAB's reliance on this new, material information violated Dr. Doe's due process rights.

Moreover, the DAB upheld Dr. Doe's termination by considering and applying new, previously undisclosed, and uncharged aggravating "Douglas factor" evidence not related to any Specification. Specifically, when addressing "mitigating circumstances" in its penalty analysis, the DAB generically referenced testimony from Ms. Torres' (without citing any specific page or line) to the effect that Dr. Doe's alleged communication issues began prior to the onset of her health concerns during late 2017 and early 2018. (AR970.) The DAB panel expressly relied on this testimony to apply it as an aggravating, rather than mitigating, factor when deciding the penalty's appropriateness. (*Id.*) As such, the DAB's consideration of this new and material information violated Dr. Doe's due process rights.

Finally, the DAB panel had before it in ECHS' Evidence File eight Tabs (19-23), entitled "Statement Regarding Similar Instance of Misconduct" (AR338-58) containing information adverse to

Dr. Doe unrelated to any of the specifications. The extraneous materials were merely vague criticisms about unrelated matters of uncharged misconduct not included in any notice. These deficiencies violated Dr. Doe's due process rights and the Final Agency Action must be set aside.

> **(5)    Dr. Doe did not have notice or a fair opportunity to respond to the bases for her initial and subsequent "automatic" summary suspensions.**

ECHS predicated its February 2018 summary suspension of Dr. Doe's privileges on alleged generic "concerns [that] have been raised to suggest that aspects of [her] clinical practice do not meet the accepted standards of practice and potentially constitute an imminent threat to patient welfare." (AR2170-71.) ECHS noted it was relying on unspecified "reports" from unnamed "peers, nurses, and residents." (*Id.*) Significantly, the suspension document did not specify what the "concerns" were, which "aspects" of Dr. Doe's practice were involved, what "accepted standards" were at issue, what the potential "imminent threat" was to "patient welfare." (*Id.*)

Thus, ECHS' further statement that Dr. Doe had "the opportunity to provide any information that [she] desire[d] regarding these concerns" (*id.*) realistically afforded her no such opportunity at all. Although Dr. Doe's then-counsel requested that ECHS provide information supporting the suspension, that never occurred. (AR 2197-2200 ("The [VA] has withheld the entirety of the specific information that would provide [Dr. Doe] an opportunity for a meaningful reply."); Ans. ¶ 54.b.) ECHS' five subsequent notices of extensions of the suspension (AR2207, 2549, 2251, 2255, 2260.) provided no additional illumination and, therefore, likewise afforded Dr. Doe no realistic opportunity to respond. They are all impermissibly vague and failed to provide her with the constitutionally-required notice.

The factors and reasons on which the ECHS intended to rely should have been included in the advance notice of adverse action so Dr. Doe would have a fair opportunity to respond to those factors before a decision was made. That did not happen either. With proper notice and a fair opportunity to respond, Dr. Doe would have established that there was no basis to suspend, much less terminate, her. This lack of notice and opportunity to respond constituted yet another violation of Dr. Doe's due

process rights and is an additional ground on which this Court must set aside the Final Agency Action.

## II.     The Final Agency Action Must Be Set Aside Pursuant to 38 U.S.C. § 7462(f)(2).

Section 7462(f) of U.S. Code Title 38 governs judicial review of adverse actions against full-time permanent VA employees when, as here, the adverse actions relate to "professional conduct or competence." Section 7462(f)(2) prescribes the applicable standard of review:

> [T]he court shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule, or regulation having been followed; or (C) unsupported by substantial evidence.

The standard in Section 7462(f)(2) "directly mirrors the standard for judicial review of other administrative actions." *Rajan v. Principi*, 90 F. App'x 262, 263 n. 1 (9th Cir.2004).

### A.     Defendants' Actions Were Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Not in Accordance with Law.

An agency's decision will be set aside under § 7462(f)(2)(A) as arbitrary and capricious

> if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Taylor v. Principi*, 92 F. App'x 274, 276-77 (6th Cir. 2004) (quoting *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 911 (6th Cir. 2000)). Although it is a "highly deferential" standard, it "does not automatically mandate adherence to [agency decisions]' – that is, it is not 'without some teeth.'" *McDonald v. W.S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (internal citation omitted). "Deferential review is not no review, and deference need not be abject." *Id.* (internal quotation marks omitted). "Federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. UnumProvident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005).

#### (1)     Defendants' failure to cite any objective standard by which it was upholding the Specifications was arbitrary and capricious.

A DAB decision is arbitrary and capricious if it fails to reference an objective standard or

criteria for evaluating the allegations on which the specifications are based. *Lerner v. Shinseki*, 2013 WL 5592906, *17 (W.D. Ky. 2013) ("[T]he DAB made no reference to any objective standard or criteria why any of Lerner's alleged comments -- irrespective of the context in which they are used -- are necessarily inappropriate.") Like Dr. Doe, Dr. Lerner was a VA anesthesiologist charged with unprofessional conduct based on allegations of improper communication. The *Lerner* court distinguished the facts before it from those in *Abaqueta*, 255 F.Supp.2d at 1026, where that court had found the DAB properly considered the applicable objective standard of care after hearing expert testimony about that standard. *See* 2013 WL 5592906, *18. No such testimony was considered in *Lerner*. Thus, the *Lerner* court held, "[b]ecause the DAB both failed to identify and utilize any sort of objective measure and to offer a reasoned explanation why Lerner's conduct constituted inappropriate conduct, the Court finds its decision arbitrary and capricious." *Id.*

ECHS terminated Dr. Doe by charging her with "unprofessional conduct" based on the above five specifications. All of those specifications, and the DAB decision upholding them, alleged that Dr. Doe acted "without appropriate communication" or that she was "unprofessional" in her interactions. (AR966-68.) Like *Lerner*, however, the DAB in Dr. Doe's case did not rely on any objective standard to find that Dr. Doe's communications were inappropriate or that she acted unprofessionally. (*Id.*)

Notably, the VA code of conduct does not reference any objective standard of communication practices with which anesthesiologists must comply. The most analogous standard is set forth in the VA Handbook 5021 under "General Misconduct," which states the following communications are improper: (i) making false or unfounded statements, which are slanderous or defamatory, about other employees or officials; (ii) disrespectful, insulting, abusive, insolent or obscene language to or about supervisors, other employees, patients or visitors; and (iii) fighting, threatening, attempting, or inflicting bodily injury to another: engaging in dangerous horseplay. (AR2924.) The alleged conduct on which Defendants based their adverse employment actions against Dr. Doe, and on which the DAB

based its decision, failed to include any conduct like that which is prohibited by the VA Handbook.

