UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANE DOE, M.D.,

*Plaintiff,*

v.

Steven Lieberman, Acting Principal Under
Secretary for Health, Department of Veterans
Affairs, *et al.*,

*Defendants.*

Civil Action No. 20-2148 (CRC)

**REPLY IN FURTHER SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

CHANNING D. PHILLIPS, D.C. Bar No. 415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By:   /s/   *Christopher C. Hair*
CHRISTOPHER C. HAIR, PA Bar No. 306656
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-2541
christopher.hair@usdoj.gov

*Counsel for Defendants*

*Of counsel*

Robert C. Burlison III, Esq.
Senior Trial Attorney
Department of Veterans Affairs

Table of Contents

**INTRODUCTION** ..................................................................................................... 1

**ARGUMENT** ........................................................................................................... 2

   **I.**    **THE AGENCY'S DECISION TO IMPLEMENT THE DISCIPLINARY APPEALS BOARD'S FINDINGS IS SUPPORTED BY SUBSTANTIAL EVIDENCE.** ..................... 2

     **A.**  **Evidence Supporting Specification 1.** ........................................................... 3

     **B.**  **Evidence Supporting Specification 2.** ........................................................... 4

     **C.**  **Evidence Supporting Specification 4.** ........................................................... 6

     **D.**  **Evidence Supporting Specification 5.** ........................................................... 7

     **E.**  **Evidence Supporting Specification 8.** ........................................................... 9

     **F.**  **Evidence Supporting Revocation of Privileges and the Penalty of Removal.** ......... 12

     **G.**  **Evidence Rebutting Plaintiff's Defense of a Conspiracy to Manufacture False Statements Against Her.** .......................................................................... 14

   **II.**   **PLAINTIFF'S ASSIGNMENTS OF ERROR LACK MERIT.** .............................. 15

     **A.**  **The Board Has No Legal Authority to Compel Former Employees to Testify.** ...... 15

     **B.**  **Plaintiff Ignores the Raft of Evidence Before the Board.** ................................ 16

     **C.**  **No Evidence That Plaintiff Will Actually Lose Her License, Nor That it is Impossible for Her to Find Employment.** ...................................................... 19

     **D.**  **Plaintiff Confuses the Charge with the Specifications.** ................................. 20

     **E.**  **Protected Peer Review Issue.** ...................................................................... 20

     **F.**  **The Agency Did Not Fail to Cite Any Specific Law or Policy for Each Specification.** ........................................................................................ 21

     **G.**  **The Existence of Plaintiff's High-Risk Pregnancy Was Not a Contested Fact Requiring Additional Evidence and, In Any Event, the DAB Held That it Was Not a Valid Defense.** .................................................................................... 22

     **H.**  **Plaintiff Inappositely Argues the DAB "Ignored" Her Evidence Solely Because It Did Not Win the Day.** ............................................................................ 23

**CONCLUSION** ....................................................................................................... 26

**INTRODUCTION**

Defendants Steven Lieberman, Acting Principle Under Secretary for Health, Department of Veterans Affairs ("VA"), the VA's Disciplinary Appeals Board ("DAB"), and the VA's Eastern Colorado Healthcare System (collectively, "Defendants" or "the Agency"), respectfully submit the following reply in further support of Defendants' cross-motion for summary judgment (ECF No. 24). The final decision of the Agency to uphold Plaintiff's removal from her position at the VA, as well as the revocation of her clinical privileges, was reasonable, supported by substantial evidence contained in the administrative record, and therefore easily satisfies scrutiny under the limited scope of judicial review of VA disciplinary actions authorized by law. Moreover, the Agency's decision was not arbitrary, capricious, an abuse of discretion, or contrary to law.

The Agency's in this case were based on one Charge of Unprofessional Conduct, supported by five sustained Specifications. Eight Agency witnesses testified as percipient witnesses in direct support of the five Specifications. Four more Agency witnesses testified as rebuttal to Plaintiff's various scattershot defenses and to prove up Plaintiff's relevant characteristics for penalty purposes. The DAB also reviewed the entire 358 page evidence file, which included approximately 153 pages of direct evidence supporting both the charged misconduct and the penalty of removal, approximately 127 pages of argument and evidence provided by Plaintiff in her defense, and approximately 78 pages of administrative documents and notices.

Plaintiff's opposition (ECF No. 25) consists of various shotgun assignments of error and unsupported assertions that, despite her vigorous defense both at the pre-decisional stage and at the appeal stage, the DAB simply did not agree with. This includes Plaintiff's theory of a

widespread conspiracy to manufacture false reports of misconduct against her from an incredibly

broad cross-section of Agency medical personnel and University anesthesiology residents.  Her

argument rests primarily on the DAB's refusal to allow her to litigate various collateral matters

over which the DAB lacks jurisdiction, including her Merit Systems Protection Board ("MSPB")

claims of Whistleblower reprisal, her Equal Employment Opportunity complaints of failure to

provide reasonable accommodation and unlawful discrimination, and her summary suspension of

clinical privileges.

However, the evidence file provided to both Plaintiff and the DAB contained substantial

evidence to notify Plaintiff of the claims against her and to support the charged misconduct in its

entirety.  After a four-day hearing, including testimony from nearly 20 witnesses, the DAB

correctly concluded that such substantial evidence supported the Charge of Unprofessional

Conduct, supported removal as an appropriate penalty, and supported the Agency's decision to

revoke Plaintiff's clinical privileges.  Accordingly, for the reasons stated in the Agency's Cross-

Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment,

and discussed further below, the Court should deny Plaintiff's motion for summary judgment

(ECF No. 21) and grant summary judgment in favor of Defendants.

## ARGUMENT

I.   **THE AGENCY'S DECISION TO IMPLEMENT THE DISCIPLINARY APPEALS BOARD'S FINDINGS IS SUPPORTED BY SUBSTANTIAL EVIDENCE.**

The DAB had substantial evidence, both documentary and in the form of sworn

testimony, upon which to base its decision and the Agency reasonably relied on that substantial

evidence when it implemented the DAB's findings.  Accordingly, the Agency's action should be

upheld.  *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S.

29, 43 (1983).  Here, the Agency proposed to remove Plaintiff from her employment under Title 38 of the United States Code, as well as revoke her clinical privileges at the Veterans Affairs Medical Center in Denver, Colorado, based on one Charge of Unprofessional Conduct supported by five Specifications.  The DAB upheld each Specification and agreed with the Agency that Plaintiff's misconduct had a decidedly negative impact on the workplace and contributed to a hostile and toxic workplace environment, eroding morale and leading the cardiac surgeons to schedule their patients to intentionally avoid Plaintiff.  (AR 968 (findings for Specification 8), 969 (¶ 6), 970 (¶ 9); *see also* AR 339 (Dr. Soong email stating that complex surgeries are scheduled to avoid Plaintiff), 342 (email citing complaint from Cardiac Surgeon), 1002-1003 (testimony of Dr. Black regarding Cardiac Surgeons complaining about Plaintiff), and 1756-1757 (testimony of Dr. Beck regarding Cardiac Surgeons complaining about Plaintiff)).  Plaintiff's misconduct also negatively impacted the Agency's relationship with the University of Colorado School of Medicine, which was (and still is) a steady source of medical residents for the Agency's hospital as well as with a contract worker, Sarah Fredriksson.  Thus, the DAB had ample evidence to support its findings and the Agency had more than substantial evidence to justify its decision to implement those findings.  (*See* AR 968 ("The Appellant's failure to effectively communicate put the agency and the patients at unnecessary risk.")).

