## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JANE DOE, M.D.**, <br><br> Plaintiff, <br><br> v. <br><br> **STEVEN L. LIEBERMAN**, in his official capacity as Deputy Under Secretary for Health, Department of Veterans Affairs, Veterans Health Administration, <br><br> **DISCIPLINARY APPEALS BOARD**, Department of Veterans Affairs, Veterans Health Administration, and <br><br> **EASTERN COLORADO HEALTHCARE SYSTEM**, Department of Veterans Affairs, Veterans Health Administration, <br><br> Defendants. | Case No. 20-cv-2148 |

## <u>MEMORANDUM OPINION</u>

This is the second time the Court has considered former Department of Veterans Affairs ("VA") anesthesiologist Jane Doe's challenge to the decision of a VA Disciplinary Appeals Board ("DAB" or "the Board") upholding her removal from federal service.[1] In a previous opinion, the Court rejected the majority of Doe's procedural and evidentiary objections to a hearing conducted by the DAB and its subsequent removal decision. But the Court agreed with Doe that the DAB did not adequately explain its exclusion of certain exhibits she sought to introduce at the hearing. The Court therefore remanded the matter to the Board for it to either

---

[1] The Chief Judge of this Court granted Doe permission to proceed under a pseudonym in August 2020. <u>See</u> Order, Aug. 5, 2020, ECF No. 4. The Court has allowed Doe to remain in that status, although it has granted the government permission to identify Doe as the party litigant in related administrative actions. <u>See</u> Order, Mar. 31, 2022, ECF No. 50.

provide that explanation or reconsider its removal decision in light of the previously excluded evidence. The DAB has now clarified why it excluded Doe's proffered evidence. On remand, the Board explained that it rejected Doe's exhibits as both untimely and irrelevant to the charges of unprofessional conduct at the center of her case.

Doe challenges that explanation in a renewed motion for summary judgment. She contends that principles of administrative law preclude the Court from considering the DAB's explanation on remand. She further argues that the DAB's reasoning is "not credible." The agency has cross-moved for summary judgment. It maintains that the DAB reasonably excluded Doe's untimely exhibits, and that her additional evidence was not material in any event. The agency asks for summary judgment on Doe's evidentiary challenge, as well as on any remaining issues on which the Court previously reserved judgment.

The Court will deny Doe's motion for summary judgment and grant the agency's cross-motion. In this context, the Court can properly consider the new rationale it invited the DAB to provide on remand. And under the deferential standard of review it must apply, the Court finds the DAB has provided a sufficient, reasonable explanation for excluding material Doe only sought to introduce on the eve of a lengthy hearing. Any other exclusions were harmless. Turning to the merits of the DAB's decision, the Court finds that it is supported by substantial evidence and complies with the relevant substantive standards. Accordingly, the Court affirms the decision of the DAB upholding Doe's removal from federal service.

## I.    Background

The Court assumes familiarity with the underlying factual background laid out in its prior memorandum opinion. See MSJ Op. at 2–7, ECF No. 38. Below, the Court recounts the facts relevant to this opinion, including recent developments following its remand order.

A.  Initial Administrative Proceedings

On August 1, 2018, the Chief of Staff of the Eastern Colorado Health Care System ("ECHCS")—a Denver-area VA hospital where Doe worked—notified Doe that the agency proposed to remove her from federal service based on an unprofessional conduct charge.  A.R. 91–93.  That charge, in turn, was supported by eight specifications.  Most related to incidents with specific patients, and one centered on "unprofessional . . . interactions with" medical residents.  Id.  Later that month, the ECHCS Director issued a final decision removing Doe from service and revoking her clinical privileges.  A.R. 101.  The Director found overall support for the charge of unprofessional conduct, and upheld five of the eight underlying specifications.  Id. In so doing, she considered, among other things, Doe's "oral and written replies," evidence Doe submitted to support her position, and a July 2018 memorandum outlining "[a]ggravating and [m]itigating [f]actors" related to Doe's conduct and performance.  Id.

Doe administratively appealed the decision, and the agency appointed a Disciplinary Appeals Board to consider the appeal.  A.R. 5.  The Board set a hearing for December 2, 2019. A.R. 473.  In advance, the Board Chair issued a memorandum outlining various deadlines and procedures.  A.R. 473–75.  He set a deadline of October 7 for "any pre-hearing motions or other requests," and required the parties to submit witness lists by October 9.  A.R. 474.  He also set deadlines for responses or objections to those filings.  Id.  The memorandum emphasized that "it [was] essential" for the parties to "adhere[] to" this schedule, given a statutory requirement that the DAB reach a decision within 45 days of the hearing's conclusion.  A.R. 475; see 38 U.S.C. § 7462(c)(4).  Finally, the Chair explained that the "the facts and issues of the appeal," as well as any pending motions or other administrative issues, would be addressed in a November 1, 2019, teleconference.  A.R. 474.

Throughout October and November of 2019, the parties submitted a variety of filings regarding the scope of the upcoming hearing and the identity of the witnesses who would testify. When each side filed untimely responses to various submissions, the DAB Chair admonished them and expressed "hope[]" that such "disregard" for the Board's "instructions" did "not become a pattern." A.R. 400. The Board nevertheless accepted the belated filings and considered those objections on the merits. Id.

On November 1, the Board held a pre-hearing conference call. See A.R. 634–39 (call summary). The Board emphasized that it was "not a court of law," and that its function was "to review and consider evidence and arguments relevant to the charges." A.R. 634. On the call, among other things, the DAB approved or denied the participation of various witnesses and set a deadline for submission of amended witness lists for the following week. A.R. 635–36. The Board later—based on Doe's objection—rejected the agency's request to use transcripts from prior depositions taken in related proceedings before the Merit Systems Protection Board ("MSPB") in lieu of live testimony from certain former VA employees. A.R. 636. Lastly, based on the summary of the conference prepared after the fact, it appears that the Board took certain "actions" regarding various exhibits submitted alongside the parties' filings throughout October. See A.R. 636–37 (listing "exhibits," including evaluations of Doe, as well as contemporaneous statements, emails, and other communications regarding the underlying specifications). It is unclear from context whether the DAB agreed to admit any of those exhibits for substantive consideration at the hearing.

The week before the hearing, the parties submitted several additional requests. First, on Sunday, November 24, Doe moved to amend her witness list to replace a former VA employee who could no longer be located with a current employee. A.R. 640–41. The agency objected on

4

several grounds, including timeliness, A.R. 645, and the DAB rejected the swap, A.R. 649.  To maintain an even number of character witnesses from each side, the Board instructed the agency to remove one from its witness list, too.  Id.

Second, on Friday, November 29, both Doe and the agency sought the admission of additional documentary exhibits.  See A.R. 666–67; A.R. 952.  The agency submitted four.  A.R. 666–67.  Doe offered 23, totaling some 280 pages.  See A.R. 669–948, 951.  Her proposed exhibits included, among other things, a copy of her CV, past recommendation letters and positive performance reviews, and correspondence regarding her supervision of residents.  A.R. 670.  Doe contended that this material was "essential as a matter of fundamental fairness," as existing evidence did not tell the complete story and largely did not support her position.  A.R. 952.  The agency objected and moved to exclude most of the exhibits as untimely, irrelevant, and/or duplicative of material already in the evidence file before the Board.  A.R. 951.  At the start of the hearing the following Monday, the Board denied both sides' November 29 requests to "include further exhibits in[] the record."  A.R. 982.  The Board's explanation for that exclusion—or, more to the point, the lack thereof—is the subject of the Court's remand order and the parties' renewed summary judgment briefing.