In the absence of an express standard applicable to VA employees, the DAB should have considered expert testimony to determine that appropriate standard as it did in *Abequeta*. 255 F.Supp.2d at 1026. ("[T]he ethical standard was a question of fact for the Appeals Board to determine based on the qualification and testimony of the expert witness.") Here, ECHS failed to introduce any expert testimony regarding an objective standard by which the DAB should evaluate Dr. Doe's conduct. And, Dr. Doe's attempt to introduce expert testimony -- by Dr. Ziegler (a former VA Chief of Anesthesiology, no less) -- about the relevant standards, including those applicable to communication by and professionalism of VA anesthesiologists, was rebuffed. Instead, without definition, the DAB panel applied in conclusory fashion its own subjective and arbitrary standard of what supposedly constitutes "improper" communication or "unprofessional" conduct. Had the DAB articulated an objective standard at the hearing, Dr. Doe would have established that she did not violate it. Like *Lerner*, the failure to apply an objective standard to uphold her removal was arbitrary and capricious.

### (2)     ECHS failed to prove each element of Specifications 1 and 2 rendering the DAB decision arbitrary, capricious, and not in accordance with law.

An agency's charge will be upheld only if the agency proves each element. *See, e.g., Burroughs v. Dep't. of Army*, 918 F.2d 170, 172 (Fed. Cir. 1990) ("The [ALJ] erred in not requiring each of the elements of the ... charge to be proved .... If the agency fails to prove one of the elements of its charge, then the entire charge must fail.") (citing cases); *see also Greenough v. Dept. of the Army*, 73 M.S.P.R. 648, 654 (M.S.P.B. 1997) ("An agency must prove every element of the charge it has brought.")

As noted, ECHS charged Dr. Doe with "Unprofessional Conduct" based on five specifications. (AR966-68.) But, it failed to prove each element of every specification, so the charge actually fails.

As set out above, Specification 1 alleged that:

> On February 9, 2018, during a parathyroidectomy procedure on patient C2171, you [i] placed an arterial line without appropriate evaluation and assessment, [ii] without confirming through additional readings or physical exam the patient's vital

signs, and [iii] without appropriate communication with other staff. (AR966.)

In its written decision, the DAB found in favor of Dr. Doe on the first and second elements ("[i]t was well within the Appellant's right to decide whether to place the arterial line") and only found in favor of ECHS on the third element (Appellant "did not have a direct conversation with Tim Christie" and "there was minimal discussion between the Appellant and members of the anesthesia team prior to … placement of [the] arterial line"). (AR966.) Each element of Specification 1 was not proved; thus, the specification was not proved, and each element of the Charge was not proved.

As also set out above, Specification 2 alleged:

> On February 7, 2018, during a procedure on patient 88826 involving excision of a pilonidal sinus and left scrotal mass, you [i] removed an inflated endotracheal tube without allowing for evaluation of placement prior to doing so, and [ii] you administered medications without appropriate communication and coordination with the CRNA. (*Id.*)

Again the DAB found in favor of Dr. Doe regarding the first element ("the Appellant's efforts were validated as the most senior person on the team") but nevertheless upheld the specification based on a determination that she acted without appropriate communication with the CRNA. (AR967.) By the DAB's own findings, then, each element of Specification 2 was not proved; thus, the specification was not proved and each element of the Charge was not proved.

Based on the foregoing, it is clear the DAB decision upheld the Charge of Unprofessional Conduct based on specifications that were not proved in all respects:

> Appellant had unprofessional conduct ... in *communication* or the lack thereof. Each specification and findings under the charge display the Appellant's failure to appropriately *communicate* .... The Appellant's failure to effectively *communicate* ....

(*Id.*) (emphasis added). Defendants even admit in their Answer to the allegation of Amended Complaint ¶ 53.a that "the charge must fall." (Ans. ¶ 53.a.) The Final Agency Action must be set aside.

### (3)     *Defendants' Failure to Comply with Their Own Directives Was Arbitrary.*

Failure of a hospital to comply with material procedures in its own bylaws and internal

regulations is "inherently arbitrary." *Balkissoon v. Capital Hill Hosp.*, 558 A.2d 304, 308 (D.C.App. 1989). The VA website provides, "VA Directives provide mandatory Department-wide policies" and "prescribe mandatory Department-wide procedures or operational requirements implementing policies contained in directives." (U.S. Department of Veterans Affairs Office of Acquisitions and Logistics Resource Library, https://www.va.gov/oal/library/dms.asp (last visited November 30, 2020).)

VA Directive 5021/9 is relevant here. It requires "[a] statement of the specific charges upon which the proposed action is based, including ***names, dates, places, and other data sufficient to enable the employee to fully understand the charges and to respond to them***. (AR2960 8.b.(2)(b)) (emphasis added). Appendix A of that Directive further requires "[a] statement of any ***specific law, regulation, policy, procedure, practice or other specific instruction (national, local or otherwise) that has been violated as it pertains to each charge***." (AR2834 at ¶2 (same), ¶3 (same) (emphasis added).)

As detailed above, the Charge and Specifications 1, 2, 4, 5, and 8 against Dr. Doe were based on vague references to unprofessional conduct and inappropriate communication. (AR966-68.) Defendants failed to cite, much less prove, any specific law, regulation, policy, procedure, practice or specific instruction that Dr. Doe violated. (*See id.*) In particular, the allegations on which Specification 8 were based and upon which the DAB upheld it alleged that "[b]etween on or about May 1, 2016 and on or about December 1, 2017 ... you were unprofessional in your interactions with residents …." (AR968.) ECHS never provided specific names, dates, places, or other data sufficient to enable Dr. Doe to respond, such as the residents with whom she interacted unprofessionally, the dates on which the unprofessional interactions took place or the patients with respect to whom the unprofessional conduct occurred. Without more, Defendants violated VA Directives and, thus, acted arbitrarily.

ECHS predicated its February 14, 2018 summary suspension of Dr. Doe's on generic "concerns [that] have been raised to suggest that aspects of [her] clinical practice do not meet the accepted standards of practice and potentially constitute an imminent threat to patient welfare." (AR2170-71.)

However, Defendants failed to cite any specific law, regulation, policy, procedure, practice or specific instruction that Dr. Doe supposedly violated giving rise to that suspension or any of its five subsequent "automatic" extensions. These automatic suspensions further violated VA policies providing that, "[u]nder no circumstances should there be more than three automatic suspensions of privileges in 1 calendar year, …" (AR3223-24 (VA Handbook at 51-52).) In so doing, Defendants acted arbitrarily.