A.  **Evidence Supporting Specification 1.**

Specification 1 alleged that "On February 9, 2018, during a parathyroidectomy procedure on patient C2171, [Plaintiff] placed an arterial line without appropriate evaluation and assessment, without confirming through additional readings or physical exam the patient's vital signs, and without appropriate communication with other staff."  (AR 175).  It is supported by an email and written statement from Certified Registered Nurse Anesthetist ("CRNA") Timothy

3

Christie, dated February 12 and March 9, 2018, respectively.  (AR 236-247).  It is also supported

by Mr. Christie's sworn DAB hearing testimony (AR 1159-1212) and the patient chart (AR 238-

239).

The DAB upheld this specification.  It considered all the evidence and testimony

submitted before it and concluded that Plaintiff "did not have a direct conversation with Timothy

Christie causing him to not feel valued as part of the anesthesia team."  (AR 966 (citing the

testimony of both Mr. Christie and Plaintiff)).  While Plaintiff had a large degree of medical

discretion to determine a course of treatment, the issue was that "there was minimal discussion

between [Plaintiff] and members of the anesthesia team prior to the placement of an arterial

line."  (*Id.*).  The DAB credited Mr. Christie's recollection of the encounter in Specification 1

over Plaintiff's, noting that Mr. Christie's description of Plaintiff's actions was consistent with

Plaintiff's typical practice.  "[T]here is no collaborative team effort to include her unwillingness

to relay information regarding why or how things are done on a daily basis."  (*Id.*).  "[W]orking

with [Plaintiff] was always very difficult concerning intervention with the patients."  (*Id.*).  In

crediting Mr. Christie's testimony over Plaintiff's, the DAB also cited to Dr. Ian Black's

testimony, as well as Plaintiff's own admission that her "communication style was not the most

effective in a clinical setting."  (*Id.*).

**B.  Evidence Supporting Specification 2.**

Specification 2 alleged that "On February 7, 2018, during a procedure on patient S8826

involving excision of a pilonidal [cyst] and left scrotal mass, [Plaintiff] removed an inflated

endotracheal tube without allowing for evaluation of placement prior to doing so, and [Plaintiff]

administered medications without appropriate communication and coordination with the

CRNA."  (AR 175).  It was supported by an email and written statement from CRNA Sarah

Fredriksson dated February 12 and March 13, 2018 (respectively), a written statement from

Molly Gordon dated April 23, 2018, and the patient chart (AR 250-264).  Ms. Fredriksson and

Ms. Gordon both also provided sworn in-person testimony at the DAB hearing.  (AR 1213-1286,

Sarah Fredriksson's testimony; AR 1344-1367, Molly Gordon's testimony).

Plaintiff's argument that the DAB's mere disagreement with her theory of the case must

mean that the DAB did not even consider her proffered evidence and testimony is illogical and

unavailing.  (*See* Pl's Opp. at 17 (arguing the DAB upheld Specification 2 "on the

unsubstantiated basis that Dr. Doe acted without appropriate communication and coordination,"

although the evidence did in fact substantiate Plaintiff's lack of appropriate communication and

coordination); *see also id.* at 20-21 (making the same argument while misleadingly omitting the

DAB's finding that Plaintiff "also has the responsibility to foster clear and open communication

with the team")).  Relevant to Specification 2, Plaintiff claimed she pulled the patient's

endotracheal tube because the patient "became cyanotic quickly" (meaning the patient was

turning blue).  (AR 18 and 130, Plaintiff's written response).  Ms. Fredriksson testified that the

patient did not become cyanotic.  (AR 1224, Ms. Fredriksson's testimony that she "can say

absolutely the patient was not cyanotic"; AR 1351, Ms. Gordon's testimony that she did not

recall the patient becoming cyanotic).  The patient's medical record also contains no notation

indicating cyanosis.  (AR 250, patient chart; *see* AR 1108, Dr. Black's testimony; AR 1225, Ms.

Fredriksson's testimony).  Also, the DAB considered that Plaintiff had pressured and misled

Molly Gordon to sign an inaccurate memorandum.  (AR 263, memo from Molly Gordon and AR

1355, testimony from Molly Gordon that Plaintiff pressured and misled her; *see also* AR 2102,

Agency's closing argument).

The DAB held that "as the most senior person on the team, [Plaintiff] also has the

responsibility to foster clear and open communication with the team." (AR 967). The DAB cited to Dr. Ian Black's testimony, which makes sense as he is the Chief of the entire Anesthesiology Service. It also cited to CRNA Sarah Fredriksson's testimony. (*Id.*). CRNA Fredriksson perceived Plaintiff's misconduct as "precipitous" and "without due diligence or coordinating and communicating" (*id.*); thus, it does not take a leap of logic to identify the adverse impact on the work environment from this finding. CRNA Fredriksson also discussed that adverse "interpersonal environment" created by Plaintiff's misconduct, and the DAB cited that testimony. (*Id.*). As a result, the DAB ultimately credited CRNA Fredriksson's testimony over Plaintiff's.

In sum, the DAB was well aware of Plaintiff's mendacious conduct because the evidence before the DAB was clear. (*See* AR 2100, Agency's closing argument).

## C. Evidence Supporting Specification 4.

Specification 4 alleged that "On January 29, 2018, during an endoscopic retrograde cholangiopancreatography (ERCP) procedure on patient W0436, [Plaintiff] entered the room where fluoroscopy was in use without lead protection, and [she] demanded that the fluoroscopy be ceased during the procedure. The reason [she] entered the room involved another case." (AR 175). This was supported by a written Report of Contact from Dr. Hazem Hammad dated February 7, 2018, a written interview statement from Dr. Hammad dated March 8, 2018, a written Report of Contact from nurse Tanya Gough dated January 29, 2018, a written interview statement from Ms. Gough dated March 12, 2018, and the patient chart. (AR 279-295). Dr. Hammad and Ms. Gough also provided sworn in-person testimony at Plaintiff's DAB hearing. (AR 1686-1734, testimony of Dr. Hammad, and AR 1460-1484, testimony of Ms. Gough).