Following a four-day hearing, the DAB upheld the charge of unprofessional conduct, the five specifications outlined in the ECHCS Director's initial decision, and the ultimate penalty of removal.  See A.R. 965–71.  In coming to that decision, the Board had before it the entire hearing record, as well as an evidence file from the initial removal decision, which included statements and submissions made by Doe at that time.  See Index to A.R. 1–6.  The final decision cited the testimony of a variety of Doe's colleagues—all of whom were subject to cross-examination by Doe's counsel—as well as Doe's testimony on her own behalf.  A.R. 966–70.

B.  <u>Prior Appeal</u>

Doe sought judicial review of the DAB's decision.  In a prior opinion, the Court granted in part and denied in part both Doe's and the agency's motion for summary judgment.  While the Court largely rejected Doe's procedural challenges to the DAB hearing, it agreed with Doe that the Board did not adequately explain two evidentiary decisions:  first, the exclusion of the supplemental evidence file Doe submitted on November 29, 2019; second, the rejection of her effort to introduce prior sworn and supposedly inconsistent testimony to impeach various agency witnesses.  <u>See</u> MSJ Op. at 16–19.  While the Court noted that a sufficient explanation "need not be extensive," it held that the DAB's silence here "'cross[ed] the line from the tolerably terse to the intolerably mute.'"  <u>Id.</u> at 19 & n.9 (quoting <u>Greater Bos. Television Corp. v. FCC</u>, 444 F.2d 841, 852 (D.C. Cir. 1970)).  The Court remanded for the Board "to either explain these exclusions or reconsider them in light of the Court's ruling."  <u>Id.</u>  It reserved judgment on several substantive issues pending remand.  <u>Id.</u> at 26–27.

C.  <u>Remand</u>

On remand, the DAB offered two reasons for the exclusion of Doe's evidence.  Primarily, the DAB explained that the "submission was . . . late."  Ex. 1 to Pl.'s Renewed Mot. ("DAB Remand Explanation"), Oct. 25, 2021, ECF No. 39-1.  Because "all exhibits, motion and requests were due to the DAB for consideration by October 7, 2019," the DAB explained, the evidence file offered "on Friday, November 29, 2019, just before the hearing was set to begin," was untimely.  <u>Id.</u>  The Board also noted that many of the documents were "excluded from the proceedings" because they "were not relevant."  <u>Id.</u>  In particular, many "related to a discrimination . . . case" Doe had filed, "which was outside the Board's jurisdiction and scope."  <u>Id.</u>

D.  Post-Remand Proceedings

Doe again sought this Court's review.  Three weeks after the DAB's decision, she filed a pleading in this case styled as a "Reply to Defendant DAB's 'Explanation' on Remand."  See ECF No. 39 ("Pl.'s Renewed Mot.").  The Court construed the filing as a renewed motion for summary judgment and set a schedule for briefing that motion and any cross-motion by the agency.  See Minute Order of Nov. 23, 2021.  Those motions are now ripe.

**II.    Standard of Review**

VA doctors may seek judicial review of unfavorable DAB decisions under 38 U.S.C. § 7462(f).  The applicable statutory standards mirror those of the Administrative Procedure Act ("APA"), and courts apply general principles of administrative law to these cases.  See Dubnow v. McDonough, 30 F.4th 603, 610 (7th Cir. 2022); Doran v. Wilkie, 768 F. App'x 340, 349 n.6 (6th Cir. 2019).  Thus, in § 7462(f) proceedings, as in APA challenges, summary judgment is the proper stage for determining whether, as a matter of law, an agency action is supported by the administrative record and otherwise complies with the law.  Cf. Richards v. Immigr. & Naturalization Serv., 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977) (explaining that the "merit of the administrative decision" must be "determined exclusively on the administrative record").

Section 7462(f) directs courts to "review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be[] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule, or regulation having been followed; or (C) unsupported by substantial evidence."  38 U.S.C. § 7462(f)(2).  Arbitrary and capricious is a "narrow standard of review."  Dep't of Homeland Sec. v. Regents of the Univ. of California ("Regents"), 140 S. Ct. 1891, 1905 (2020).  Under this test, "a court is not to substitute its judgment for that of the agency, but instead" must

"assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. (internal citation and quotation marks omitted). The standard for reviewing factual findings—substantial evidence—is likewise "highly deferential to the agency fact-finder, requiring only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Sec'y of Lab. v. Knight Hawk Coal, LLC, 991 F.3d 1297, 1308 (D.C. Cir. 2021) (internal quotation marks omitted). "The test requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." Duke Energy Corp. v. FERC, 892 F.3d 416, 420 (D.C. Cir. 2018) (internal quotation marks omitted). Reversal on substantial evidence grounds is thus rare. Knight Hawk Coal, 991 F.3d at 1308.

### III. Analysis

The Court begins with the question presented in its order remanding Doe's case to the DAB: Has the DAB provided a sufficient explanation for its decision to exclude certain evidence from consideration at the December 2019 hearing? Principles of administrative law do not bar the Court from considering the new rationale it ordered the DAB to provide on remand. And, at least as to the supplemental evidence file, that explanation is not arbitrary and capricious or otherwise contrary to law. As to any of Doe's other remaining evidentiary challenges, the Court will not disturb the DAB's decisions under the prejudicial error rule.

After disposing of Doe's remaining procedural challenges to the DAB's decision, the Court decides the two substantive challenges on which it previously reserved judgment: First, the DAB's decisions upholding the underlying specifications are supported by substantial evidence. Second, the DAB properly considered and weighed the multi-factor test for upholding

penalties laid out in VA Directive 5021. The Court will therefore affirm the DAB decision and grant summary judgment to the agency.

A. Evidentiary Exclusion

Following remand, Doe continues to challenge as arbitrary and capricious the DAB's decision to exclude certain evidence from her hearing. See Pl.'s Renewed Mot. at 1–5. Her effort falls short.

*1. Limitations on Post Hoc Explanations*

Doe first contests whether the Court may evaluate the DAB's remand explanation at all. In her view, the Court must disregard the DAB's order because it provides an impermissible post hoc rationale under Department of Homeland Security v. Regents of the University of California, 140 S. Ct. at 1907–09. See Pl.'s Renewed Opp'n & Reply at 7–9, ECF No. 43. The Court concludes that Regents does not bar it from considering the DAB's new rationale, although not for the exact reasons offered by the agency.

In Regents, the Supreme Court considered the Department of Homeland Security's ("DHS") decision to rescind the Deferred Action for Childhood Arrivals program. 140 S. Ct. at 1901. In earlier stages of the case, the district court found the rationale for the rescission in a 2017 memorandum lacking, so it remanded to give DHS a chance to reissue the decision with a "fuller explanation of the determination that the program lacks statutory and constitutional authority." Id. at 1907 (quoting NAACP v. Trump, 298 F. Supp. 3d 209, 245 (D.D.C. 2018)). On remand, the new DHS Secretary "decline[d] to disturb" the initial rescission decision, but she issued a second memorandum offering "additional explanation." Id. at 1908.