Moreover, ECHS failed to cite, much less provide, materials relied on to suspend her (AR2183-84), despite counsel's request for such materials (AR2197-99.). This failure constitutes yet another violation of VA Directive 5021/9 Appendix A (Nov. 8, 2012) at A-6 4(d) (affording the affected employee "[t]he right to review the material relied upon to support the reasons for the proposed action"), AR2839, *accord* VA Directive 5021 Appendix A (Apr. 15, 2002) at A-3 3(d) (same), AR3834; and VA Handbook 1100.19 (Oct. 15, 2012) at 53 (4)(b) (practitioner must be allowed to review all evidence not restricted by statute or regulation), AR3225.

Finally, pursuant to VA bylaws and portions of Handbook 5021, (AR581; AR2909-12), ECHS and the DAB were required to consider medical documents and information regarding the possible nexus between the health issues for which she sought a reasonable accommodation and the Charge brought against her. (AR1072 (DAB tr. 99:16-23), 2402 (Black Dep. tr. 163:18-21), 2494 (¶¶ 9-10), 2351; *see* AR2077-79 (DAB tr. 250:12 – 252:1)).

Yet, the DAB failed to do so in upholding Specification 4, which directly resulted from the medical issues, including her high-risk pregnancy, that were not accommodated at the time. Similarly, ECHS never requested or considered Dr. Doe's medical documentation, and the DAB failed to state in its decision why it ignored testimony by Dr. Humphreys about the nexus between her medical issues and the allegations of Specification 4. (AR1853-1854 (DAB tr. 26:9-27:8).) Had ECHS complied with these requirements, Dr. Doe would have been granted a reasonable accommodation instead of a career-ending adverse action. At worst, it could only have discharged Dr. Doe due to a disability, which is not

reportable to the NPDB or state medical board. Defendants' failure to comply with their own directives renders their actions inherently arbitrary and capricious, for which it must be set aside.

> **(4)    Defendants' failure to appropriately consider and weigh the "Douglas factors" in upholding the penalty was arbitrary and capricious**.

Courts will only uphold a penalty if they determine the DAB "examined the relevant data and articulated a satisfactory explanation for [its] decision, including a rational connection between the facts and decisions made." *Kreso v. McDonald*, 631 Fed.Appx. 519, 523-24 (10th Cir. 2015). Federal courts utilize the factors set forth in *Douglas*, 5 M.S.P.R. at 305, to determine whether a penalty imposed on a Title 38 employee is arbitrary and capricious. *Compare Lerner*, 2013 WL 5592906, at *20 *with Kreso*, 631 Fed.Appx. at 524. Regardless whether *Douglas* is "binding" on the DAB, where it elects to consider those factors it should not do so arbitrarily. The DAB's rejection of Dr. Doe's evidence file was an arbitrary failure to examine all the relevant data necessary to determine whether her termination was appropriate. Even considering the evidence the DAB *did* consider, the DAB misapplied the *Douglas* factors to arrive at an unconscionable decision. (AR965-71.)

> **a.    Penalty imposed for Dr. Doe's alleged offenses is greater than the seriousness of the alleged offense under <u>Douglas Factor 1</u>.**

An agency commits reversible error when it selects a penalty greater than the offense charged. *Culley v. Def. Logistics Agency*, 60 M.S.P.R. 204, 214-15 (M.S.P.B. 1993). An agency's removal action will be reversed, for example, if it "viewed the appellant's misconduct supporting the charge and the charge itself to be more serious than the actual circumstances surrounding the charge and the charge itself." *Shelly v. Dept. of Treasury*, 75 M.S.P.R. 677, 683 (1997). Courts defer to the DAB's judgment "unless the penalty is so harsh or disproportionate to the offense as to constitute an abuse of discretion." *Abaqueta*, 255 F.Supp.2d at 1028 (quoting *McClaskey v. U.S. Dept. of Energy*, 720 F.2d 583, 586 (9th Cir.1983)). Thus, courts have held that dismissal is sufficiently harsh to be an abuse of discretion when the offense committed is minor. *See, e.g., Morales v. Merit Sys. Prot. Bd.*, 932 F.2d

800, 802 (9th Cir. 1991). In *Abaqueta*, for example, the court upheld dismissal of a VA anesthesiologist whom two attending physicians observed touch a female patient's breast after he administered medication to her, which was an intentional violation of her dignity, 255 F.Supp.2d at 1030.

Here, the misconduct alleged against Dr. Doe is about a purported lack of explicit communication and unprofessional conduct. The record is devoid of conduct that reasonably could be characterized as anything but "minor." For one thing, contrary to the requirements of the VA penalty table set forth in VA Handbook 5021 (AR2986), the DAB never found that Dr. Doe's alleged communication shortcomings were intentional, malicious or resulted in patient harm.

ECHS' claim that Dr. Doe's conduct was significant because "16 residents" made complaints was refuted by testimony from Dr. Oliva that just four residents submitted the alleged complaints. (AR1404 (DAB tr. 379:1-5), 1409-10 (DAB tr. 384:22-385:1), 1411 (DAB tr. 386:8-11), 1413 (DAB tr. 388:3-20).) Dr. Black also testified in his deposition that it is "quite common" for faculty to receive complaints from residents. (AR2387 (Black Dep. Tr. 102:11-13).)

Further, ECHS had assembled an evidence file against Dr. Doe almost three months before summarily suspending her. (AR750-51.) Yet, it allowed her to continue working in the interim while not raising with her a belief that her conduct was jeopardizing patient safety. Allowing her to continue performing her duties well after learning of alleged misconduct undermined the purported seriousness of her supposed offense. *See Hovanec v. Dept. of the Interior*, 67 M.S.P.R. 340 (M.S.P.R. 1995). Thus, upholding her termination based on minor conduct was arbitrary and an abuse of discretion.

        **b.**      **The DAB failed to properly consider Dr. Doe's job level and type of employment under <u>Douglas Factor 2</u>.**

The second *Douglas* Factor involves consideration of the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position. *Douglas*, 5 M.S.P.R. at 305. As the DAB acknowledged, Dr. Doe "is a very well-trained anesthesiologist with board certifications in anesthesiology, cardiac and critical care anesthesia."

(AR969 ¶ 2.) Nevertheless, the DAB found that this factor supported the penalty imposed because Dr. Doe's "improper communication is not appropriate for the team model the VA promotes." (*Id.*)

The DAB's consideration of this factor is fatally flawed because it failed to define what constitutes "improper" communication by such "a very well-trained anesthesiologist." Further, the DAB failed to explain how Dr. Doe's termination for this reason was appropriate when she had successfully served as a VA anesthesiologist for three years without prior allegations of communication inappropriate for this "team model." The DAB also failed to consider the Anesthesia Department's history of unprofessionalism and problematic communication practices caused by employees other than Dr. Doe. (AR727, 945.) These failures render the DAB's application of this factor fatally arbitrary.