The DAB's decision relied on the testimony of Dr. Hazem Hammad and Nurse Tonya Gough, as well as on Plaintiff's own testimony "admit[ting] she should have put on her lead protection prior to entering the room and [that she] apologized to Dr. Hammad for the interaction." (AR 967). Again, the record supported the credibility of Defendant's witnesses and evidence over Plaintiff's. "Dr. Hazem Hammad explained everyone's surprise to the [Plaintiff's] demand to cease using fluoroscopy due to the severity of the procedure which could endanger the patient." (*Id.*). "Although x-ray usage signs were posted on the doors, Dr. Hammad asked the [Plaintiff] on more than one occasion, to protect herself, to which she refused." (*Id.*). "RN Gough described the [Plaintiff's] demeanor as dismissive to the patient and the procedure and only advantageous to her own agenda/concern." (*Id.*). Plaintiff, for her part, blames her pregnancy,[1] but it is clear from the testimony and evidence presented to the DAB that, in this instance, the members of the surgical team were clearly more concerned for Plaintiff's safety (and that of the patient) than Plaintiff was. Clearly, this misconduct negatively impacted the workplace. Rather than work collaboratively, Plaintiff was "dismissive," interrupted a surgery at a critical stage, and jeopardized the safety of both the patient and herself. (AR 967, discussion of Specification 4). Thus, the DAB credited the Agency's evidence over Plaintiff's evidence and upheld this Specification.

**D. Evidence Supporting Specification 5.**

Specification 5 alleged that "On November 3, 2017, during a left cubital tunnel release on patient T330 I, [Plaintiff was] distracted by a conversation on [her] cell phone involving an

---

[1] *See* Pl's Opp. at 2 (arguing retaliation based on her pregnancy), 18 (arguing without support that Plaintiff was incapable of wearing a lead apron), 29 (same), 30 (arguing failure to accommodate pregnancy as a defense), 36 (arguing the DAB "failed to account for her high-risk pregnancy"), and 43 (arguing failure to accommodate pregnancy as a defense).

unrelated matter.  Due to [Plaintiff's] distraction, [she was] unprepared to address the patient's

discomfort, and [she was] unaware of the surgeon's progress on the case."  (AR 175-176).  This

was supported by an email from Dr. Rajshri Bolson dated February 23, 2018 and Dr. Bolson's

written interview responses dated March 8, 2018 and the patient chart.  (AR 298-305).  Dr.

Bolson communicated this complaint to Dr. Black immediately after the surgery at issue but did

not feel comfortable providing a written statement until February 2018.  (AR 1022-1023, Dr.

Black testifying that Dr. Bolson first complained in November 2017 "contemporaneously with

the event" but wanted to remain anonymous; AR 1436-1438, Dr. Bolson testifying that she

reported the incident "The afternoon of the case" but wanted to remain anonymous due to

concerns of retaliation from Plaintiff).  Dr. Bolson also provided sworn in-person testimony at

the hearing.  (AR 1427-1459).

The DAB's findings credited Dr. Bolson's testimony that she had "observed the

[Plaintiff's] distracted inattentiveness (i.e. 'turned away from the field, not addressing' patient

concerns) to the patient at a critical time during a surgery."  (AR 967).  The DAB also noted that

Plaintiff's phone usage was "not related to work" and that Dr. Bolson immediately reported the

incident to Dr. Black.[2]  (*Id.*).  Plaintiff's only defense appears to be to point the finger at CRNA

Brenda Cordova.  (*See* Pl's Opp. at 24-25, arguing that "Specification 5 was founded on Dr.

Bolson's mistaken belief that Dr. Doe was present during the entire surgery"; *see also* AR 298,

patient chart noting "13:10 [Plaintiff] back from break.  Report received from CRNA Cordova").

---

[2]    In fact, Dr. Bolson actually reported two complaints about Plaintiff's conduct that same day in November 2017—the Agency charged one incident as Specification 5 and the other was left as supporting evidence to prove up the penalty and to rebut Plaintiff's potential defense of mistake of fact.  (*See* AR 301 (email from Dr. Bolson reporting incident in Specification 5); AR 347 (email reporting similar incident); AR 1022:6-8 (Dr. Black's testimony noting that Dr. Bolson immediately reported both incidents)).

Yet the evidence clearly established that the issues Dr. Bolson complained about occurred during the last half of the surgery and that Plaintiff had returned from lunch approximately half-way through the surgery.  (AR 301 (email from Dr. Bolson describing issues with Plaintiff "about ½ way through the case"), AR 298 (patient chart showing that the surgery went from 12:15PM-13:30PM); *compare with* AR 1540 (testimony of CRNA Cordova that she and Plaintiff "probably had some crossover, so 13:05")).  In any event, CRNA Cordova certainly did not testify that she was the one who had been distracted and inattentive on her phone, so the DAB rightly concluded that the responsibility lay on Plaintiff.  The DAB rejected Plaintiff's defense that Dr. Bolson's perceptions were merely due to "differing anesthetic techniques."  (AR 968).  Again, a distracted anesthesiologist in these circumstances would clearly have a negative impact on the work environment.

### E.  Evidence Supporting Specification 8.

Specification 8 alleged that "Between on or about May 1, 2016 and on or about December 1, 2017, while serving as an attending anesthesiologist, [Plaintiff was] unprofessional in [her] interactions with residents from the University of Colorado Anesthesiology Residency Program.  Specifically, [she was] difficult to reach or not present during key parts of patient care, and [she] provided inadequate supervision and guidance to anesthesiology residents.  [She] also displayed a lack of effective, respectful, and professional communication with residents before, during, and after cases."  (AR 176).  This was supported by the report of resident complaints received from the University of Colorado as well as interview statements from various witnesses. (AR 228-235, 247, 262, 305, 337, 349, 358).  Plaintiff also had access to her MedHUB resident

evaluations[3] from August 2017 which identified identical complaints.  (AR 550-551, documents provided by Plaintiff).  Dr. Oliva (the residency program director for the University of Colorado) testified about his personal knowledge as to how the University of Colorado became aware of the residents' complaints and how the University responded.  (*See* AR 1373-1377, Dr. Oliva's testimony).  Dr. Oliva also testified that he sent an anonymous survey and "at least a dozen more" residents expressed concerns.  (AR 1378).  He also explained why Plaintiff's MedHUB evaluations reflected such significant issues with the residents.  (AR 1384, 1386-1391, Dr. Olivia testifying about the significance of Plaintiff's MedHUB scores).

In finding that the Agency had presented substantial evidence to support Specification 8, the DAB cited specifically to the testimony of four witnesses who had given a consistent account of Plaintiff's character and reputation for acting in the exact same manner as the complaining residents had described.  The DAB found that the adverse impact of Plaintiff's conduct on the workplace is apparent from the face of the complaints.  "[A]t least a dozen or the vast majority of residents [] were uncomfortable working with the [Plaintiff]."  (AR 968).  The residents reported "'serious concerns about the training environment' (i.e., 'not learning . . . patient safety concerns . . . techniques used . . . that were nonstandard'), knowledge and supervision (i.e., 'how they were treated . . . whether they were being intimidated in the OR' and unsafe learning environment) under the [Plaintiff]."  (*Id.*).  The DAB credited Dr. Oliva's testimony that the residents' complaints led the University to remove Plaintiff from supervising residents and Dr. Beck's testimony that the same types of concerns had led surgeons to "schedule[e] procedures to avoid the [Plaintiff] and request[] backup availability when scheduled with the [Plaintiff]."  (*Id.*).

---

[3]     The DAB also considered Plaintiff's further mendacity.  Plaintiff asserted in her oral reply that "she received evaluations from residents, all positive."  (AR 123).  However, this was false, as her MedHUB evaluations clearly show.  (AR 550-551).