The Supreme Court held that it could not consider the reasons given in this second memorandum because they "b[ore] little relationship to" those given in the initial one. Id. The

Court based its decision on "a 'foundational principle of administrative law'[:]  that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'"  Id. at 1907 (quoting Michigan v. EPA, 576 U.S. 743, 758 (2015)).  If those grounds are inadequate, a reviewing court may remand to the agency to either "offer a fuller explanation of the agency's reasoning *at the time of the agency action*" or "deal with the problem afresh" through "*new* agency action."  Id. at 1908–09 (internal citations and quotation marks omitted). But this first route, the Court explained, came with "important limitations":  "When an agency's initial explanation indicate[s] the determinative reason for the final action taken, the agency may elaborate later on that reason (or reasons) but may not provide new ones."  Id. at 1909 (internal quotation marks omitted).  Doe contends that this rule bars the Court from considering the DAB's remand explanation, which contains reasoning not offered when it first excluded the evidence.  See Pl.'s Renewed Opp'n & Reply at 8.

The agency disagrees, and argues that the rule against post hoc rationalization does not prevent the DAB "'from submitting an amplified articulation' of the reasons for its decision following a remand."  Defs.' Renewed Reply at 5, ECF No. 45 (quoting Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006)).  In the agency's view, the rule against post hoc rationalization "is not meant to be 'a time barrier which freezes an agency's exercise of its judgment . . . and bars it from further articulation of its reasoning."  Id. (quoting Alpharma, 460 F.3d at 6).  The agency suggests that the DAB's remand explanation is a permissible "amplified articulation" because it is consistent with other points in the record where the Board had cited similar rationales—based on timeliness and relevance—and Doe never asked for a fuller explanation at the time the evidentiary decisions were made.  Id. at 5–6.

The Court will not rely on the language in Alpharma that the agency cites, as Regents called into question the continued vitality of the approach laid out in that case.  In Alpharma, the D.C. Circuit reasoned that the purpose of the post hoc rationalization rule is to "forbid[] judges" from "uphold[ing] agency action on the basis of rationales offered by anyone other than the proper decisionmakers"—the agency itself, not litigation counsel or the court.  460 F.3d at 6 (quoting Local 814, Int'l Bhd. of Teamsters v. NLRB, 546 F.2d 989, 992 (D.C. Cir. 1976)).  But in Regents, the Supreme Court rejected any effort to characterize the post hoc rationalization rule's focus as "the speaker" rather than "the timing."  Regents, 140 S. Ct. at 1909; cf. id. at 1934 (Kavanaugh, J., concurring in the judgment in part and dissenting in part) (citing Alpharma for that proposition).  Rather, the majority emphasized that the rule prohibits "*post hoc* rationalizations, not advocate rationalizations."  Id. at 1909.  It thus "appl[ies] with equal force regardless" of whether the explanations are offered by counsel or the agency itself.  Id.  In the wake of Regents, at least one court has thus found that the approach in Alpharma is no longer good law.  See IAP Worldwide Servs., Inc. v. United States, 160 Fed. Cl. 57, 77 n.32 (Fed. Cl. 2022).  Instead, when the agency does not issue an entirely new decision on remand, it still "must defend its actions based on the reasons it gave when it acted" in the first instance.  Regents, 140 S. Ct. at 1909.

But here, the DAB's remand explanation does not run afoul of Regents for a separate reason.  Consider the Supreme Court's own phrasing of the rule:  "When an agency's initial explanation indicate[s] the determinative reason for the final action taken, the agency may elaborate later on that reason (or reasons) but may not provide new ones."  Id. at 1908 (internal quotation marks omitted).  Here, the agency's initial explanation did not provide any determinative rationale.  Rather, the Court previously found that the DAB had "failed to give *any*

explanation for the exclusion of Doe's supplemental evidence file or the prior sworn testimony." MSJ Op. at 19 (emphasis added). The rule announced in <u>Regents</u> by its own terms does not apply, as there was no prior explanation that could have cabined the agency's reasoning on remand.

Doe proposes a contrary approach for applying the rule in <u>Regents</u> to cases, like this one, where an agency entirely failed to articulate its reasoning in the first instance. In Doe's view, because the DAB did not give a reason initially, it could not have possibly provided an amplified articulation on remand. Pl.'s Renewed Opp'n & Reply at 8–9. In Doe's reading, the Court's remand order offered an illusory choice; in reality, "the DAB's only actual option on remand was to admit the previously excluded supplemental evidence file and prior sworn testimony . . . , consider matters afresh[,] and take new agency action" on her termination. <u>Id.</u> at 9.

The Court does not read <u>Regents</u> to mandate this harsh result, which would essentially render half of its prior order a nullity. Most significantly, Doe incorrectly insists that, because the DAB failed to offer any explanation the first time it issued the decision, it is precluded from taking that same path again on remand. <u>Regents</u> does not purport to so limit the substantive results an agency might reach. Doe's argument also ignores the possibility that, under <u>Regents</u>, the DAB could still issue a "new" decision on the relevant question. <u>See</u> 140 S. Ct. at 1908 (allowing agency to take "new agency action" so long as it "compl[ies] with the procedural requirements" to do so). Here, the relevant question is whether to exclude or admit certain evidence—not, as Doe suggests, the ultimate issue of whether she should be removed from federal service. <u>See</u> Pl.'s Renewed Opp'n & Reply at 9 (suggesting that "new agency action" would be based on record after admission of previously excluded exhibits). Given the DAB Chair's general discretion on evidentiary questions, <u>see</u> <u>Nat'l Airlines, Inc. v. Civil Aeronautics</u>

Bd., 321 F.2d 380, 383 (D.C. Cir. 1963); VA Directive 5021/2 App. A § C(6)(b), it is not clear

that a "new" agency evidentiary determination would look all that different from what the DAB

offered on remand.

Doe's proposed rule makes even less sense in the context of evidentiary rulings in agency

adjudications.  Although judicial trials are not perfectly analogous to agency adjudications, in

both cases the presiding officer is responsible for making and explaining evidentiary rulings.

See Fed. R. Evid. 103(c) (outlining guidelines for courts to make statements about evidentiary

rulings); VA Directive 5021/2 App. A § C(6)(b) (DAB Chair's power includes "[r]uling on all

questions arising during the proceedings, such as the admissibility of evidence").  And in judicial

trials, reviewing courts do not require perfect explanation for each of the myriad evidentiary

decisions a judge makes, particularly when the disappointed party does not ask for specific

clarification at the time.  See United States v. Russo, 104 F.3d 431, 434 (D.C. Cir. 1997) ("Trial

judges, of course, are not expected to provide detailed explanations for each of their evidentiary

rulings.").  Rather, the "reviewing court will sustain the exclusion on any ground that the district

court could have invoked."  United States v. Ashton, 555 F.3d 1015, 1019 (D.C. Cir. 2009)

(citing 1 McCormick on Evidence 260 (6th ed. 2006)).  Here, Doe's counsel did not ask the DAB

Chair to elaborate when he excluded the evidence in question.  Instead, "to make a record" for

judicial review, he merely reiterated why such evidence may be necessary for Doe to present a

full defense.  See A.R. 982–83.  Given this context, the practical reason appellate courts do not

fault trial judges for failing to provide full explanations for every evidentiary ruling applies with

full force:  A contrary requirement would be unduly burdensome during a lengthy proceeding,

upsetting the desired balance between efficiency and justice in every adjudication.  See 21

Kenneth W. Graham, Jr. & Daniel D. Blinka, Fed. Prac. & Proc. Evid. § 5035 (2d ed. Apr. 2022

update); see also 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 1:17 (4th ed. July 22 update) (explaining that Federal Rules acknowledge "the judgment that a standard requiring error-free trials is too exacting, [and] that mistakes in trials are inevitable").