**c.     The Penalty imposed fails to properly account for Dr. Doe's lack of a prior disciplinary record under <u>Douglas Factor 3</u>.**

Lack of a prior disciplinary record is a significant mitigating factor when determining the appropriate penalty for a federal employee. *See, e.g., Wentz v. U.S. Postal Serv.*, 91 M.S.P.R. 176 (M.S.P.R. 2002). Dr. Doe had no prior discipline. It follows that Defendants failed to present any evidence of prior disciplinary actions against her. In its decision, the DAB expressly acknowledged "that there was no FPPE for cause and the reason for the FPPE was administrative error." (AR969 at 3.) The DAB should have found that this factor favored overturning the termination.

Notwithstanding the evidence to the contrary, the DAB asserted that this factor favored termination because of the University's "unusual decision" to "fire" Dr. Doe from supervising residents. (*Id.*) This finding disregarded evidence to the contrary which Dr. Doe presented at the hearing. She demonstrated that her removal from supervising residents was made based on unfounded complaints from four anonymous residents about unspecific conduct. (AR231-35.) Additionally, ECHS' own evidence reflected residents' evaluation of Dr. Doe as exceeding expectations in 6 categories, meeting expectations in the other 3 and adding 12 positive comments. (AR50).

Moreover, Dr. Oliva testified that the action the DAB characterizes as a "firing" from

overseeing residences was a temporary decision, and the University was amenable to creating a remediation plan for Dr. Doe to resume her supervision of residents in 2017. (AR1393-95.) In fact, they had already developed a specific strategy upon her reinstatement to the VA. (*Id.*) Thus, even considering the DAB's claimed basis for finding that Dr. Doe's disciplinary record supported the penalty, there is no rational basis for that conclusion. This factor weighed heavily against her removal.

### d. The DAB failed to appropriately consider Dr. Doe's work record under <u>Douglas Factor 4</u>.

Courts will reverse a penalty where the agency's decision is based on a portrayal that the appellant's work record or performance is poor, but that portrayal is unsupported by the evidence in the record. *See, e.g., Murdock-Doughty v. Dep't of Air Force*, 70 M.S.P.R. 119 (M.S.P.B. 1996). The DAB claimed to uphold Dr. Doe's penalty, in part, because "Dr. Shockey gave her low satisfactory proficiency rating on 10/31/19." (AR969 ¶ 4.) Again, Dr. Doe has no prior discipline. The DAB even acknowledged the alleged FPPE for cause was made in error (*id.* ¶ 3). Even more, the evidence Dr. Doe sought to admit but the DAB refused to consider established her exceptional record. For example, professional practice evaluations conducted regarding her performance for the same period evaluated by Dr. Shockey indicated that she met 100% of the performance metrics for FY 2017. (AR796-814.) Dr. Doe also received "excellent" marks on her credentialing evaluation forms in the years leading up to her alleged misconduct. (AR695-715.) Dr. Doe's work record clearly supported a different outcome.

### e. The Penalty imposed should have been mitigated based on her future ability to fulfill her duties under <u>Douglas Factor 5</u>.

The fifth *Douglas* Factor prescribes an evaluation of the effect of the alleged offense on the employee's ability to perform at a satisfactory level and its effect on supervisors' confidence in the employee's ability to perform assigned duties. *Douglas*, 5 M.S.P.R. at 305. The DAB upheld the termination under this factor based on the claim by witnesses that they lost confidence in Dr. Doe and that allowing her to continue her employment at ECHS would be detrimental to their belief that the

VA holds its employees accountable. (AR969 ¶ 5.)

Additional evidence offered by Dr. Doe but excluded by the DAB established that ECHS knew about conduct forming the basis for action against her months before it suspended her in early 2018. (AR823-24.) The decision to terminate Dr. Doe because the ECHS supposedly lost trust in her ability to fulfill her duties is undermined by evidence of ECHS allowing her to continue in her position for several months after becoming aware of conduct giving rise to a purported offense. *See Mann v. Dept. of Health and Hum. Serv.*, 78 M.S.P.R. 1, 13 (M.S.P.B. 1998); *see also Goode v. Def. Logistics Agency*, 31 M.S.P.R. 446, 450 (M.S.P.B. 1986) (allowing appellant to continue in his position for five months after learning of offense was mitigating factor where agency claimed it lost trust in him).

The DAB inconsistently acknowledged that "[Dr. Doe] could be successful in other work environments ...." (AR970 § VI.) That more reasonably supports a conclusion that she could have performed her duties at ECHS, but that it did not want to give her that opportunity. To the extent the DAB believed witnesses were concerned with the VA holding employees accountable, there are other ways that could have been accomplished here.

Insofar as the DAB's decision found that Dr. Doe would be unable to work at ECHS because of the employees with whom she worked there previously (AR969 ¶ 5), many of the employees who filed complaints against her no longer work at the ECHS. That includes CRNA Christie (AR1160), CRNA Fredriksson (AR1214) and RN Tonya Gough (AR1474-78). The residents who allegedly complained in 2017 (Specification 8) also graduated before June 2020 (AR2604 (Oliva Depo. tr. 49:17-50:4). The officials involved in Dr. Doe's adverse privileging action and removal no longer work at the VA, including Ms. Hanfelder, Dr. Mangione, and Dr. Dillon. (AR2371 (Black Dep. tr. 40:10-16).)

In contrast, other ECHS staff who still work at the VA testified on Dr. Doe's behalf, including CRNAs Egan (AR1480) and Cordova (AR1505), Perioperative Nurse Manager Karissa Stewart (AR1587), and Chief of Vascular Surgery Dr. Thomas Whitehill (AR1734), These employees clearly

would be willing to work with Dr. Doe. In sum, the DAB arbitrarily misapplied Douglas Factor 5.