The DAB's findings are patently reasonable considering the litany of other evidence clearly establishing that the conduct the residents complained about was consistent with Plaintiff's standard pattern of practice.  Other witnesses also testified that residents had informally complained to them about Plaintiff, which is consistent with the statements in Plaintiff's Fiscal Year 2017 Proficiency Report noting "multiple complaints against her from resident physicians as to her lack of availability, teaching skills, and demeanor, in general."  (AR 247, written statement from Mr. Christy stating "What I have had is numerous conversations with the residents and their concerns about [Plaintiff's] clinical judgment;" AR 262, written statement of Molly Gordon that "I have witnessed some frustration between residents and CRNAs with [Plaintiff]" due to lack of communication; AR 305 and 349, written statement of Dr. Bolson regarding "some difficulty with discussions about plan of care . . . and sudden changes in plan of care;" AR 358, written statement of Dr. Soong that he had been "messaged by the anesthesiology resident . . . for lack of response from [Plaintiff];" AR 816, FY17 Proficiency Report; AR 1357-1358, testimony of Molly Gordon that a resident complained to her that "he didn't feel comfortable working with [Plaintiff], and that he just didn't feel like her knowledge was the best;" AR 1753-1754 and 1758, testimony of Dr. Beck that "There was sometimes a lack of clear direction given to particularly residents" and discussing other complaints).  Plaintiff argues that the DAB should have concluded that the at least four residents who wrote down complaints (AR 232-235), the eight of twelve residents who provided negative evaluation comments in 2017 (AR 550-551), and the "at least a dozen more" who responded to an anonymous survey and expressed concerns (AR 1378, testimony of Dr. Oliva), all must have lied and fabricated all of their complaints.  (*See* Pl's Opp. at 10 (arguing the existence of a retaliatory "campaign relating to her resulting in generation of residents' complaints), 16 (arguing that Dr.

11

Ziegler's testimony would have convinced the DAB that "the hearsay on which the DAB upheld Specification 8" was not true), 26-27 (referring to the residents' complaints as "uncorroborated" and unreliable), 31 (same)).  The DAB reasonably rejected such an implausible assertion.

**F.  Evidence Supporting Revocation of Privileges and the Penalty of Removal.**

The DAB discussed eleven penalty factors in its analysis.  (AR 968-970).  The DAB noted the "common theme" of the charged misconduct and the "consistency among all agency witnesses" regarding the evidence.  (AR 968).  The DAB also noted as an aggravating factor that it is "highly unusual" for a medical provider to receive "such a large number of negative feedback responses from residents."  (AR 968-969).  The DAB also considered the fact that Plaintiff "is a very well-trained anesthesiologist[,]" (AR 969), which made her difficulty in grasping concepts of civility and teamwork all the more concerning.  Indeed, the DAB noted that "[t]his is an accepted basic concept" and Plaintiff "should have known effective communication is imperative."  (AR 969).

The DAB gave Plaintiff credit for her lack of prior discipline but also noted that this did not excuse her current misconduct.  The DAB referenced the egregiousness of Plaintiff's misconduct when it noted "the very unusual CU decision to fire the Appellant from supervising residents."  (AR 969).  Plaintiff takes semantic issue with the term "fire" (*see* Pl's MSJ at 30, arguing Plaintiff was not really "fire[d]" because the DAB "disregarded evidence to the contrary"), but there is no dispute that the University took the unusual step of revoking Plaintiff's ability to supervise any of its residents.  (*See* AR 229-230).[4]  Looking at Plaintiff's work record, the DAB went beyond Plaintiff's Fiscal Year 2017 proficiency rating and noted the "consistency

---

[4]     The DAB also credited testimony that "every word" of the University's December 2017 memorandum at AR 229-230 "had to be vetted for truthfulness and accuracy."

among the agency's witnesses" relating to Plaintiff's performance and misconduct.  (AR 969).

Plaintiff does not explain how a patchwork of Focused Professional Practice Evaluations

covering other short periods of time could have in any way changed the DAB's finding.  The

DAB credited the bulk of evidence showing that Plaintiff "lacked proper communication skills

and was impulsive.  (AR 969).

The DAB found that, of the Agency employees who testified, only four said they would

be willing to work with Plaintiff again while "all other witnesses agreed they lost confidence in

the [Plaintiff] and it would be detrimental to their belief that the VA hold[s] their employees

accountable" if Plaintiff were returned to duty.  (AR 969).  The DAB thus correctly concluded

that removal was appropriate.  Looking at the consistency of the penalty, the DAB considered

that Plaintiff's "communication style created a toxic environment resulting in, in some cases,

surgeons cancelling surgeries."  (AR 969).  The DAB also clearly was aware of and considered

the "highly unusual" circumstance of Plaintiff "[r]eceiving such a large number of negative

feedback responses from residents" and the fact that the University ultimately felt compelled to

"fire" Plaintiff from supervising residents.  (AR 968-969).  There was no evidence before the

DAB that any other employee ever even came close to the level of misconduct that the DAB

upheld against Plaintiff.  Thus, the "removal penalty is consistent with the non-binding table of

penalties for similar repeated conduct."  (AR 969).

Looking to impact on the Agency's reputation, the DAB cited Dr. Oliva's testimony, as

the head of the University's anesthesiology residency program, that he was "concerned about

returning the [Plaintiff] to duty."  (AR 969).  The DAB also noted other employees' concerns

"that their faith in the VA['s] ability to hold their employees accountable will be undermined if

the [Plaintiff] would be returned to duty."  (AR 969).  One of these "employees" was Sarah

Fredriksson, who was a contractor working with the Agency (i.e., a private citizen and not a federal employee) and who testified that if the DAB returned Plaintiff to duty, "that would be a violation of the trust."  (AR 1214-1215 and 1240).

The DAB also properly considered that Plaintiff has little potential for rehabilitation. Plaintiff points to her participation in the Colorado Physician Health Program (*see* Pl's Opp. at 42-43), but the DAB found that "that self-referral only occurred after the [Plaintiff's] privileges were revoked.  Her written replies to the Agency's allegations at the time did not show any acceptance of responsibility and was filled with placing blame on others."  (AR 970).  Thus, the DAB rightly concluded that Plaintiff is part of the roughly 10% of doctors that Dr. Humphreys testified cannot be rehabilitated in his experience.  (AR 1860, Dr. Humphreys testifying to a "success rate" above 90% in general).  Finally, the DAB found that Plaintiff's medical issues spanned only a small portion of the timeframe of her misconduct and therefore were not a valid excuse, and it expressed its opinion that "the offense was serious enough to warrant removal from the VA" rather than a lesser penalty.  (AR 970).