Of course, appellate review of a trial court's order is not a perfect analogy.  Most significantly, as Doe notes, the Court cannot affirm based on a reason the agency "could have invoked" but did not.  Ashton, 555 F.3d at 1019; see Pl.'s Sur-Reply at 2, ECF No. 46-1.[2]  Such substitute reasoning would violate the foundational rule of administrative law that the court "judge the propriety of [agency] action solely by the grounds invoked by the agency."  SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).  But that does not mean the agency cannot, on remand, provide this valid explanation itself—as the DAB has tried to do here.  Cf. 21 Kenneth W. Graham, Jr. & Daniel D. Blinka, Fed. Prac. & Proc. Evid. § 5034 n.31 (2d ed. Apr. 2022 update) (suggesting that an appropriate remedy for a judge's failure to provide explanation for exclusion of evidence, even when pressed by a party, would be a "remand with an order to the judge to comply with" Federal Rule of Evidence 103(b)).  If anything, there is more reason to allow a second chance in DAB proceedings, which are presided over by non-lawyer subject matter experts and are not governed by the formalities of the Federal Rules of Evidence.  See A.R. 634 (allowing admission of hearsay); VA Directive 5021/2 App. A § C(4)(a) (noting qualifications of DAB members).  The Court thus finds it particularly inappropriate to apply Doe's proposed reading of Regents here, and will consider the merits of the response on remand.

---

[2] The Court grants Doe's motion for leave to file a sur-reply, see ECF No. 46.  Because the Court construed Doe's short, initial post-remand filing as a renewed motion for summary judgment, many of the relevant legal issues were not aired until each side's second brief.  It was therefore appropriate for Doe to file a short response to address those new arguments.  See Flynn v. Veazey Constr. Corp., 310 F. Supp. 2d 186, 189 (D.D.C. 2004).

2.  *Merits of DAB's Remand Explanation under § 7462(f)*

The Court now turns to the substance of the DAB's remand order.  On remand, the DAB noted that it had been tasked with "provid[ing] an explanation for its decision to exclude supplemental evidence and the prior sworn testimony."  DAB Remand Explanation.  The DAB offered two reasons for the exclusions:  that the supplemental evidence submission was late, and that "a review of the documentation also showed that many of the documents" were not relevant.  Id.  In light of those explanations, the Court evaluates the propriety of the exclusion of the two categories of evidence:  the supplemental evidence file, and the prior sworn testimony.  Neither exclusion warrants vacatur of the DAB's decision.

a.  Supplemental Evidence File

The DAB's first rationale on remand applies most obviously to the supplemental evidence file, which was submitted after 2 p.m. on the Friday "just before the hearing was set to begin."  DAB Remand Explanation.  In the DAB's view, this submission qualified as a "motion or other request," so it was subject to the October 7, 2019, deadline in the scheduling order.  Id.; see also A.R. 474 (setting deadline for "any pre-hearing motions or other requests").

Doe dismisses this argument as not "[c]redible."  Pl.'s Renewed Mot. at 1.  She points out that the relevant language in the scheduling order only mentions "motions or other requests," meaning there "was no filing deadline for exhibits."  Id. at 1–2.  Doe also claims that the conduct of everyone involved throughout October and November—Doe, the VA representative, and the DAB itself—confirms there was no firm deadline.  Id. at 2.

The agency counters that Doe's effort to add exhibits to the existing evidentiary record qualified as an "other request[]," so the Board reasonably interpreted the October 7 deadline to apply.  See Mem. in Supp. of Def.'s Renewed Cross-Mot. at 9–10, ECF No. 41-1.  The agency

also notes that the Board displayed consistent concern, throughout the fall of 2019, with both sides' untimely submissions, and that it ultimately rejected both of their last-minute efforts to augment the record.  Id. at 14–16.

Mindful of the deferential standard of review that applies to agency action, the Court agrees with the agency, credits the DAB's reasoning, and upholds the exclusion of this evidence. To begin, absent good cause, courts generally should not "engraft[] their own notions of proper procedures upon agencies."  Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 525 (1978).  Even in formal APA adjudications, the presiding officer has the authority to "regulate the course of the hearing."  5 U.S.C. § 556(c)(5).  In DAB hearings, too, the Chair has the power to take "proper steps to expedite the hearing of evidence" and rule on procedural matters such as the "admissibility of evidence" and the "calling of witnesses."  VA Directive 5021/2 App. A § C(6)(a), (b).  The DAB thus was authorized to both set and apply the October 7 deadline.  To be sure, it is not obvious that the deadline's reference to "other requests" can *only* be read to cover submission of additional evidence.  But the Court's task on review under § 7462(f)(2) is not to decide if the agency's interpretation was correct, but to evaluate whether the agency made any "clear error of judgment" in reaching its conclusion.  Regents, 140 S. Ct. at 1905.

There was no clear error of judgment.  Contrary to Doe's suggestion, it was not unreasonable for the DAB to interpret the October 7 deadline to cover requests for the admission of exhibits.  Plainly, Doe's bid to add exhibits to the file in her administrative appeal was a "request" that needed the DAB's approval.  There is also evidence in the record that the DAB did in fact believe, in the fall of 2019, that the scheduling order deadlines would cover a request like Doe's.  Most significantly, in a summary of the November 1 pre-hearing call, the DAB noted it had taken actions "regarding requests for the introduction of exhibits" during the conference.

16

A.R. 636.  The list of documents that followed included all the exhibits Doe and the VA had filed alongside their various witness lists, motions, and objections.  See id.  While many of these exhibits were submitted after October 7, they all accompanied filings contemplated in the original scheduling order.  See id.  And when the parties submitted some of those filings after the relevant deadlines the DAB had set, the Board Chair admonished them for ignoring the scheduling order.  See, e.g., A.R. 400.  While the Chair did not penalize the parties for their few days' delay, see id., that lenience did not preclude him from later enforcing the scheduling order and refusing to accept filings submitted weeks after the fact, on the afternoon of the last business day before the hearing.

In addition, the record makes clear that the Board policed the timeliness of the parties' filings and prevented them from expanding the scope of the hearing as it drew closer.  At the end of its June 2019 scheduling memorandum, the Board emphasized that it was "essential" that the parties "adhere[] to" the dates laid out above, given a statutory requirement that the DAB issue a decision within 45 days after the close of the evidentiary hearing.  A.R. 475.  The Board chastised the parties when they missed those deadlines.  A.R. 400.  In addition, the administrative record demonstrates that the Board likely believed the time for expanding the record had passed by the time it reached the November 1 pre-hearing conference.  At that point, Doe's counsel requested a "numbered evidence file," which the Board provided.  A.R. 638.  The existence of such a file indicates that, even a full month out, the DAB was close to finalizing its plan for the hearing.  In fact, after November 1, the Board only allowed the parties to narrow—rather than expand—the scope of the evidence.  See, e.g., A.R. 490–96, 635 (requiring amended witness list based on discussion at conference); A.R. 649 (preventing Doe from substituting character witness).  Finally, the Board's even treatment of the parties' last-minute submissions—

a blanket rejection of both the VA's and Doe's supplemental evidence—suggests that it was timing rather than substance that mostly drove the exclusion decision.[3]  In sum, the Board's explanation that it rejected the supplemental evidence file as untimely is both reasonable and supported by substantial evidence in the record.

Even if the Court did not accept the DAB's timeliness explanation, its failure to admit the supplemental exhibits does not warrant vacatur.  In administrative law, as in judicial proceedings, courts apply a harmless error rule.  Zevallos v. Obama, 793 F.3d 106, 115 (D.C. Cir. 2015).  Courts therefore will not invalidate a substantive agency decision "based on procedural error unless the errors alleged could have affected the outcome."  Id.  After careful review of the excluded evidence, the Court concludes that Doe has not established that any of it could have affected the DAB's outcome.  The Court therefore would not vacate the decision regardless.