> **f.     The Penalty imposed is far harsher than imposed on others for the same or similar offenses under <u>Douglas Factor 6</u>.**

Courts have held that the VA should apply a policy of similar penalties for similar offenses. *See Ward v. Brown*, 22 F.3d 516, 521-22 (2d Cir. 1994). Similarly, VA Handbook 5021 requires that penalties imposed be the same or similar for similar offenses for employees in the same organization work unit doing similar work. (AR2987 (VA Handbook 5021(f) <u>2</u>.) Dr. Doe's additional evidence file excluded by the DAB included evidence of instances in which other physicians at ECHS were reported for creating a hostile work environment but received minimal or no repercussions. This included evidence of misconduct involving Dr. Douglas Semian. (AR911.) He was an ECHS physician who worked under the same supervisor as Dr. Doe – Dr. Black. In September 2017, in the presence of patients, Dr. Semian acted so hostilely toward Nurse Practitioner ("NP") Carrie Parkinson that it required police intervention. (*Id.*) In December 2017, NP Parkinson reported Dr. Semian to Dr. Black for ongoing failure to comply with the VA's "hand-off policy" required for transitioning care of critically ill veterans to another team. (AR923.) Then, in January 2018, NP Parkinson reported additional misconduct by Dr. Semian in which she described how he adversely affected patient care:

> This is a patient safety issue as I have discovered patients who were critical in the am coming on and information was not passed on to me which is pertinent to patient care.
> It's also Unprofessional and it's not safe for my practice.

(AR937 (Parkinson Report of Contact).)

Based on these reports of misconduct, Dr. Black proposed a *mere three-day suspension* in January 2018 and issued a "letter of expectation" setting forth ECHS' explicit expectations regarding Dr. Semian's conduct. (AR926-27.)[1] In May 2018, NP Parkinson reported Dr. Semian again based on conduct in which he refused to communicate with other team members regarding a veteran having a

---

[1] "Effective hand off, especially warm hand off, is an integral component of good patient care. As such, in the interest of best practice, practitioners must communicate with each other regarding matters of patient care ...." (AR926)

stroke. (AR938.) The complaint also detailed that Dr. Semian lacked clinical competence after failing to diagnose and treat a life-threatening illness**.** (*Id.*) NP Parkinson then reported Dr. Semian in October 2018 after other doctors, staff and a student witnessed him failing to understand the importance of clinical issues and failing to provide pertinent clinical information to at least three critically ill patients. (AR940-41.) She even reported, "[Dr. Semian is] dangerous, doesn't understand critical care or basic medicine as evidenced by many prior reports and witnessed that morning." (*Id.*)

Despite these allegations that Dr. Semian engaged in more severe and pervasive misconduct during the same period as the charges brought against Dr. Doe, including communication-based misconduct, ECHS only subjected Dr. Semian to a three-day suspension. The minimal penalty imposed on Dr. Semian for far more serious and pervasive unprofessional conduct, despite previous discipline and having been put on notice, highlights the egregiousness of Dr. Doe's termination. This factor favored the DAB's reversal of the penalty, and its failure to do so was arbitrary and capricious.

g.   **Dr. Doe's alleged offenses have no impact on the VA's reputation under <u>Douglas Factor 8</u>.**

A significant penalty may be appropriate where there is substantial notoriety associated with an offense or the offense will impact the agency's reputation. *Douglas*, 5 M.S.P.R. at 305. Here, the DAB first noted that "[s]everal employees voiced their concern that their faith in the VA's ability to hold … employees accountable will be undermined if [Dr. Doe] … return[s] to duty." (AR969 ¶ 7.)

This factor, however, is concerned with the "notoriety" of the alleged offense and reputational harm it would cause the VA with third parties – not its impact on views of VA employees or individuals no longer working there. ECHS failed to offer any evidence that Dr. Doe's conduct was sufficiently notable or detrimental to the VA's reputation to warrant termination and the DAB's analysis of this factor fails to establish otherwise. Notably, Dr. Doe's lack of reputational impact is highlighted by the evidence she sought to introduce regarding actual harm resulting from her colleagues' misuse of post-call days and substantiated in the OMI report to Congress, which undermined the confidence of

hundreds of veterans in ECHS and the VA's perception more broadly. (AR944-45.) The DAB failed

to consider this critical aspect contrary to the considerations outline in VA Handbook 5021. (AR2987.)

Second, the DAB reasoned that "[e]ven Dr. Oliva was concerned about returning [Dr. Doe] to

duty and having to monitor her … before allowing her to supervise residents again." (AR969 ¶ 7.) This

cited rationale is wholly unrelated to the VA's reputation. It is also contrary to Dr. Oliva's testimony

at the hearing indicating he was open to a remediation process. (AR 1394 (DAB tr. 369:15-370:5),

1425 (DAB tr. 400:4-12).) It also conflicts with his testimony that he expected the DAB to return Dr.

Doe to duty and the University had considered how to handle that. (AR1426 (DAB tr. 401:3-9).)

Simply put, the DAB's two-pronged rationale on this factor doesn't withstand scrutiny.

### h. ECHS failed to provide Dr. Doe with any clarity or warning regarding rules she allegedly violated under <u>Douglas Factor 9.</u>

A severe penalty may be appropriate where an employee was on notice of rules that were

violated or where the employee was warned about the conduct in question. *Douglas*, 5 M.S.P.R. at

305. The DAB found this factor favored termination by stating "[p]roper communication and

thoughtfulness before taking actions is an essential part of being a successful physician." (AR969¶ 8.)

This factor, however, relates to notice and warning required regarding <u>specific</u> allegations of

misconduct. (*See* AR571 (VA Directive 5021, ¶ 6.c.2, p. A-6) (VA employees must be provided details

about specific charges upon which any proposed adverse action is based, "including the details and

circumstances (i.e., names, dates, places, and other data) constituting the basis for action").)

The record establishes that ECHS failed to define an objective communication standard for

purposes of warning Dr. Doe about how to correct any alleged misconduct and failed provide her with

any notice or warning about any specific complaints of the alleged misconduct or unprofessionalism.

Unlike Dr. Semian, Dr. Doe did not receive notice or a letter of expectation about any concerns ECHS

officials had regarding her communication style. In fact, as established in her evidence excluded by

the DAB, ECHS drafted a letter to Dr. Doe in November 2017 describing its concerns about her

professional conduct *but it was never sent*. (AR823-24.)

The *Lerner* court determined the DAB acted arbitrarily where there was no evidence the VA offered counseling, employee assistance, or communication skills training to Dr. Lerner. 2013 WL 5592906, at *20. That is analogous here, where there is no evidence ECHS offered assistance to Dr. Doe.

This factor did not support Dr. Doe's termination, and the decision upholding it was arbitrary.

### i.    Dr. Doe's potential for rehabilitation fails to support her termination under <u>Douglas Factor 10</u>.

A penalty of removal is inappropriate where there is potential for an employee's rehabilitation. *Douglas*, 5 M.S.P.R. at 305. During the DAB hearing, Dr. Oliva testified that in January – February 2018 he and Dr. Doe exchanged emails to set up a meeting during which they could develop a plan of action to improve her supervision of residents. (AR1394 (DAB tr. 369:11-14).) In fact, Dr. Oliva testified that, "I explained to her that that I'm happy to work on a remediation plan, but that I couldn't put a timeline on when that plan was going to be implemented because I had lots of other issues that I was dealing with*." (Id.* (DAB tr. 369:17-21.) Despite this express acknowledgement by Dr. Oliva, a plan was never prepared or implemented; instead, Dr. Doe was suspended and that was extended until she was terminated without any efforts to facilitate her rehabilitation.