## G. Evidence Rebutting Plaintiff's Defense of a Conspiracy to Manufacture False Statements Against Her.

Plaintiff urges the Court to confuse the distinct concepts of correlation and causation, arguing that the litany of complaints against her must all have been falsified because the Agency triggered the summary suspension of clinical privileges process "only after, in January 2018, she disclosed a disability relating to her difficult pregnancy and requested a reasonable accommodation" and that complaints came out around "the same time she began meeting with ECHS leadership to report dysfunction."  (Pl's Opp. at 2).  Of course, this does nothing to explain the residents' and University's complaints from January to August 2017.  Moreover, Plaintiff's legal theories regarding the Agency's alleged retaliatory motives are beside the point

14

in this lawsuit where, as here, the record fully supports the DAB's conclusions and is otherwise devoid of evidence demonstrating any correlation between Plaintiff's complaints and reasonable accommodation request.

Plaintiff also erroneously argues that her management must have fabricated the litany of complaints against Plaintiff because they failed to limit Plaintiff's radiation exposure. (*See* Pl's Opp. at 29). There is no dispute that Plaintiff's doctor advised her to "limit radiation exposure while pregnant." (AR 2533). While Plaintiff interpreted this to mean that she could never be assigned to cases involving x-rays (AR 2078), that is not what her doctor advised. In the case at issue in Specification 4, Plaintiff began the procedure by anesthetizing patient, then left the room while radiation was in use. She re-entered the room not because the patient needed her, but because she wanted to retrieve a file for a different case. (AR 1970, Plaintiff's testimony). Far from showing a managerial conspiracy to injure her, the clear evidence shows that Plaintiff exposed *herself* to radiation and then blamed her management for this decision.

## II.    PLAINTIFF'S ASSIGNMENTS OF ERROR LACK MERIT.

### A. The Board Has No Legal Authority to Compel Former Employees to Testify.

Plaintiff falsely argues that Defendant has conceded that the DAB "improperly" precluded Plaintiff from cross-examining the proposing official (Dr. Ellen Mangione) and the deciding official (Ms. Sallie Houser-Hanffelder). (*See* Pl's Opp. at 17). But Defendant clearly pointed out that both Dr. Mangione and Ms. Houser-Hanfelder had retired before the DAB's hearing on the merits.[5] (*See* Def's Cross Mot. For Summ. J. at 4). The DAB has no authority to issue subpoenas, no power to enforce subpoenas, and no ability whatsoever to require a non-

---

[5]    In fact, the reason the DAB did not hold a hearing until December 2019 was because of Plaintiff's own requests for delay. (AR 455, 461, and 467).

employee to appear before it and testify, and Plaintiff cites no such authority in her brief. Moreover, Plaintiff did not even request Dr. Mangione or Ms. Houser-Hanfelder as witnesses, so it is difficult to fathom how the DAB could have "precluded" her from examining a witness which she did not even request.  (*See* AR 498-499, 614-616, and 641-642).

**B.  Plaintiff Ignores the Raft of Evidence Before the Board.**

Plaintiff's opposition accuses Defendants of engaging in post hoc rationalization of the DAB's decision to exclude evidence proffered by Plaintiff.  (*See* Pl's Opp. at 9, 12, 33, and 41-42).  However, this argument rests on the faulty premise that the DAB ignored the parties' arguments and the raft of evidence before it.  Indeed, the record contains ample basis to justify the DAB's decision to exclude Plaintiff's exhibits relating to her collateral matters, namely her ongoing MSPB Whistleblower claims and her ongoing Equal Employment Opportunity discrimination claims.  The Agency pointed this out in its briefing before the DAB, and Plaintiff argued the very opposite.  (AR 650-657 and 962).  It strains credulity to conclude that the DAB, in expressly excluding Plaintiff's evidence, failed to consider the parties' briefing in the issue.  (*See* AR 982, DAB President acknowledging the parties' submissions and denying motions to include further exhibits in the record).

Plaintiff's objection to the DAB's exclusion of her proffered evidence also relies on her erroneous argument that the Board should have considered that evidence because it was relevant to additional arguments she wished to raise before the DAB (and not that it was relevant to any fact or matter actually in issue).  (*See* Pl's Opp. at 9-10 and 23).  But the issue before the DAB was the Charge and Specifications of Unprofessional Conduct, the penalty of removal, and the decision to revoke Plaintiff's clinical privileges.  As discussed in Defendants' motion, Plaintiff's collateral attacks alleging Whistleblower reprisal, failure to provide a reasonable

16

accommodation, and pretextual Title VII discrimination were never before the DAB and thus were never "relevant."  (*See* Def's Cross-Mot. for Summ. J. at 13, 19, and 20).

For example, Plaintiff's efforts to litigate her allegation of "department-wide dysfunction" are really just Plaintiff trying to litigate others' misconduct as a red herring to distract from her own misconduct.  (*See* Pl's Opp. at 10).  Simply put, the relevant issue before the DAB was whether Plaintiff had engaged in the charged misconduct.  The fact that she alleges that others also contributed to an overall toxic environment does not absolve Plaintiff of her misconduct or her own significant contributions to that environment.  Plaintiff points to her Pay for Performance and Dr. Black's reticence to recommend full bonus pay given Plaintiff's misconduct issues (*see* Pl's Opp. at 10-11), yet she fails to explain how this is relevant to whether she actually committed any of the charged misconduct (or how it proves that so many VA employees and University residents must have falsified their reports in such a coordinated fashion).[6]  In a bit of sophistry, Plaintiff also claims that she did not seek relief from the DAB "for whistleblowing retaliation or equal employment opportunity discrimination" (Pl's Opp. at 12), yet she argues that her removal was triggered solely by her alleged Whistleblowing disclosures in mid-to-late 2017 and her EEO activity in January 2017.  (*See* Pl's Opp. at 2 (arguing that Plaintiff's misconduct "did not begin to arise" until immediately after her Whistleblowing disclosures and her EEO activity)).  Plaintiff clearly attempted to leverage those claims to convince the DAB to dismiss the charged misconduct as a conspiratorial fabrication in retaliation for protected activity.

---

[6]    Notably, Dr. Shockey recommended giving Pay for Performance on November 7, 2017, before the University "fired" Plaintiff from supervising residents and before the charged misconduct in Specifications 1, 2, 4, and 5 came to light.  (*See* AR 820).

Plaintiff also points to Focused Professional Practice Evaluations ("FPPEs") covering limited timeframes of three months each, which were limited in scope to either the Surgical Intensive Care Unit or the Operating Room but not both, and in which Dr. Torres did not participate.  (*See* Pl's Opp. at 13-14).  However, the FPPEs Plaintiff points to do not undermine or negate Dr. Torres' testimony—they are merely a snapshot in time and say nothing about whether Plaintiff committed any of the charged misconduct.  Plaintiff likewise overreaches when she labels Dr. Semian's conduct as "far more egregious" than Plaintiff's.  (Pl's Opp. at 14).  The complaints against Dr. Semian did not involve anywhere near the breadth and depth of the complaints against Plaintiff, nor were they so substantial and severe as to motivate the University to "fire" Dr. Semian from supervising any of the University's residents.  Accordingly, he is not a valid comparator.