To begin, several of the documents did not even contain new evidence, either because they contained no evidence at all or duplicated material already in the record.  See, e.g., A.R. 739–48 (excerpting VA Directive 5021); A.R. 722, 735–36 (duplicating material at A.R. 49, 51–52).  Several more were of at most minimal relevance to the charges of unprofessional conduct under review by the DAB, as they concerned Doe's work before the relevant time period or were disconnected from the specific incidents at issue in the hearing.  See, e.g., A.R. 677–90 (CV for

_____

[3] Doe suggests that the DAB's timeliness explanation cannot be the real reason for the exclusion because "the VA itself never had any understanding that there was a DAB deadline for the submission of exhibits," given the agency's own belated submission.  Pl.'s Renewed Mot. at 2.  But for the purposes of this case, the VA and the DAB are functionally two different entities—one presenting evidence to defend the ECHCS Director's removal decision, and one overseeing those proceedings.  The agency's similar efforts to flout the DAB's procedural rulings cast no doubt on the latter's efforts to enforce its scheduling order.

expert witness Board properly excluded); A.R. 695–715 (performance reviews for years before alleged misconduct).

The Court agrees with Doe that some of the evidence in the supplemental file is at least arguably relevant to the DAB's consideration—to cast doubt on whether she committed the alleged misconduct, or at least to decide the penalty against her.[4]  For instance, the file includes positive reviews of Doe's performance, including by residents she supervised.  See, e.g., A.R. 724–25 (MedHub report of reviews by residents); A.R. 895–97 (letters of support from other doctors).  It also contains evidence related to a series of complaints Doe had raised about the workings of the Anesthesiology Department.  See, e.g., A.R. 859 (unsworn list of Department departures/resignations allegedly due to management practices); A.R. 874–80 (material about dispute with Dr. Carlton Barnett, including Doe's complaint to supervisor about incident).

However, refusing to admit additional relevant evidence may be harmless error where a decisionmaker has heard other evidence on the topic.  See Russo, 104 F.3d at 434–35; 5 U.S.C. § 556(d) (authorizing agency to exclude "unduly repetitious" evidence).  In this case, the DAB heard ample evidence of both Doe's competent performance and the substance of her disputes with others in the Department.  See, e.g., A.R. 1737–41 (testimony of Dr. Thomas Whitehill about Doe's clinical competence and professionalism); A.R. 1846–47 (testimony of Dr. Scott Humphreys of the Colorado Physician Health Program about positive reviews of Doe by residents in same MedHub report); A.R. 1127–1128 (cross examination of Dr. Ian Black about

---

[4] The Court remains unconvinced by the DAB's alternate reasoning for excluding this portion of the supplemental evidence file—that it was irrelevant and outside the DAB's jurisdiction because it concerned issues raised in collateral proceedings before the MSPB and elsewhere.  As the Court previously explained, evidence from outside proceedings is generally admissible to demonstrate witness bias, testimonial inconsistency, and the like.  See MSJ Op. at 19 n.8 (citing Fed. R. Evid. 613).

scheduling issue Doe had reported in Department); A.R. 1570–75 (cross-examination of Dr. James Lavelle IV about incident with Dr. Barnett).  The DAB even credited a portion of this evidence in its final decision.  It noted that Doe "does not lack competence," but nevertheless upheld the penalty of removal based on evidence of her difficulty "interact[ing] within a team." A.R. 970.  Because these issues were fully aired before the Board already, the Court concludes that the exclusion of this minimal underlying documentation did not prejudice the outcome of the hearing.

### b. Prior Sworn Statements

This Court's remand order also instructed the DAB to explain why it precluded Doe from using prior sworn testimony to impeach the motivations of various agency witnesses.  See MSJ Op. at 18–19.  On remand, the DAB acknowledged that the Court had tasked it with addressing the prior sworn testimony, but did not otherwise direct its explanation specifically at this material.  See DAB Remand Explanation.  For that reason, Doe asks the Court to entirely reject the DAB's remand explanations—whether or not they could logically apply to the prior sworn testimony.  See Pl.'s Renewed Opp'n & Reply at 16–19.

The Court need not wade into this question because, as with the supplemental evidence file, any exclusion here does not satisfy the prejudicial error rule that applies to all administrative proceedings.  As the government points out, for at least one of the witnesses Doe sought to challenge—Certified Registered Nurse Anesthetist ("CRNA") Sarah Fredriksson—Doe's counsel engaged in a substantial cross-examination about what she had testified to in prior sworn proceedings.  See A.R. 1267–69.  The agency did not object to that line of questioning, and the DAB did not prevent Doe's counsel from pursuing it.  Doe suggests that she should have been able to admit the transcript of the prior sworn testimony itself—as she would be able to under

Federal Rule of Evidence 613. But the formalities of the rules of evidence do not apply in agency proceedings. FTC v. Cement Inst., 333 U.S. 683, 705–06 (1948). Doe therefore was not entitled to every procedural device she might have resorted to in a court setting, even ones that could have helped her make a substantive point somewhat more effectively. And given the vigorous cross-examination on this very topic, the Court finds that admitting the transcript of Nurse Fredriksson's testimony could not have altered the outcome.

The Court reaches the same conclusion as to the other two witnesses Doe apparently wished to impeach—Dr. Ian Black and Dr. Anthony Oliva. See Pl.'s Renewed Opp'n & Reply at 18 (discussing alleged inconsistencies in their testimony). There is no indication that the DAB would have precluded her from engaging in a similar line of questioning about their allegedly inconsistent statements in other proceedings. But Doe did not take advantage of that opportunity. Instead, when Doe's counsel cross-examined Dr. Black, he tried to make his substantive point—casting doubt on the number of residents who in fact complained about Doe's work. See A.R. 1087–94. Yet counsel failed to ask Dr. Black about his prior sworn statement on that same subject. Id. And when Doe's counsel cross-examined Dr. Oliva, he did not even do that much. There, he declined to follow-up entirely on Dr. Oliva's direct testimony about whether Doe could be rehabilitated—despite having purportedly crucial impeachment evidence on the subject. See A.R. 1401–15; Pl.'s Renewed Opp'n & Reply at 18.

Finally, the Court notes that the DAB's final decision did not rest on the testimony of the supposedly impeachable witnesses alone. Rather, the DAB cited a wealth of testimony—in some cases concessions from Doe herself—about her failure to communicate properly, as well as complaints from colleagues and residents on that subject. See A.R. 968 (upholding overall unprofessional conduct charge based in part on Doe's "admi[ssion] to ineffective communication

and poor interactions with team members"); id. (upholding Specification 8 based on testimony of two individuals beyond Drs. Black and Oliva). In the context of several days of testimony on a wide range of subjects, much of which supported the DAB's conclusion, a few lines of cross-examination could not have swayed the agency's decision in this case.

### 3. Due Process Claim

For the same reasons, the Court rejects Doe's claim that evidentiary exclusions in the DAB proceedings violated her right to due process. In her initial summary judgment motion, Doe averred that the DAB had precluded her from "present[ing] rebuttal evidence on all matters decided at the hearing," in violation of procedural due process norms. See Mem. In Supp. of Pl.'s Summ. J. Mot. ("Pl.'s Summ. J. Mot.") at 10, ECF No. 21-2 (quoting Pub. Serv. Comm'n of Ky. v. FERC, 397 F.3d 1004, 1012 (D.C. Cir. 2005)). The Court previously reserved judgment on this question, although it expressed "doubt[] that any due process violation would lie absent a statutory violation." MSJ Op. at 17 n.7. The Court has now found that the DAB's two evidentiary exclusions did not violate § 7462(f). Consistent with its previous reasoning, the Court holds that these exclusions did not violate Doe's right to procedural due process, either.