The DAB also claimed that Dr. Doe's potential for rehabilitation did not support overturning her removal because her written reply to the VA's allegations in 2018 "did not show any acceptance of responsibility and was filled with placing blame on others." (AR970 ¶ 9.) Again, however, the DAB disregarded the evidence in the record. For example, in her request for a hearing Dr. Doe stated:

> Dr. [Doe] acknowledges that communication with respect to some of the alleged incidents could have been more explicit, [but] she does not believe communication issues resulted in a breach of care. However, she is willing to discuss these situations with her superiors and colleagues so that she can learn and grow both as an employee and a medical provider ....

> As evidence of her willingness to address the criticisms regarding her communications, Dr. [Doe] has self-reported to the Colorado Physician Health Program …. Evaluation[] of physician communication skills is one of the core services provided by CPHP.

(AR39-40.)

And, Dr. Doe sought to present additional evidence about proactive steps she had taken to enhance her communication skills, but that was among the many items excluded by the DAB. (AR719-20 (Colorado Physician Education Program seminar "Improving Inter-Professional Communication: Working Effectively in Medical Teams").) Further, she did present additional evidence about proactive steps she had taken with CPHP to enhance her communication skills showing that she was very desirous of improving in that respect and had a good prognosis. (AR1844-46 (DAB tr. 17:1-19:2).)

In the latter regard, the DAB failed to properly consider, or to state why it disregarded, evidence from Dr. Scott Humphreys, a forensic psychiatrist and Medical Director of CPHP, who testified regarding Dr. Doe's ability to rehabilitate any purported deficiencies in her communication. (AR1844-1847 (DAB tr. 17:20-20:24).) Critically, Dr. Humphreys testified that he determined Dr. Doe was well equipped and willing to improve any communication deficiency perceived by ECHS. (AR1851 (DAB tr. 24:19-26:8).) During his comprehensive medical evaluation of her, Dr. Humphreys concluded that Dr. Doe was competent to practice medicine with reasonable skill and safety and did not find any indication of a need for treatment and monitoring. (AR1847 (DAB tr. 20:16-24).) The DAB ignored this evidence in concluding Dr. Doe had no potential for rehabilitation.

The DAB also stated in its decision that, "[d]espite [Dr. Doe's] assertion that not returning her to the VA would destroy her career, the board believes she can be hired by another institution with a clean slate." (AR970 ¶ 9.) As established above, Dr. Doe faces significant and potentially career-ending irreparable harm if an adverse report is filed because of her privilege revocation and removal from the VA. *Walker,* 231 F.Supp.3d at 216-217. The fact that the DAB made its decision to uphold her removal based on the assertion that doing so would provide her with a *"clean slate"* is contrary to fact and constitutes a serious misapplication of this *Douglas* factor. These facts further establish the VA's selected penalty and the DAB' decision to uphold it were arbitrary and capricious.

       **j.   The DAB failed to consider mitigating facts under <u>Douglas Factor 11</u>.**

Dr. Doe was prevented from utilizing evidence of her medical diagnosis directly relevant to one of the Specifications (#4) forming the basis for her removal. (AR2531-36.) Specifically, the DAB failed to adequately consider Dr. Doe's high-risk pregnancy with symptoms of pre-term labor and hemorrhage, (AR2533-35), which were exacerbated by Dr. Black's insistence that she wear a heavy lead gown to protect herself and her baby from radiation (AR2403 (Black Dep. tr. 167:10-168:9)). Dr. Doe's request for reasonable accommodation to Dr. Black in January 2018 outlined the concerns with radiation exposure and weight restrictions. (*Id.*) Nevertheless, Dr. Black continued to assign Dr. Doe to cases requiring radiation exposure. (AR2424-25 (251:8-252:1).) These actions prompted the incident on January 29, 2018 forming the basis for Specification 4. (AR91.) Notwithstanding that this evidence should have been applied to overturn that Specification, at the very least the DAB should have applied this evidence as a mitigating factor undermining the VA's decision to terminate her.

Moreover, Specification 8 alleged that Dr. Doe provided inadequate supervision and guidance to anesthesiology residents. Critically, the DAB failed to consider as a mitigating circumstances evidence that, contrary to ECHS and VA protocol confirmed by Dr. Oliva during the hearing, (AR1423 (DAB tr. 398:5-22)), Dr. Doe was assigned two CA-1 residents where she only should have been assigned one. (AR148.) Dr. Doe requested that leadership "take this into consideration when making the assignments." (*Id.*) Although Dr. Doe was never provided sufficient information to know precisely what residents she supervised "inadequately," the DAB failed to consider Dr. Doe's responsibility of having to supervise two CA-1s rather than one as a possible reason for any claimed issues with her supervision of residents under Specification 8.

Finally, in its decision regarding mitigating factors the DAB expressly referred to testimony by Melanie Torres in concluding that Dr. Doe's allegedly inappropriate communications occurred prior to her health issues in 2017 and 2018. It construed this "evidence" as an aggravating factor supporting

Dr. Doe's removal. (AR970 ¶ 10.) The DAB, however, precluded her from presenting evidence establishing the falsity of the Torres testimony where claimed deficiencies in Dr. Doe's communication were, in fact, the responsibility of the surgical service rather than her. (AR860-61 ("each primary service will assume full responsibility for order entry and call response.").) That evidence should have been a mitigating, rather than aggravating, factor for determining the reasonableness of the penalty.

The DAB's failure to consider these mitigating factors was arbitrary and capricious.

### k.    Alternative sanctions would have adequately and effectively deterred any future misconduct under Douglas Factor 12.

A severe penalty is unreasonable where an alternative sanction would have adequately and effectively deterred future misconduct. *Douglas*, 5 M.S.P.R. at 305. Dr. Doe sought to unsuccessfully, and did successfully, present evidence establishing that – with notice of the concerns or the assistance of a formal remediation plan -- she could and would correct any alleged misconduct. Improperly, Dr. Doe was precluded by the DAB from calling Dr. Ziegler as an expert witness to testify that any ECHS concerns regarding her communication style, resident complaints or clinical competence would, could and should have been best handled through means other than revocation of her privileges and termination. (AR615 ¶ 6.) The DAB inexplicably failed to credit the evidence she did present on these issues. The DAB's upholding of her removal under these circumstances disregarded the numerous more appropriate and less drastic sanctions that could have resolved any issues.