The DAB also rightly excluded Dr. Ziegler's proffered testimony as an "expert" on both the ultimate issue that the DAB was required to decide, namely an appropriate penalty, and whether or not Plaintiff's conduct was "unprofessional."  (AR 499 (Plaintiff's proffer for Dr. Ziegler stating he "will testify to the fact that the misconduct . . . do[es] not represent instances of substandard [or] improper patient care" and to the appropriateness of "avenues other than termination"), 587 (Agency's pleading arguing that Dr. Ziegler's proffered testimony goes beyond the scope of the charged misconduct), 615 (Plaintiff proffering Dr. Ziegler for same purposes described above), 638 (DAB Summary of Pre-Hearing Conference addressing the parties' briefings and stating that the DAB will not allow expert witnesses), 1799-1800 (transcript of hearing, DAB President stating same)).  Presumably Plaintiff wanted Dr. Zeigler to testify that Plaintiff's misconduct was "professional," despite the undeniable negative impact it had on the workplace.  But the DAB did not need Dr. Ziegler for that purpose, as it was entitled

to use the definition of unprofessional conduct in well-established case law as well as the plain meaning of the phrase.  Plaintiff does not cite any prior case where an expert was permitted to opine on such a basic proposition as to whether conduct which creates such a toxic working environment as here is "unprofessional" or not.  In *Abaqueta v. United States*, 255 F. Supp. 2d 1020 (D. Ariz. 2003), the case relied on primarily by Plaintiff, the court analyzed whether expert testimony was necessary to determine whether there was a valid medical reason for a doctor to palpate a patient's breasts while the patient was under anesthesia.  That is not the issue here, where Plaintiff asserts that none of the charged misconduct occurred *at all*.  However, the record before the DAB adequately demonstrates that her conduct had a decidedly negative impact on her co-workers, on the medical teams in which she worked, and on the entire work environment and it therefore meets the objective standard of unprofessional conduct established by clear case law.

Plaintiff also inappositely refers to her MedHUB evaluations as "favorable" based on an insistence that the court look to the literal titles of the five evaluation ranges to the exclusion of the substance of the actual evaluations.  Here, there were 12 responses, not 18 (*see* AR 550), and of those, 8 evaluators left negative comments.  Plaintiff's evaluations are also substantially lower than for her peers by an average of 1.5 standard deviations or more.  (AR 550).  Accordingly, regardless of her score, Plaintiff was clearly much less regarded than her peers.

## C. No Evidence That Plaintiff Will Actually Lose Her License, Nor That it is Impossible for Her to Find Employment.

Plaintiff repeatedly asserts, without any evidence, that her career is permanently over.  It is not, and she provides no evidence to support her apocalyptic speculation.  The Defendant has no power or authority to take an action against a medical provider's state-issued medical license. The Defendant can only report the DAB's findings and the state licensing board must make its

own determination.  The DAB found that Plaintiff engaged in "professional misconduct" and that "[h]er main problem was how to interact within a team."  (AR 970).  The DAB found that, given that Plaintiff's primary issue was her interpersonal interactions with others, "[s]he might be successful somewhere else."  (AR 969).  It is anything but a foregone conclusion that Plaintiff's state licensing board will allow her to maintain her license and work for a different hospital (or open her own medical practice).

### D.  Plaintiff Confuses the Charge with the Specifications.

Plaintiff still confuses the Charge with the Specifications, arguing erroneously that the Agency must prove the "essence" of each specification based on case law stating instead that the Agency must prove the "essence" of each charge.  (*See* Pl's Opp. at 23-24 and 30).  The MSPB in *Otero v. USPS*, 73 MSPR 198, 204 (1997) explained the rule as follows:

> [A]lthough . . . a charge must fall if any element of the charge label is not proven, that does not thereby mean that a charge must fall if any portion of the narrative description of the charge is not proven.  For example, if an agency named a charge "theft of government property," and then in the narrative description stated that on a single occasion, the employee stole a hammer, a wrench, and a screwdriver the charge would not fall under *Burroughs* if on appeal the agency could prove only that a hammer and a wrench were taken.

*Id.* (citing *Burroughs v. Dep't of the Army*, 918 F.2d 170, 172 (Fed. Cir. 1990)).  The DAB's findings as to Specifications 1 and 2 (let alone the findings as to Specifications 4, 5, and 8) are sufficient to uphold the Charge of Unprofessional Conduct based on the entire record.

### E.  Protected Peer Review Issue.

Plaintiff also argues for the first time in this litigation that she sought, but was denied, admission of evidence "establishing that Soong's matters were the subject of a Protected Peer Review evaluated by the Peer Review Committee."  (Pl's Opp. at 33).  Plaintiff has never previously argued that the DAB considered otherwise protected peer review records, so she has

20

waived this issue. *See Noble Energy, Inc. v. Salazar*, 691 F. Supp. 2d 14, 23 n.6 (D.D.C. 2010) (argument not raised in summary judgment motion is waived). Moreover, federal law provides that "Records and documents created by the Department as part of a medical quality-assurance program (other than reports submitted pursuant to section 7311(g) of this title) are confidential and privileged and may not be disclosed to any person or entity except as provided in subsection (b) of this section." 38 U.S.C. § 5705(a). This section refers to peer review files from the Agency's Quality Assurance (also called Quality, Safety and Value) Service, and subsection (b) does not provide an exception for disclosures in discovery or litigation.

The "evidence" plaintiff now points to did not come from the Agency's Quality Assurance Service, though. Nor was it produced by a protected Peer Review process. The Agency is free to use non-privileged evidence which was not gathered through a protected Peer Review process. Thus, Dr. Soong and every other witness was free to provide unprotected adverse reports to Dr. Ian Black, to the DAB, and to anyone else who requested them for a valid managerial purpose. The fact that information might be duplicated in both a protected and an unprotected forum does not make every iteration of that information magically privileged. Plaintiff has not identified any document or testimony which came directly from a protected source, such as the Peer Review process, rather than an independent and unprotected source.

### F.  The Agency Did Not Fail to Cite Any Specific Law or Policy for Each Specification.

Plaintiff inappositely argues that the Agency was required to cite specific law or policy for each of the charged Specifications. (*See* Pl's Opp. at 33-34 (citing VA Directive 5021/9)). However, the VA Directive cited by Plaintiff clearly states that such law or policy only needs to be cited "as it pertains to each charge." (*See* AR 571). If a specific rule or law does not pertain to a charge, the Agency need not cite it. The Agency need not charge a violation of a specific

statute or rule.  Instead, it may label a charge appropriately (such as by labeling it Unprofessional

Conduct), describe the conduct at issue, then prove that the charged conduct meets the elements

of the charging label.  The Agency did so here.

### G. The Existence of Plaintiff's High-Risk Pregnancy Was Not a Contested Fact Requiring Additional Evidence and, In Any Event, the DAB Held That it Was Not a Valid Defense.

Plaintiff also makes much of a policy applicable to Title 5 employees that permits

employees to submit medical documentation to demonstrate that a medical condition affected his

or her performance.  (*See* Pl's Opp. at 35).  However, the Agency appointed Plaintiff as a

physician pursuant to Title 38, not pursuant to Title 5.  While Plaintiff cites to AR 2909, which is

Part I, Chapter 3 of VA Handbook 5021, the table of contents for VA Handbook 5021 clearly

states that Part I applies only to "Disciplinary and Adverse Actions *Under Title 5*."  (AR 2872

(emphasis added)).  Part II, rather, applies to "Disciplinary Procedures Under Title 38."  (*See* AR

2870).  Plaintiff therefore cites the wrong rules.