As the Court has explained previously, tenured government employees are generally entitled to due process protections, including notice and a hearing, prior to termination. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538–39, 542 (1985). But claimants are only entitled to "'due' process, not every procedural device that [s]he may claim or desire." Johnson v. United States, 628 F.2d 187, 194 (D.C. Cir. 1980). The precise form and amount of process due is determined by the familiar Mathews balancing test, which weighs (1) the private interest affected; (2) the risk of erroneous deprivation and value of additional safeguards; and (3) the government's interest, including the burdens additional process would entail. Propert v.

District of Columbia, 948 F.2d 1327, 1332 (D.C. Cir. 1991) (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

Here, Doe undoubtedly had an "opportunity to present [her] side of the story"—the fundamental purpose of due process protections. Loudermill, 470 U.S. at 546. Over the course of a several-day hearing, Doe was able to testify to the relevant incidents and present witnesses to back up her account and speak to her professionalism more generally. See A.R. 980. And, although due process does not necessarily mandate it, Doe was allowed to cross-examine the agency's witnesses—including on issues of bias and inconsistency. See Cellular Mobile Sys., Inc. v. FCC, 782 F.2d 182, 198 (D.C. Cir. 1985) ("Cross-examination is . . . not an automatic right conferred by the APA[.]"); A.R. 980. Notably, the Court has already held that the few limitations imposed on Doe's presentation of evidence could not have affected the outcome of the proceeding. The additional process she seeks, then, would not have reduced the risk of erroneous deprivation. Doe may have wished to use this material to question agency witnesses on certain topics, but due process does not "entitle[]" Doe to "perfect procedures or the procedure of [her] choice." Bagenstose v. District of Columbia, 503 F. Supp. 2d 247, 257 (D.D.C. 2007). The DAB's exclusion of the late evidence file and prior sworn testimony transcripts thus did not violate Doe's right to due process.

B.  Sufficiency of the Evidence

Now that it has disposed of the issues related to the DAB remand, the Court turns to Doe's substantive challenges to the DAB's final order, on which the Court previously reserved judgment. See MSJ Op. at 26–27. First up is Doe's claim that various aspects of the DAB's decision were either not "prove[n]" or unsupported by substantial evidence. See Pl.'s Summ. J. Mot. at 24–25, 42–45 (citing 38 U.S.C. § 7462(f)(2)). Again, substantial evidence is a "highly

deferential" standard of review, "requiring only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Knight Hawk Coal, 991 F.3d at 1308 (internal quotation marks omitted). The Court finds that the DAB generally comported with the relevant substantive standards, and that each individual specification is supported by substantial evidence in the record.

### 1. Overarching Challenges

Doe raises two overarching challenges to the evidence underlying the DAB decision. Neither succeeds.

First, Doe essentially recycles her procedural challenge to the DAB's exclusion of her supplemental evidence file and prior testimony transcripts. See Pl.'s Summ. J. Mot. at 42–43. As Doe correctly notes, the Court "may not find substantial evidence 'merely on the basis of evidence which in and of itself justified [the Board's decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" Lakeland Bus Lines, Inc. v. NLRB, 347 F.3d 955, 962 (D.C. Cir. 2003) (alteration in original) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951)). But this maxim does not mean that the DAB must have admitted "*all* relevant evidence" in the literal way Doe proposes. See Pl.'s Summ. J. Mot. at 42 (emphasis added). Rather, the DAB Chair possesses the authority to maintain the efficiency of proceedings and exclude evidence if, among other things, it is unduly repetitious. VA Directive 5021/2 App. A § C(6)(a), (b); cf. 5 U.S.C. § 556(d). And under the prejudicial error rule, an agency's failure to consider every piece of relevant evidence does not necessarily warrant vacatur—under the deferential arbitrary and capricious standard, or under the even more deferential substantial evidence one. Doe's procedural challenge fares no better when packaged as a substantial evidence claim.

Second, Doe contends the DAB "fail[ed] to consider important aspects of the problem"—most notably, her claim that the unprofessional conduct charge was brought in retaliation for either protected whistleblower activity or her request for a reasonable accommodation of her high-risk pregnancy.  See Pl.'s Summ. J. Mot. at 39–40; Pl.'s Opp'n & Reply at 2, ECF No. 25.  But the agency's motivation in bringing charges against Doe is not the relevant question in this case, which addresses only whether substantial evidence supports the DAB's assessment that Doe should be removed from service.  See 38 U.S.C. § 7462(a)(1) (limiting DAB's jurisdiction to major adverse actions against qualifying employees).  Besides, the record contains substantial evidence that either predates the alleged motivation to retaliate and/or comes from sources uninvolved in Doe's other disputes.  This evidence includes below-standard resident reviews from mid-2017, A.R. 550, as well as contemporaneous emails from colleagues memorializing complaints about Doe's conduct with patients, A.R. 241–42, 253–54, 270.  Doe's counsel also cross-examined several witnesses about any alleged sources of bias, putting that issue squarely before the Board.  See, e.g., A.R. 1072–73 (cross-examination on pregnancy accommodation); A.R. 1794–95 (cross-examination on bias arising out of dispute over patient); see also A.R. 2107 (closing statement on retaliation argument).  The DAB thus did not fail to account for any allegedly improper motivation when it independently reviewed the agency's decision to remove Doe from service.

### 2. Challenges to Each Specification

The Court now turns to the specifications underlying the agency's unprofessional conduct charge.  In its initial summary judgment opinion, the Court dealt with a variety of arguments Doe raised contesting the DAB's decision upholding each specification.  See MTD Op. at 24–25.  But the Court also suggested that Doe's "real complaint" may be "that the agency did not have

sufficient evidence to support any particular specification," and it reserved judgment on that question.  Id. at 25.  The Court will now construe Doe's summary judgment motion to raise such a challenge, and will address the specifications in turn.

        a.   Specification 1

Doe argues that Specification 1 was erroneously upheld for reasons "wholly unrelated" to the specific conduct charged.  See Pl.'s Summ. J. Mot. at 19, 24–25.  In particular, she objects to the DAB's reliance on testimony discussing her general demeanor and conduct, rather than the incident at issue in the misconduct charge.  This objection fails.

Specification 1 alleged that on February 9, 2018, during a parathyroidectomy procedure, Doe placed an arterial line in a patient "without appropriate evaluation and assessment" and "without appropriate communication with other staff."  A.R. 966.  The DAB's decision cited direct evidence in the record that, during this procedure, Doe did not have a necessary conversation with CRNA Timothy Christie about the correct approach with the patient, causing him "not to feel valued as part of the anesthesia team."  id.; see also A.R. 1168 (testimony from CRNA Christie on lack of communication during incident); A.R. 241–42 (email from CRNA Christie expressing concern days after the incident).  To be sure, the DAB also referenced Christie's belief that Doe had an ongoing pattern of poor communications skills.  But these general statements merely bolstered its well-supported conclusion that Doe acted unprofessionally in this instance.  They do not undermine Christie's direct testimony to the events underlying Specification 1, which constitutes substantial evidence.

        b.   Specification 2

Doe raises a similar challenge to Specification 2, which charged that she "removed an inflated endotracheal tube [from a patient] without allowing for evaluation of placement prior to

doing so, and . . . administered medications without appropriate communication and coordination

with the CRNA." A.R. 966. Again, testimony and documentary evidence supports Specification

2. For instance, CRNA Sarah Frederiksson emailed a supervising physician about the incident

just days later, and testified about it at length during the DAB hearing. See A.R. 253–54, 1213–

86. As Fredriksson put it, Doe took "precipitous actions without taking the time to . . .

communicate." A.R. 1260; see also A.R. 1219–27 (testifying to incident).