Had the DAB properly considered and applied the *Douglas* factors, it could not have arrived at a decision to uphold the severe and ruinous penalty imposed. This failure was arbitrary and capricious.

### (5)    *Defendants' failure to consider important aspects of the problem was arbitrary and capricious*.

Courts have held that, whether an agency failed to consider an important aspect of the problem and, thus, acted arbitrarily and capriciously, "turns on what a relevant substantive statute makes

'important.'" *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F.Supp.3d 54, 78 (D.D.C. 2016)

(quoting *Oregon Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996)).

Here, the DAB failed to consider Dr. Doe's claims that she was retaliated against for engaging in protected whistleblower activity. Whistleblower protections are a fundamental aspect of federal employment. *See* 5 U.S.C. § 2302(b)(8). The additional evidence file Dr. Doe sought to introduce included evidence regarding the protected disclosures Dr. Doe made to VA leadership regarding the source of dysfunction in the Anesthesia Department, including reports that were subsequently substantiated by the VA's OMI, and evidence that the allegations of misconduct leveled against Dr. Doe came as retaliation for those protected disclosures. (AR8-10.)

Her request for a reasonable accommodation was another important aspect of the problem the DAB failed to consider regarding Specification 4, including evidence proffered by her that (i) she was laboring with the disability of high-risk pregnancy, (ii) her doctor requested an accommodation limiting exposure to radiation, and (iii) the request was ignored. (AR2077 (DAB tr. 250:7-251:1).)

By January 2018 at a gestational age of only 21 weeks, Dr. Doe was experiencing pre-term labor and hemorrhage due to placenta previa. (*Id.*) She immediately submitted medical documentation to Dr. Black apprising him of her disability and requesting a reasonable accommodation limiting her exposure to radiation and weight requirements. (AR2403 (Black Dep. Tr. 165:5-24), 2351-53.) Wearing a heavy lead vest pressing over her womb triggered contractions and bleeding and posed a life-threatening risk to both Dr. Doe and her baby. (AR2077-78 (DAB tr. 250:12-251:7); AR2351-33.)

Yet, as Dr. Doe testified:

Q.     Did you request from your Chief that you be assigned to cases that do not
       involve X-ray?
A.     Yes, I did. Multiple times.
Q.     And that was honored?
A.     No.
Q.     Why do you think that was not honored?
A.     He didn't give me an explanation, it was just never honored. I was the only
       female anesthesiologist and the only one pregnant, it was very stressful.

(AR2078-79 (DAB tr. 251:8-252:1).) ECHS did not grant her request for accommodation until six weeks later in late February 2018 -- *after* her clinical privileges had been suspended. (AR2495 ¶ 23).

Defendants cannot credibly argue it was not a failure by the DAB to consider an "important" aspect of the problem where it excluded evidence of ECHS's failure to timely provide Dr. Doe with reasonable accommodations for her high-risk pregnancy as required by the American's with Disabilities Act. 42 U.S.C. § 12112. That, in turn, gave rise to the claims supporting Specification 4.

If the DAB had considered these important aspects of the problem, it could not have reasonably or justifiably upheld any of the Specifications. The DAB's arbitrary and capricious failures to analyze or reference these significant factors constitute additional grounds to set the decision aside.

### B.      Defendants' Actions Were Obtained Without Procedures Required by Law, Rule, or Regulation Having Been Followed.

An agency's decision will be set aside if the reviewing court determines it was obtained without procedures required by law, rule, or regulation having been followed. 38 U.S.C. § 7462(f)(2)(B). Of course, Defendants violated this obligation first and foremost by depriving Dr. Doe of her constitutionally required due process rights, as set forth in Section I above. In addition to Defendants' deprivation of Dr. Doe's right to due process, and like the VA Directives that Defendants disregarded when suspending and terminating Dr. Doe, Section 7462 of Title 38 requires that:

> In any case in which charges are brought against a section 7401(1) employee, which could result in a major adverse action, the employee is entitled . . . to the following:
>
> (A) Advance written notice from the Under Secretary for Health or other charging official specifically stating the basis for each charge, the adverse actions that could be taken if the charges are sustained, ***a statement of any specific law, regulation, policy, procedure, practice, or other specific instruction that has been violated with respect to each charge, and a file containing <u>all</u> evidence in support of each charge*** ....

38 U.S.C. § 7462(b)(1) (emphasis added).

The Charge and the Specifications against Dr. Doe, and the DAB's decision to uphold them, failed to state with any specificity the "law, regulation, policy, procedure, practice, or other specific

instruction" that Dr. Doe violated. Rather, they made vague references to "unprofessional conduct" and "inappropriate communications." Without any such specific citation, and without advance notice of all evidence to be offered against her, ECHS' actions revoking her privileges and terminating her and the DAB's decision upholding those actions did not satisfy the requirements of section 7462(b)(1).

### C.  Defendants' Actions Were Unsupported by Substantial Evidence.

An agency decision will be set aside if it is unsupported by substantial evidence. 38 U.S.C. § 7462(f)(2)(B). "To determine whether the board's findings are supported by substantial evidence, the court must determine whether the board considered 'such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached.'" *Taylor*, 92 F. App'x at 277 (quoting *R.P. Carbone Constr. Co. v. Occup. Safety & Health Rev. Comm'n*, 166 F.3d 815, 818 (6th Cir.1998)). "Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence." *R.P. Carbone*, 166 F.3d at 818. It "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Payne v. Comm'r of Soc. Sec.*, 402 F.App'x 109 at 111 (6th Cir.2010) (internal quotation marks omitted) (quoting *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986)).

#### (1)  The DAB's decision was not supported by substantial evidence where it failed to consider a plethora of relevant evidence offered by Dr. Doe.

"Before [the court] can determine whether substantial evidence supports an administrative determination, [it] must 'first ascertain whether [the agency] has discharged [its] duty to consider all relevant evidence." *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439 (4th Cir. 1997) (citing *Arnold v. Sec'y of HEW*, 567 F.2d 258, 259 (4th Cir. 1977) ("Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.")).

The court "may not find substantial evidence 'merely on the basis of evidence which in and of

itself justified [the Board's decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Lakeland Bus Lines, Inc. v. N.L.R.B.*, 347 F.3d 955, 962 (D.D.C. 2003) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)); *see also Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 216 (D.D.C. 1994). Without explanation, the DAB failed to even consider Dr. Doe's "Additional Evidence File Exhibits" and related testimony she sought to offer. Thus, the DAB upheld her removal from federal service without considering a plethora of contradictory evidence from which conflicting inferences could be drawn. Thus, the DAB failed to consider all the relevant evidence and, thus, there is not substantial evidence to support its decision.