More importantly, Plaintiff's pregnancy was never a contested issue before the DAB.

The Agency did not argue that Plaintiff was not pregnant or that her pregnancy was not a high-

risk pregnancy.  To the extent Plaintiff argues that she was precluded from proving that claim,

her argument is meritless.  Rather, the DAB found that, assuming Plaintiff's claim relating to her

pregnancy were true, it did not explain or justify the charged misconduct because Plaintiff's

misconduct was not limited to the timeframe of her pregnancy.  (AR 970, DAB decision

concluding that "The Appellant had health issues during late 2017 and early 2018; however, the

communication issues started prior to her health concerns")).  Thus, the DAB appropriately

rejected this argument.

**H. Plaintiff Inappositely Argues the DAB "Ignored" Her Evidence Solely Because It Did Not Win the Day.**

Similarly, Plaintiff cites to a portion of VA Handbook 5013 which also applies only to Title 5 personnel, not to Title 38 personnel such as Plaintiff.  (*See* Pl.'s Opp. at 36-37).  Plaintiff also appends four exhibits to her brief, which are not part of the Administrative Record nor were they before the DAB for review.  However, Plaintiff offers no basis for the Court to consider any extra-record evidence as is her burden.  *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (identifying exceptions to the general prohibition on extra-record evidence).  At page 36, Plaintiff argues that the Agency did not provide her with a copy of her proficiency report in time for her to avoid committing further misconduct.  This, of course, does not address the substantive issue of whether Plaintiff engaged in the charged misconduct in the first place.

Plaintiff's Exhibit 4 cites to portions of VA Handbook 5013, Performance Management Systems, contained in Part I.  A glance at the table of contents for that policy shows that Part I applies to the "Title 5 Performance Appraisal Program" while Part II applies to the "Title 38 Proficiency Rating System."  *See* Exhibit 1 (relevant portions of VA Handbook 5013).[7]  Of course, regardless of the above, Plaintiff still fails to explain how the existence or non-existence of this policy is in any way relevant to whether she engaged in the charged misconduct.

Plaintiff also lists a raft of inaccurate or inapposite arguments.  At page 37 she claims incorrectly that the DAB's decision did not find any risk of harm to patients.  However, at AR 968, the DAB specifically noted that "The Appellant's failure to effectively communicate put the agency and the patients at unnecessary risk."  At page 38, Plaintiff argues that a failure to sustain

---

[7]     Defendants attach this information solely for the purpose of addressing Plaintiff's extra-record exhibits and not to supplement the Administrative Record in this case.

all specifications may render a penalty unreasonable, yet the DAB *did* sustain all the specifications at issue.  Plaintiff also incorrectly claims the Specifications did not reference the Agency's "team" model while ignoring both the entire evidence file and common sense.  But the terms "team" and "teamwork" are referenced 86 times in the Evidence File.[8]

At page 39, Plaintiff refers to another anesthesiologist, Dr. Frandrup, who was returned to his position after a DAB hearing.  However, unlike Plaintiff, Dr. Frandrup's removal was overturned by the DAB, so this is not an apt comparison.  Moreover, Dr. Frandrup's case is the case which Dr. Oliva testified "burned" him and the University, and it soured his relationship with the Agency.  (*See* AR 1401, 2424, 2431, 2611-2612).

Plaintiff incongruously argues that the DAB should have mitigated the penalty based on Plaintiff's "future ability to fulfill her duties" and Plaintiff's assertion that "There is no allegation that Dr. Doe has any flaws of integrity or character."  (*See* Pl's Opp. at 40).  Yet, this is contradicted by the great weight of the evidence and the clear record before the DAB, which was rife with evidence of flaws of both integrity and character.  (*See, e.g.*, references to Plaintiff's mendacity which were before the DAB).  Plaintiff follows this claim with another clearly inapposite assertion, namely that "many witnesses expressed a willingness to continue working with" Plaintiff.  (Pl's Opp. at 40).  Of course, this is only relevant if both the DAB and the Court ignore the litany of witnesses who expressed the exact opposite point of view.  Plaintiff also, again, incorrectly claims that penalties for similar misconduct weighed in favor of a lesser

---

[8]     *See* AR 13, 44, 60, 64, 65, 67, 127, 136, 137, 150, 154, 155, 157, 180, 208, 209, 216, 222, 224, 225, 226, 227, 229, 233, 241, 244, 245, 246, 253, 260, 270, 272, 273, 303, 311 (SICU Team Multidisciplinary Progress Note), 315, 321, 323, 326, 327, 340, 348, 351, 355, 356.

penalty here, yet Plaintiff cannot identify a single other employee who had such a huge laundry list of complaints from such a broad cross-section of the hospital (and the University to boot).

At page 41, Plaintiff completely ignores the reputational injury of the VA in the eyes of both the University (and its residency program and the flow of incoming residents who have to decide each year what programs to apply to) and CRNA Sarah Fredriksson, a contractor.  At page 42, Plaintiff falsely refers to her MedHUB evaluations as "overwhelmingly favorable," ignoring the fact that she was rated approximately 1.5 standard deviations lower than her peers and 8 out of the 12 residents who evaluated her had negative comments to add, including that her actions endangered patient safety.  (*See* AR 550-551).  Plaintiff also misrepresents her request for reasonable accommodation.  She never requested a reasonable accommodation of not being assigned cases requiring radiation.  As noted, her doctor said to "limit" (not remove) radiation exposure, and the only reason she went into the room for case at issue in Specification 4 was not for the case she assigned to but for a *different* case.  Plaintiff exposed *herself* to radiation and now wants to place the blame on Defendant.  Plaintiff did not identify a single other case which required her to expose herself to radiation.

Plaintiff also claims that she was assigned two first year residents for one week and the DAB should have considered this as a mitigating factor for Specification 8.  Plaintiff's claim finds no support in law or reason, nor did Plaintiff present any evidence that this assignment continued beyond one week.  Last, Plaintiff argues that Dr. Ziegler should have been allowed to testify as an "expert" regarding VA Directives because those Directives apply equally to all facilities.  Yet, this argument weighs against allowing his testimony, as the DAB could have just taken judicial notice of the policies and disciplinary options in those Directives.

**CONCLUSION**

For the foregoing reasons, as well as those discussed in Defendants' motion, Defendants respectfully request that the Court grant Defendants' cross-motion for summary judgment and deny Plaintiff's motion for summary judgment.