Doe suggests that the DAB's decision is internally contradictory because it found in her

favor "on the two supposed medical errors," and concluded only that she "did not communicate

appropriately and coordinate with the CRNA." Pl.'s Opp'n & Reply at 24. But those findings

cut against Doe. They show that the DAB took "into account contradictory evidence or evidence

from which conflicting inferences could be drawn," Lakeland Bus Lines, 347 F.3d at 962, and

still, after weighing all of the evidence, came to the conclusion that Doe's actions during this

procedure were unprofessional.

c. Specification 4

Substantial evidence likewise supports the "essence" of the allegations contained in

Specification 4. There, the agency charged that Doe violated the standard of care when, during a

January 2018 procedure, she "entered the room where fluoroscopy was in use without lead

protection" and then "demanded that the fluoroscopy be ceased during the procedure." A.R. 967.

The DAB upheld this specification based on, among other things, testimony from both a surgeon

and nurse present at the time. See A.R. 1690–99 (testimony of Dr. Hazem Hammad); A.R.

1463–68 (testimony of RN Tonya Gough). They testified both that Doe's demand to cease the

use of fluoroscopy was unusual *and* that her communication of that request during a difficult

procedure was unprofessional. See A.R. 1698 (describing Doe's approach as "not the usual" and

"demanding"); A.R. 1467–68 (calling Doe's actions unprofessional as she "was pretty dismissive of the care of the patient").

Doe suggests that the DAB ignored a "plausibly benign" explanation for her actions: Because she was experiencing a high-risk pregnancy at the time, she could not have protected herself with a lead shield, requiring instead that fluoroscopy be stopped entirely. Pl.'s Summ. J. Mot. at 40–41; Pl.'s Opp'n & Reply at 29–30. At most, that explanation addresses only a small portion of the factual predicate for Specification 4; it does not undermine the evidence in the record that Doe should not have entered the procedure room in the first place, nor the manner in which she communicated her request to stop the fluoroscopy. Indeed, Doe herself conceded at the hearing that she had entered the room to retrieve papers related to another patient, that she had inadvertently "walked in at a bad time," and that her alarm at the situation may have led her to "c[o]me across as demanding." A.R. 1971. These admissions form part of the substantial evidence supporting Specification 4.

d.  Specification 5

Doe asserts that Specification 5 was not supported by substantial evidence because documents in the record contradict the main witness's account of the relevant events. See Pl.'s Summ. J. Mot. at 43–44. Specification 5 charged that, during a November 2017 surgery, Doe was "distracted by a conversation on [her] cell phone involving an unrelated matter," and was "unprepared to address the patient's discomfort" and "unaware of the surgeon's progress" as a result. A.R. 967. Doe identifies evidence in the record that, in her view, suggests that the surgeon on the case, Dr. Rajshri Bolson, had misremembered whether Doe was in fact distracted during that surgery. In particular, she notes that Dr. Bolson recalled Doe asking if she was "closing" about halfway through the surgery—even though Doe did not actually enter the

operating room until the final quarter of the procedure.  See A.R. 301 (email from Dr. Bolson memorializing issue); A.R. 298 (noting Doe entered room with 20 minutes left in 80-minute procedure).

But at the hearing, Dr. Bolson testified that it was Doe—not another anesthesiologist—who asked whether the surgery was nearly over when Dr. Bolson was still "obvious[ly]" "in the midst of operating."  A.R. 1434.  While Dr. Bolson conceded on cross-examination that her memory of the events was not perfect and that she was not sure of "the exact time" Doe asked the question, she otherwise stuck to her story.  A.R. 1450.  To the extent any minor discrepancy exists in the record about the timing and significance of this event, it was within the DAB's discretion to accept Dr. Bolson's version of the story.  On substantial evidence review, the Court will not reweigh the evidence or overturn the DAB's finding of fact.  See Little v. Colvin, 997 F. Supp. 2d 45, 49 (D.D.C. 2013) (explaining, in substantial evidence review of Social Security ALJ determination, that court "is not to review the case 'de novo' or reweigh the evidence").  Moreover, the single comment Doe discusses is not the only evidence upholding Specification 5.  The DAB decision also relied on testimony from Dr. Bolson that, even during her short time in the operating room, Doe was otherwise inattentive to the patient and uncommunicative with her colleagues.  See A.R. 1431–32 (noting Doe was distracted by phone call and did not notice patient activity that could have led to surgical complications).  Specification 5 is therefore supported by substantial evidence.

### e.    Specification 8

That leaves Specification 8, which focused on Doe's "unprofessional . . . interactions with" medical residents from May 2016 to December 2017.  A.R. 968.  The charge specifically noted that Doe was "difficult to reach or not present during key parts of patient care, . . .

provided inadequate supervision and guidance" to residents, and "display[ed] a lack of effective, respectful, and professional communication with residents."  Id.  The DAB upheld the charge based on testimony from several VA employees about complaints from medical residents, "serious concerns about the training environment," and Doe's tendency to blame residents when things went wrong.  Id.

Doe criticizes the DAB's analysis, claiming that the initial allegations were vague, that the Board relied on inadmissible hearsay evidence, and that the final decision ignored or misrepresented contradictory evidence in the record.  The Court has already rejected the first two arguments.  See MSJ Op. at 13, 25.  As to the DAB's consideration and weighing of evidence, none of Doe's evidence undermines the Board's ultimate conclusion.

Most notably, Doe suggests that the DAB misrepresented the results of a survey of residents with whom she'd worked, as well as the number of residents who ultimately complained about her performance.  See Pl.'s Opp'n & Reply at 27.  To the extent Doe has even identified disputes in the record, none of this material undermines the DAB's overall finding on Specification 8.  Take Doe's MedHUB survey evaluations, which, Doe correctly notes, include several positive comments.  See id.  But the overall results were not "overwhelmingly favorable," as Doe insists.  Id. at 42.  Rather, the survey included statements from residents that Doe was "very quick to jump in," would "chang[e] the plan" without informing the resident, and "compromised" patient care "due to poor communication."  A.R. 551.  On nearly every metric— from quality of teaching to interpersonal skills—the residents rated Doe substantially below her peers.  A.R. 550.  Dr. Anthony Oliva, the director of the residency program, placed her in the "bottom 10 percent" of physicians evaluated in the program.  A.R. 1370, 1390.  And this is not the only evidence of Doe's unusual troubles with residents.  The DAB credited testimony from a

wide array of colleagues who had fielded complaints—directly or indirectly—from frustrated residents.  A.R. 968; see also A.R. 262, 305, 1753–54.  Doe also conceded some of the substance of those complaints.  In her own testimony before the DAB, she recognized her "tendency to take over" complicated cases, and "to just focus on taking care of the patient rather than engaging with everyone there"—including residents—during such stressful situations.  A.R. 1985, 1995. All of this evidence supports Specification 8.