> *(2)*      ***The DAB's decision was not supported by substantial evidence where it upheld Specification 5 despite directly contrary evidence in the record.***

In Dr. Bolson's complaint giving rise to Specification 5 (AR301-02), she claimed that "[*Dr. Doe*] *was not in tune with the case*" because, halfway through the case, she asked Dr. Bolson whether she was *"closing."* (AR301.) Critically, however, medical documents in the record demonstrate that Dr. Doe was only present in the operating room from 13:10 to 13:30 (the last 20 minutes of the procedure) out of the 80 minutes the patient was in the operating room (12:15 to 13:30). (AR298.)

CRNA Cordova also testified that she started as the anesthesia provider during the procedure at 12:15 but was relieved by Dr. Doe at 13:10. (AR1539-41 (DAB tr. 514:21-516:2).) Thus, Dr. Doe was only in the operating room at the time of surgical closing. Dr. Bolson could not even refute this in her own testimony. (A1449-51 (DAB tr. 424:2-426:18)) (Q. "So, [the medical record reflecting time entries] is at odds with your recollection that [Dr. Doe] was present during the entire time, correct? A. Correct. Q. So your recollection of this case isn't perfect in all details, is it? A. Correct.").

Dr. Bolson's lack of recollection is unsurprising, considering that she did not note her purported concerns about Dr. Doe until February 2018 -- 15 weeks after the alleged incident and the same month Dr. Doe's clinical privileges were suspended. Dr. Bolson only signed off on the report after being asked by Dr. Black to do so to retroactively justify the suspension. (AR1453-54 (DAB tr. 428:19-429:1).)

Due to evidence in the record refuting Dr. Bolson's allegations, there is not even a scintilla of, much

less substantial, evidence supporting the DAB decision to uphold Specification 5 and, thus, the Charge.

> **(3)     The DAB's decision was not supported by substantial evidence where it upheld Specification 8 based entirely on inadmissible hearsay evidence.**

Although "relevant and material hearsay may constitute substantial evidence[,]" *R.P. Carbone*,

166 F.3d at 819, "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence."

*Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 230 (1938). Determining whether hearsay

constitutes substantial evidence to support an administrative decision requires evaluation of factors

outlined in *Richardson v. Perales*, 402 U.S. 389, 402–06 (1971). Those factors are:

> (1) the independence or possible bias of the declarant, (2) the type of hearsay material submitted, (3) whether the statements are signed and sworn to as opposed to anonymous, oral, or unsworn, (4) whether the statements are contradicted by direct testimony, (5) whether the declarant is available to testify and, if so, (6) whether the party objecting to the hearsay statements subpoenas the declarant, or whether the declarant is unavailable and no other evidence is available, (7) the credibility of the declarant if a witness, or of the witness testifying to the hearsay, and finally, (8) whether the hearsay is corroborated.

*Id.* (*citing Calhoun v. Bailar*, 626 F.2d 145, 149 (9th Cir.1980) (citing *Perales*, 402 U.S. at 402–07);

*Myers v. Sec'y of HHS*, 893 F.2d 840, 845 (6th Cir.1990)).

Specification 8 alleged:

> Between on or about May 1, 2016 on or about December 1, 2017, while serving as an attending anesthesiologist, you were unprofessional in your interactions with residents …. Specifically, you were difficult to reach or not present during key parts of patient care and you provided inadequate supervision and guidance to anesthesiology residents. You also displayed a lack of effective, respectful and professional communication with residents before, during and after cases.

In upholding Specification 8, AR968, the DAB considered vague hearsay testimony from

individuals without first-hand knowledge and who did not witness any of the incidents regarding Dr.

Doe's supposed inadequate interactions with residents as described in a four-page document submitted

by Dr. Todorovic. (AR231-34.) That testimony came from Dr. Black, RN Molly Gordon, Dr. Beck,

and Dr. Oliva – all of whom were quoted numerous times by the DAB panel in its decision. (*Id.*) The

DAB relied on their testimony despite none of it including residents or patient names, case numbers, dates, medical records, other witnesses present or outcomes, and the panel cited no justification or criteria for considering and relying on such hearsay. (*Id.*) It was rumor and innuendo.

For example, Dr. Oliva testified that the anonymous complaints forming the basis for Specification 8 came from 4 residents, (AR1411 (DAB tr. 386:8-21)), which directly contradicted the allegations in the letter issued by the University stating that the complaints came from 16 residents. (AR229-30; *see also* AR2387 (Black Dep. Tr. 102:11-13) (Dr. Black testifying in deposition that it is "quite common" for attending anesthesiologists to have complaints from a few residents.))

The DAB cited hearsay testimony from Dr. Beck, an anesthesiologist, in which he stated that surgeons scheduled procedures to avoid working with Dr. Doe. (AR968.) Without explanation, the DAB gave more credence to that hearsay regarding surgeons' opinions than to direct testimony from a surgeon, Dr. Whitehill, Chief of Surgery for 11 years and current Chief of Vascular Surgery, that she was thorough and did a very good job with his surgery patients. (AR1736-40 (DAB tr. 668:23-672:8).)

The DAB's decision upholding Specification 8 based on hearsay testimony does not address or apply any, much less all, of the *Perales* factors. It is not supported by the substantial evidence and provides yet another reason that the Final Agency Action must be set aside.

## CONCLUSION

For the foregoing reasons, the entire VA process violated Dr. Doe's right to due process and was arbitrary, capricious, an abuse of discretion, contrary to law and unsupported by substantial evidence. It cannot be allowed to stand.

DATED: December 21, 2020

JONES & KELLER, P.C.
*S/ T.P. McMahon*
Thomas P. McMahon
Admitted *pro hac vice*
1675 Broadway, 26th Floor
Denver, Colorado 80202

HOYER LAW GROUP, PLLC
*/s/ David Lawrence Sher*
David Lawrence Sher
Dave@hoyerlawgroup.com
1300 I Street N.W. Suite 400e
Washington, DC 20005
Tel. (202) 975-4995
Fax (813) 375-3710

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2020, a true and correct copy of the foregoing pleading was electronically filed and served using the CM/ECF system.

MICHAEL R. SHERWIN
Acting United States Attorney
DANIEL F. VAN HORN, D.C. Bar No. 924092
Chief, Civil Division
CHRISTOPHER C. HAIR, PA Bar No. 606656
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-2541
christopher.hair@usdoj.gov
*Counsel for Defendants*

*s/ Renae Mesch*
Renae Mesch