Dated March 8, 2021     Respectfully submitted,

           CHANNING D. PHILLIPS, D.C. Bar No. 415793
           Acting United States Attorney

           BRIAN P. HUDAK
           Acting Chief, Civil Division

By:  /s/   *Christopher C. Hair*
           CHRISTOPHER C. HAIR, PA Bar No. 306656
           Assistant United States Attorney
           555 Fourth Street, N.W.
           Washington, D.C. 20530
           (202) 252-2541
           christopher.hair@usdoj.gov

           *Counsel for Defendants*

*Of counsel*

Robert C. Burlison III, Esq.
Senior Trial Attorney
Department of Veterans Affairs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE, M.D.,<br><br>        *Plaintiff,*<br><br>    v.<br><br>Steven Lieberman, Acting Principal Under<br>Secretary for Health, Department of Veterans<br>Affairs, *et al.*,<br><br>        *Defendants*. | Civil Action No. 20-2148 (CRC) |

**[PROPOSED] ORDER**

UPON CONSIDERATION of Defendants' Cross-Motion for Summary Judgment, Plaintiff's Motion for Summary Judgment, and the entire record herein, it is hereby

ORDERED that Defendants' motion is GRANTED;

ORDERED Plaintiff's motion is DENIED; and it is further

ORDERED that Plaintiff's complaint is DISMISSED WITH PREJUDICE.

It is SO ORDERED this _____ day of _____, 2021.


_____
Hon. Christopher R. Cooper
United States District Judge

# EXHIBIT 1

**Department of Veterans Affairs**
**Washington, DC 20420**

**VA HANDBOOK 5013**
**Transmittal Sheet**
**April 15, 2002**

## PERFORMANCE MANAGEMENT SYSTEMS

**1.  REASON FOR ISSUE:**  To issue Department of Veterans Affairs (VA) procedures regarding performance management systems.

**2.  SUMMARY OF CONTENTS/MAJOR CHANGES:**  This handbook sets forth mandatory procedures previously contained in numerous other issuances.  No substantive changes have been made.

**3.  RESPONSIBLE OFFICE:**  The Human Resources Management Employee Relations and Performance Management Service (051), Office of the Deputy Assistant Secretary for Human Resources and Labor Relations.

**4.  RELATED DIRECTIVE:**  VA Directive 5013, "Performance Management Systems."

**5.  RESCISSIONS:**  Refer to the Transmittal Sheet for VA Handbook 5001, "General Introduction and Administration."

**CERTIFIED BY:**

**BY DIRECTION OF THE SECRETARY OF VETERANS AFFAIRS:**

John A. Gauss
Assistant Secretary for
Information and Technology

Jacob Lozada, Ph.D.
Assistant Secretary for Human
Resources and Administration

**APRIL 15, 2002**                                                    **VA HANDBOOK 5013**

## PERFORMANCE MANAGEMENT SYSTEMS

## CONTENTS

**PART I**.  **TITLE 5 PERFORMANCE APPRAISAL PROGRAM**

**PART II**.  **TITLE 38 PROFICIENCY RATING SYSTEM**

# PERFORMANCE MANAGEMENT SYSTEMS

## PART I.  TITLE 5 PERFORMANCE APPRAISAL PROGRAM

### CONTENTS

**PARAGRAPH**        **PAGE**

1. COVERAGE ...........................................................................................................I-1
2. EXCLUSIONS .......................................................................................................I-1
3. GENERAL PROVISIONS .....................................................................................I-2
4. EVALUATION .......................................................................................................I-2
5. DEFINITIONS .......................................................................................................I-2
6. PLANNING PERFORMANCE .............................................................................I-3a
7. MONITORING PERFORMANCE ........................................................................I-3c
8. APPRAISING PERFORMANCE ..........................................................................I-3c
9. [PROCEDURES FOR ADDRESSING UNACCEPTABLE PERFORMANCE .......I-[4]
[10]. PROCEDURES FOR DETAILS, TRANSFERS AND OTHER CIRCUMSTANCES ...........I-[4g]
[11]. REWARDING PERFORMANCE .......................................................................I-[5]
[12]. PERFORMANCE RATING GRIEVANCES AND APPEALS ...........................I-[6]
[13]. WITHIN-GRADE INCREASES – GENERAL SCHEDULE .............................I-[7]
[14]. WITHIN-GRADE INCREASES – PREVAILING RATE .................................I-[14]
[15]. FAILURE TO COMPLETE A SUPERVISORY PROBATIONARY
    PERIOD SATISFACTORILY ..............................................................................I-[15]
[16. APPEALING REQUIREMENT TO SERVE SUPERVISORY PROBATIONARY PERIOD...I-17]

**APPENDICES**

I-A. PERFORMANCE APPRAISAL SYSTEM APPROVED BY OPM ........................I-A-1
I-B. OPM APPROVAL OF VA PERFORMANCE APPRAISAL SYSTEM ................I-B-1
I-C. SAMPLE PERFORMANCE IMPROVEMENT PLAN .......................................I-C-1
I-D. APPRAISAL PROGRAM FOR VETERANS BENEFITS ADMINISTRATION
    NON-EXECUTIVE DIRECTORS .......................................................................I-D-1
I-E. VBA NON-EXECUTIVE DIRECTOR COMMON MANAGERIAL ELEMENTS ................I-E-1
I-F. PERFORMANCE APPRAISAL PROGRAM FOR VHA EMPLOYEES IN THE
    EXECUTIVE CAREER FIELD ...........................................................................I-F-1

## PART I.  TITLE 5 PERFORMANCE APPRAISAL PROGRAM

**1.  COVERAGE.**  This part applies to the process used to appraise the performance of the following Department of Veterans Affairs employees:  (**NOTE:** This policy applies to bargaining unit employees, unless negotiated provisions in National Agreements and Memoranda of Understanding provide otherwise):

a.  General Schedule employees, including employees covered by the Performance Management and Recognition System Termination Act of 1993.

b.  Federal Wage System employees.

c.  Scientific and Technical (Senior Level) employees paid under 5 U.S.C. 5376.

d.  Full-time, part-time and intermittent hybrid Title 38 employees appointed under 38 U.S.C. 7401(3) or 7405(a)(1)(B).

e.  Veterans Canteen Service employees appointed under 38 U.S.C., chapter 78.

f.  Temporary and Term employees, except as specifically excluded.

g.  All Veterans Health Administration (VHA) employees [under the Executive Career Field Performance Appraisal Program fall under the provisions of Appendix F of this part.  However, for matters not specifically covered by Appendix F, the provisions of this part shall apply].

**2.  EXCLUSIONS.**  This part excludes the following:

a.  Officers appointed by the President, by and with the advice and consent of the Senate, or by the President alone, to positions for which rates of basic compensation may exceed the maximum rate provided in the General Schedule.

b.  Employees in the Senior Executive Service.

c.  Full-time, part-time, and intermittent physicians, dentists, chiropractors, nurses, nurse anesthetists, optometrists, podiatrists, physician assistants, expanded-function dental auxiliaries appointed under 38 U.S.C. 7401(1), 7405(a)(1)(A), or 7406, and individuals appointed under 38 U.S.C. 7306 in the Office of the Under Secretary for Health.

d.  Non-U.S. citizens employed at the VA Regional Office, Manila, Republic of the Philippines, who are paid according to local prevailing wage rates.

e.  Temporary employees in the excepted service for which employment is not reasonably expected to exceed 90 days in a 12-month period.

f.  Members of the Board of Veterans' Appeals and the Board of Contract Appeals.

g.  Veterans Benefits Administration (VBA) non-executive directors.

h.  Veterans Health Administration (VHA) Associated Health Trainees..