C.  Weighing of Penalty Factors

Finally, the Court addresses Doe's claim that the DAB did not properly consider and weigh the multi-factor test for upholding penalties laid out in VA Directive 5021.  See Pl.'s Summ. J. Mot. at 28–39.  These twelve factors, adopted from Douglas v. Veterans Administration, 5 M.S.P.R. 280, 305–06 (M.S.P.B. 1981), include the nature and seriousness of the offense, the employee's past disciplinary and work records, the consistency of the penalty with those imposed for similar conduct, the potential for the employee's rehabilitation, and so on.  See VA Directive 5021/25 App. A Title 38 – Table of Penalties.  The factors are not binding, and not all of them will be relevant in every case.  Kreso v. McDonald, 631 F. App'x 519, 524 (10th Cir. 2015); Doran, 768 F. App'x at 353.  Ultimately, courts "will uphold the penalty chosen by the DAB so long as the DAB 'examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts and the decision made.'"  Doran, 768 F. App'x at 352 (quoting Kreso, 631 F. App'x at 523–24).

In her summary judgment briefing, Doe goes through all twelve factors and asserts that the DAB erred in evaluating each.  See Pl.'s Summ. J. Mot. at 28–39.  The Court disagrees.  In its final decision, the DAB addressed all twelve Douglas factors and discussed the relevant evidence in the record to support its conclusion that the penalty of removal was warranted.

Compare A.R. 968–70 (evaluating factors) with Lerner v. Shinseki, No. 3:12-cv-00565, 2013 WL 5592906, at *20 (W.D. Ky. Oct. 10, 2013) (faulting DAB for failing to address several factors).  Rather than go through each factor in detail, the Court, below, addresses the substantive content of Doe's objections collectively.

First, Doe repeatedly suggests that the DAB's analysis was flawed because it ignored evidence in the record that would support her position or contradict evidence on which the Board relied.  Among other things, she points out that she had received no other formal discipline and had an otherwise positive work record (Factors 3 and 4); that several current VA employees testified that they would work with her again (Factor 5); and that many witnesses believed she could be rehabilitated (Factor 10).  See Pl.'s Summ. J. Mot. at 30–33, 36–37.  As the agency points out, however, there was also evidence in the record either contradicting or mitigating the value of all those points.  See, e.g., A.R. 1001 (testimony of Dr. Black that he had never seen the "breadth and variety of complaints" against a single physician); A.R. 1039–40 (testimony of Dr. Black that agency was drafting "counseling statement" when additional complaints raising "patient safety issues" triggered more serious response); A.R. 1400–01 (testimony of Dr. Oliva that returning Doe to service would have negative consequences for University of Colorado residency program's relationship with the VA).  It was the DAB's job—not the Court's—to resolve those conflicts and weigh competing evidence.

Second, Doe recycles several of the arguments the Court has already rejected related to either the DAB's procedural decisions or the strength of the evidence underlying the various specifications.  For example, she claims the DAB failed to discuss, as a mitigating factor, her high-risk pregnancy in the winter of 2018.  See Pl.'s Summ. J. Mot. at 38.  The Court has already found that the DAB properly discounted Doe's high-risk pregnancy as an explanation for the

allegations of misconduct underlying Specification 4.  <u>See</u> <u>supra</u> Part III.B.2.d.  There is no evidence that any of Doe's longstanding communication problems stemmed from her health issues.  Similarly, she argues that her proposed expert witness was improperly excluded, and that he could have testified that a less serious penalty was sufficient.  <u>See</u> Pl.'s Summ. J. Mot. at 39. But as the Court has already noted, Doe's proposed expert was permitted to testify as a lay witness, and he specifically addressed the appropriateness of lesser penalties.  <u>See</u> MSJ Op. at 21 (discussing A.R. 1907–11).

Third, Doe suggests that the penalty of removal was disproportionate to both the nature of her conduct and the way that similar VA employees were punished in the past.  Contrary to Doe's suggestion, however, the DAB reasonably concluded that her lack of communication was anything but "minor."  <u>See</u> Pl.'s Summ. J. Mot. at 29.  There was extensive evidence in the record that her conduct put patients at risk and created a difficult work environment for her colleagues.  <u>See, e.g.</u>, A.R. 1039–40 (noting "patient safety issues"); A.R. 1365–66 (testifying that Doe's lack of communication during procedure could have potentially endangered patient safety); A.R. 1467–69 (explaining that Doe's work style led to break down or delay in care). The record likewise does not suggest that the DAB failed to consider the proportionality of the penalty in relation to other, similar cases.  As the agency points out, several witnesses testified that the scope of Doe's conflict with her coworkers was highly unusual.  <u>See</u> A.R. 1001–02. This pattern of strife supports the DAB's reasonable conclusion that, unlike in the cases she cited before both the DAB and this Court, a lesser penalty allowing Doe to continue working in the same environment would not be effective.

Fourth, Doe claims that the DAB inappropriately relied on vague, general, or uncommunicated standards in evaluating the penalty factors.  But, as the Court explained in its

prior opinion, "violations of" even general "professional conduct" standards may be punishable in DAB proceedings.  See MSJ Op. at 24 (citing Abaqueta v. United States, 255 F. Supp. 2d 1020, 1026 (D. Ariz. 2003)).  Here, the DAB found that a "well-trained anesthesiologist" like Doe should know of the importance of communication, and that proper communication is "an accepted basic concept all training programs teach" to doctors.  A.R. 969.  Doe was not removed from service because she failed to meet some technical definition of "proper communication," but because her colleagues repeatedly found her to be dismissive, distracted, and aggressive, see, e.g., A.R. 1433, 1467–68, which in turn implicated patient welfare.  Faulting Doe for failing to meet these baseline standards was eminently reasonable.

Fifth, Doe suggests that the penalty of removal was inappropriate because, based on their conduct and statements, both the agency and the DAB could not have really believed she was incapable of working as an anesthesiologist.  She points out that the agency allowed her to keep working while it processed the complaints against her, and notes that the DAB expressed a belief that she could be successful in another environment in the future.  See Pl.'s Summ. J. Mot. at 29, 32, 37.  But as the agency points out, the complaints against Doe only accelerated in the winter of 2018—at which point the agency "acted quickly" and "summarily suspended [her] clinical privileges while it investigated."  Mem. in Supp. of Def.'s Cross-Mot. at 39, ECF No. 24-1; see A.R. 1039.   In addition, the Court sees no inconsistency in the DAB's finding that Doe could be successful in another clinical setting.  Much of its discussion of the various penalty factors turned on the loss of trust in Doe within the VA.  See A.R. 970 (discussing difficulty reintegrating within the VA given the blame Doe had placed on others during the process).  This suggests that the real problem was not Doe's inherent inability to change, but rather the challenge of doing so successfully in an environment where she had burned so many bridges.  That is sufficient to

support the DAB's finding that Doe could not be rehabilitated or face a lesser penalty in her current position.

In sum, the Court finds no significant problem with the DAB's analysis of the relevant penalty factors. Even if the Board could or should have come out the other way on any individual factor, it was not arbitrary and capricious for it to conclude that "the offense was serious enough to warrant removal" and that Doe could not be rehabilitated successfully while maintaining her position with the VA. A.R. 970. Because the Board ultimately "examined the relevant data and articulated a satisfactory explanation for its decision," the Court must uphold the penalty chosen. Doran, 768 F. App'x at 353.

## IV.  Conclusion

For the foregoing reasons, the Court will deny Plaintiff's Renewed Motion for Summary Judgment, grant Defendants' Renewed Cross-Motion for Summary Judgment, and enter summary judgment in favor of Defendants. A separate Order shall accompany this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge


Date:  August 10, 2022